UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:24-cr-01040-ROS |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 8, 2024 |
| Alexandra Gehrke, | ) | 1:23 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE DEBORAH M. FINE, MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

CONTINUED DETENTION HEARING

Transcriptionist:
Elva Cruz-Lauer
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

A P P E A R A N C E S


For the Government:

            U.S. Department of Justice - Criminal Division
            Public Integrity Division
            By:  SHANE RITCHIE BUTLAND, ESQ
            1400 New York Ave. NW, 12th Fl.
            Washington, DC  20005

            U.S. Attorney's Office
            By:  MATTHEW WILLIAMS, ESQ.
            40 North Central Avenue, Suite 1800
            Phoenix, AZ  85004

For the Defendant Alexandra Gehrke:
            Lowther Walker LLC
            By:  JOSHUA SABERT LOWTHER, ESQ.
            101 Marietta St. NW, Ste. 3650
            Atlanta, GA  30303

UNITED STATES DISTRICT COURT

INDEX

SUMMARY OF COURT PROCEEDINGS                          PAGE:

Argument presented by Mr. Butland                    10,38


Argument presented by Mr. Lowther                    25


Ruling by Judge Fine                                 40

INDEX OF EXHIBITS


| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 1 | Handwritten Notes | 17 |

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

THE COURT:  Good afternoon, everyone.

Please be seated.

THE CLERK:  Case number CR24-1040-01, United States of America versus Alexandra Gehrke, before the Court for continued detention hearing.

MR. BUTLAND:  Good afternoon, Your Honor.  Good to see you again.  Shane Butland from the Department of Justice's fraud section, on behalf of the United States.  Also at counsel table is Assistant U.S. Attorney Matthew Williams.

THE COURT:  Good afternoon to you both.

MR. LOWTHER:  Good morning, Your Honor.  Joshua Lowther for Ms. Gehrke.  Ms. Gehrke is present at counsel table with me.

THE COURT:  And good afternoon to you both.

This is the time of the continued detention hearing.

Are there any housekeeping matters that we need to deal with, Mr. Lowther?

MR. LOWTHER:  Your Honor, I would like to briefly address the last hearing we had with the sealed document issue.  As far as I am concerned, and I will just preface with this, I believe the issue is resolved.  The Court struck the document from the record.  The Court has agreed not to consider it today.  I am fine with that.

But I do want to, just to be very clear, when the

Court asked me if I had received the document, I said I did not, or I wasn't served.

Ms. Gehrke's former counsel actually was served. So the filter team did serve him by email on the same day, of course, they filed the document. He just didn't realize he had an email, and therefore, he didn't get it over to me.

So I want to be clear, because I did say, no, I didn't get it, but that's the reason why. It wasn't by any fault of the filter team.

Regardless, the filing -- and I know we are not here to litigate that -- but I mean, the filing is a bit inexplicable, just from my perspective.

After having an opportunity to discuss it with Ms. Gehrke, and of course with Mr. King's counsel, who is actually present in court today, we believe it is a privileged document.

It's -- this is all I will say, it is absolutely not what the government purported in its motion that it is, and therefore, we don't believe the attorney-client or the crime-fraud exception to the attorney-client privilege applies.

I say all that, because I understand that the Court directed me to provide that to Mr. King's counsel, which I did, but I did that with an understanding that at this point, there's a joint defense agreement. I don't want that to waive privilege for purposes of today, or really for any purpose,

until we get to that point.

That was a little longer coming out of my mouth than I had in my head, but I just wanted to be clear about those issues.

THE COURT:  Thank you.  It's always, for me, longer coming out of my mouth than it is in my head, so I well understand that.

Mr. Butland, are you in agreement with my entering an order that the provision of the materials to Mr. King's counsel is not a waiver of any privilege?

MR. BUTLAND:  Yes, Your Honor.

THE COURT:  Thank you.  And Mr. Lowther, does that satisfy your concerns?

MR. LOWTHER:  Yes, Your Honor, it does.

THE COURT:  Thank you.  So we'll have, in the minute entry, I am ordering that Mr. Lowther's provision of the stricken documented materials to Mr. King's counsel is not a waiver of any attorney-client privilege, and the minute entry will also note that the prosecution has no objection to such an order.

And I did understand, Mr. Lowther, exactly what you told me of what happened.  I understood when we left here last time, that the first time you spoke, you didn't have it.  And the reason for that turned out to be, from what Mr. Butland later explained, was that the filter team had sent it to your

client's former counsel or local counsel, and he had not recognized it as being different from the memorandum that was filed on that public document, and therefore, my understanding was, from last time, that hadn't even opened it, let alone forwarded it to you, believing that you had the other memorandum.

But in any event, there was no idea at any point in my mind that the -- that at all you were not forthright with the Court, and I believe at all times that you were.  And as I was last week, very forgiving of Mr. Ramos for having made that error, I think that those kinds of things are inevitable in this day and age to happen from time to time, given the sheer volume of emails and attachments that the lawyers receive and are pressed to respond to on a day-to-day basis.

And as I stated previously, to me, the stricken materials were, in any event, provided or not, completely out of order.  They are stricken.  They are not considered.

And my focus was the other reasons that they appeared to be out of order rather than only that I believe they hadn't been provided to any of the defense counsel.

Does that resolve all of the housekeeping issues from your end, Mr. Lowther?

MR. LOWTHER:  Yes, Your Honor.

THE COURT:  Thank you.

And Mr. Butland?

MR. BUTLAND:  Just very briefly on the submission to the Court.  It's my understanding that the filter team believed there may have been a crime-fraud exception to the material provided, which is why it was submitted to Your Honor simultaneously with defense counsel.

I understand that Your Honor does not feel comfortable finding such an exception without litigating the issue further, and because of that, you know, we are completely amenable to this Court disregarding that filing in its entirety and just proceeding based on arguments made today.

But I just wanted to clarify the rationale for providing it to the Court in the first instance.

THE COURT:  I want to reiterate -- I appreciate that, Mr. Butland, and I realize you have nothing to do with that.  But I am going to reiterate that the filing violated binding precedent from the Ninth Circuit and the United States Supreme Court regarding how such matters are to be handled.

And while I can well understand Mr. Ramos' oversight in what had occurred, it is distressing how the filter team was either unaware of or disregarded what I believe to be very clear law on how -- on one, the filter team's role, and two, the procedures that they are supposed to follow.

Now, you are not the filter team.  That was my big takeaway from the stricken document.  That would be what I -- as a remnant of what's in my mind from what occurred, I hold it

against neither party. Neither party is responsible for that occurrence.

Also, as I made very clear, when I say "the filter team," I hold that to counsel. It appears to me that particularly underscored by Mr. Lowther's statements today, the agents acted appropriately in providing those documents to the filter team.

So with that, unless there's something else, we will proceed with the detention hearing.

MR. BUTLAND: Just a last housekeeping matter. Pursuant to the Court's order last week, I did provide the affidavit in support of the residential search warrant to both Mr. Lowther, as well as Mr. Altman, saved for the redacted portion of material that was sealed by a different court.

I also provided the search warrant itself and all of the attachments. I just wanted to make that clear for the record.

THE COURT: Okay, thank you. And everything went as anticipated with that, Mr. Lowther?

MR. LOWTHER: Received. Yes, Your Honor.

THE COURT: Okay, thank you. If anyone wishes to bring any of that to the Court's attention in any way for the detention hearing, you must proffer -- at the time last week that the number was provided, it appears to be an inaccurate number. There's some delay in filings under seal being

uploaded anyway by the clerk's office.

So just so everyone knows, don't operate from an assumption that I have any of that information.  But I think that that production was appropriate for counsel to be able to present what they believe is relevant and appropriate for the detention hearing.

The government is seeking detention here on the basis of serious risk of flight, and the government may proceed with any evidence, proffer, argument it has on the issue of detention.

MR. BUTLAND:  Thank you, Your Honor.

So as Your Honor is well aware, there's a two-step inquiry determining whether detention is appropriate based on risk of flight.

First, whether the defendant in fact presents a serious risk of flight, and then secondly, whether there are any conditions that would assure her return to court.

The Court is to consider four separate factors:  The nature and circumstances of the offense; the weight of the evidence; the history and characteristics of the defendant; as well as the nature and seriousness of danger posed by the defendant's release.

I know Your Honor has reviewed the indictment, so I will not belabor those allegations, except to say that, in terms of the nature and circumstances of the offense, the

charges against this defendant demonstrate a serious, sophisticated, and massive fraud scheme whereby this defendant, and her codefendant, caused the application of highly expensive wound grafts to dying Medicare beneficiaries to steal money that's meant for legitimate medical care for the elderly and disabled patients who receive coverage under Medicare.

This defendant was the co-owner and CEO of Apex Medical.  She paid volume-based commissions to a fleet of sales representatives who were charged with identifying these hospice patients, and other Medicare beneficiaries, in the Arizona area, going out, assessing those patients' wounds, and ordering wound grafts to be placed on those patients.

These sales representative had no medical training, and yet were tasked, by this defendant and the codefendant, with assessing the wounds and ordering the appropriate number of grafts.

There's evidence that this defendant directed the sales representatives to order grafts dramatically exceeding the size of wounds, to order grafts for wounds that didn't need them, and that were medically unnecessary.

Those --

THE COURT:  Can I --

MR. BUTLAND:  Yes.

THE COURT:  So Mr. Butland, how does that aspect of the nature and circumstances of the alleged offenses relate to

serious flight risk and conditions?

MR. BUTLAND:  I was providing a basis for the charges, Your Honor.  I can get to the additional factors moving on.

THE COURT:  You don't need to move on.  I know you will get there, so I just didn't want to skip over that connection.

MR. BUTLAND:  I will address that directly in just a moment.

These Medicare beneficiaries identified by these sales representatives were then referred to the defendant's own company, Apex Mobile Medical, and APX Mobile Medical, which was co-owned and operated by the codefendant, and this defendant's husband.

They then paid nurse practitioners to just apply whatever grafts were ordered on the patients without conducting any meaningful assessment of the patients, without coordinating with the primary care physicians or any other medical professionals who dealt with these patients, without reviewing any medical records whatsoever, and without providing any independent medical assessment of these patients.

Between November of 2022 and May of 2024, these defendants caused $900 million in false and fraudulent claims to Medicare for these amniotic graphs.  Medicare paid over $600 million based on those false and fraudulent claims.

So where this ties into a factor for risk of flight,

is that these are crimes of deceit.  The defendant, as the authorized representative of Apex Mobile Medical, falsely certified to Medicare that she complied with its rules and regulations.

They lied to the patients as to necessity of these grafts, and then submitted these false and fraudulent claims month after month after month, to the tune of almost $1 billion.

The defendant is charged with eight counts in the indictment.  The top count, conspiracy to commit health care fraud and wire fraud, carries a 20-year statutory maximum.

The combined sentences for all of these charges is 85 years' incarceration, and the sentencing guidelines are life.

So I submit to Your Honor that you may consider the seriousness of the charges, as well as the sentencing exposure when determining whether that presents a risk for this defendant to flee.  Certainly facing 85 years in prison would provide such an incentive.

The second factor is the weight of the evidence.  The weight of the evidence in this case is extremely strong.  It consists of cooperating witnesses, audio and video recordings, internal company documents, bank and financial records, medical records for patients to whom the grafts were applied, and statements from health care professionals and other family members whose loved ones received some of these grafts.

The indictment itself actually specifies, you know, some of this direct evidence. In paragraph 29J there's a quotation from the defendant directing the sales representatives that, "You will order an allograft 4 by 6 centimeters," which is the size of my little fingernail.

When we turn to the history and characteristics of the defendant, this defendant has lots of money. Her company has received over $240 million in kickbacks from company 1, for the marketing and purchasing of its allografts. $100 million of that was diverted to this defendant's own personal bank accounts.

As Your Honor knows, and I will get into a little more detail, several search warrants were executed the day after this defendant's arrest. $60 million was seized from this defendant's accounts. That included $52 million in 11 bank accounts in her name, plus an 8-million-dollar life insurance policy.

That leaves $40 million unaccounted for, based on the way this defendant was shifting money around between various banks and bank accounts in the names of LLCs that did not serve any legitimate business purpose.

It appears, based on the evidence, that this money had been moved around specifically to conceal it from authorities.

The government is aware that as of June 1st, there was almost $14 million in an account that's currently accessible by

the defendant who was unable to be traced.  So she still has a substantial amount of proceeds that she could use to flee the jurisdiction and live a life of luxury as a fugitive.

THE COURT:  You said there's $14 million that's not been seized?

MR. BUTLAND:  Correct.

As a highlight in the detention motion, there's evidence that this defendant and her codefendant were aware that criminal charges were imminent, and they made preparations to flee.

So this defendant and her husband, the codefendant, were arrested at the Phoenix airport just prior to boarding a flight to London.

In the carry-on luggage was a criminal law handbook, which ordinarily would not be possessed by individuals going on a European trip of any length, and three phones.

The defendants also had their own personal phones on their persons at the time of the arrest.  So there were three additional phones in their carry-on luggage.

The defendant gave a glimpse as to why she possessed these phones in a notebook that was seized from her residence upon the execution of the search warrant there.

There was a date book that was contained in the residence with the defendant's handwriting.  In an entry, on November 22nd, 2023, the defendant noted that she had purchased

burner phones.

I think that provides substantial evidence that these phones were concealed in the carry-on luggage in order for the defendant to have various means of communicating with people that may not be detected by law enforcement.

A notebook that was found on the kitchen island of the residence had a note to the defendant's housekeeper.  In addition to instructions about pet care and things like that, there's a note that said, "Please notify of indictment or any further harsher legal escalations."

There's also a book in this defendant's office closet that was entitled, How to Disappear, Erase Your Digital Footprint, Leaving False Trails, and Vanish Without a Trace. And there was $100,000 in cash in one of the safes.

It was clear that this defendant had made arrangements that if these charges were brought while she was traveling to Europe, that she was to be notified by the housekeeper, and had several burner phones that she could use while she was abroad.

Search warrants were also executed on three safe deposit boxes that were in this defendant's name, as well as the codefendant's name.  There were also a couple of additional parties who were added to the safe deposit boxes as authorized users.

One of them was the defendant's mother, and a second one was a friend, who I will get into in just a second.

In one of the safe deposit boxes were USB or flash drives that appear to contain cryptocurrency.  Based on the presence of a passcode book, the crypto passcode book in with the USB drives.  There were also instructions to anyone who had access to the safe deposit box as to how to transfer the cryptocurrency to the defendant, once she gave them the pass phrase.

These instructions were written on Post-it notes that were contained in the safe deposit box.

Another document which I did not cite in the detention motion, but I have since come across, is an exhibit that I (inaudible) to the Court and provided a copy to defense counsel last week prior to the hearing.

These handwritten notes --

THE COURT:  Are you moving to admit Exhibit 1?

MR. BUTLAND:  Yes, Your Honor.  Thank you.

THE COURT:  And Mr. Lowther, any objection?

MR. LOWTHER:  No objection.

THE COURT:  Exhibit 1 is admitted.

(Exhibit Number 1 is admitted.)

THE COURT:  And before I look at it and you talk about Exhibit 1, can we rewind back a little bit.

So there's 40, 4-0, million dollars unaccounted for. And then you said, I think it was 14, 1-4, million dollars that's not been seized that's in a bank account; am I right

about that?

MR. BUTLAND:  That's correct, Your Honor.

THE COURT:  And then a lot of what you are proffering, which is fine, is in the motion for detention, which now I have had opportunity to thoroughly look through.

A question I had and still have is, notes for the housekeeper?  I mean, I -- why does the government think that it's for the housekeeper?  And I guess being someone who doesn't have a housekeeper and therefore no relationship with one, it seems to me that those notes seemed rather personal and extensive for someone who cleans your shower.

So can you elaborate on why the government thinks that these are notes for the housekeeper?  And when the government says "housekeeper," is there more of a relationship there, like a personal-assistant type relationship?

MR. BUTLAND:  Your Honor, I was also surprised that there would be a note to notify the defendant of an indictment while she was traveling, written on handwritten notes on the kitchen island.

But the reason why I surmise that it was to the housekeeper, is because above that highlighted quote in the detention motion, you can see, you know, "Please check on the house."  There's a note to check in on the pet sitter between the time that the defendant would be traveling, you know, once a week or twice a week.  She would get the pet sitter a house

key to get them a door code and the garage code.

So the presence of that particular note, in terms of notifying about an indictment, was in the same, you know, handwritten note concerning pet sitters and garage codes and house codes.  That's the reason why we believe it was to a house sitter.

THE COURT:  Okay.  Because my inference in looking at that note, and it really puzzled me, was that looked like the kind of note that someone leaves for a person that they have a closer relationship with than someone who would clean their kitchen and bathroom.

For example, a close family member or friend that would have a house key.  You know, the idea of, you know, folks who are on your emergency contact list, generally are not your housekeeper, are generally family, friends, and the like.

So this looks like the kind of note for someone who would be on the, metaphorical and literal, emergency contact list, rather than a housekeeper.

And so is there any other information that the government has about who the note appears to be directed to?

MR. BUTLAND:  No.  And Your Honor may be correct, it could be left for somebody with a closer familial relationship to the defendant.  But I think the operative point is the notification provision, that, you know, the defendant believed that -- it appeared she believed that charges were imminent and

wanted to be notified, and even thought she could be charged as soon as, you know, her trip to Europe.

So I think that that was really the takeaway that I took from this handwritten note.

THE COURT:  Thank you.  So now we are to -- Exhibit 1 is admitted, and I'm looking at Exhibit 1.

MR. BUTLAND:  So, Your Honor, I do not argue that this is in the defendant's handwriting.  In fact, based on the other evidence we have, I don't believe it is.

But this note was in a folder within the same safe deposit box as proceeds from the fraudulent activity, included jewelry, designer jewelry, gold coins, silver bars, and substantial amounts of cash, tens and thousands of dollars' worth of cash.

On this document, under recommendations, about half page down, there's a note about dual citizenship in Malta, and below that, banking vis-à-vis Cook Islands to Swiss banks.

So as I learned, individuals can purchase citizenship for Malta.  You can buy Maltese citizenship, and that enables you to travel to any country within the European Union without additional paperwork.

And then of course there's reference to Swiss bank accounts.  Those are secure bank accounts, largely out of the reach of American authorities.  So these notes, taken together, in the defendant's safety deposit box, with fraudulent

proceeds, demonstrates that, you know, she was looking to have dual citizenship, possibly stay for an extended period of time abroad, and also planned to put a substantial amount of money -- it looks to be about $10 million, if you look to the right margin next to the Swiss bank account notation, into Swiss banks.

While discussing the nature and characteristics of the defendant, I think it's important to note that this defendant's apparent very good friend owns a private plane. And I noted in the detention motion, there is a photo shoot conducted at the Scottsdale airport with this defendant and her friend's plane.

This friend was also involved with the companies alleged to have committed fraud as outlined in the indictment. Bank records reflect that this friend made over $3 million during the course of this fraudulent scheme.

This friend was also an authorized user on the safe deposit boxes that contained the fraudulent proceeds, including the safe deposit box with the cryptocurrency, and the instructions with respect to how to transfer that money.

THE COURT: If it was there, I missed the name of the friend. Maybe we are not saying the name of the friend. The statutory agent listed at the bottom of -- towards the bottom of page 2 of doc 10, June 20th, 2024 Pretrial Service Report, is that someone with any significance, or is that just a stat agent, like someone who's in the business of being a statutory

agent?

MR. BUTLAND: So the friend's name is Jamie Tryba. I don't believe she was mentioned in the Pretrial Services Report.

THE COURT: Thank you.

MR. BUTLAND: But of course in traveling on private aircrafts, you know, there's no electronic tickets required. You don't go through security, making it extremely easy for this defendant to get a flight on her best friend's plane, who had access to the fraudulent proceeds, access to the cryptocurrency, and flee the country without detection by law enforcement.

And then the last point were the lies contained in the Pretrial Services Report to Pretrial Services during the interview.

The defendant stated that her net worth was $17 million. As I proffered to Your Honor, $60 million was seized in one day on June 18th alone. So even limiting her misrepresentation to the amount of money that was seized, that's about 30 percent of the amount of money.

And as I indicated, there's an additional $14 million in an account that we know of right now, and, you know, likely almost $30 million that we have just not been able to identify yet.

The defendant also lied about her drug usage. The

report indicates that she initially refused to submit to a urinalysis test.

After several hours she finally consented.  She tested positive for methamphetamine, and then told the Pretrial Services officer that she doesn't take methamphetamine, thereby refuting, you know, the urinalysis results.

THE COURT:  That's a screening urinalysis.  That's not sent off to the lab for testing, correct?

MR. BUTLAND:  Correct.  Correct.

And then with respect to the foreign travel.  You know, she indicated that her last foreign travel was to the Bahamas in February or March of 2024.  It is true that she and the codefendant did travel to the Bahamas, I believe, in early March of 2024.

But they also traveled to Mexico by vehicle on March 31st, 2024.  And, you know, this defendant could simply walk across the border, if she was issued a bond, and be out of the reach of United States law enforcement.

So just to conclude, it's hard to imagine additional facts that would make this risk of flight more likely.  We've got millions of dollars in bank accounts that have not been seized by law enforcement.

Cryptocurrency in safe deposit boxes with instructions to transfer it to her.  A book literally telling her how to disappear without a trace.  We've got notes to somebody who has

access to her house, to notify her in the event of criminal charges.

A criminal law handbook and burner phones in her carry-on luggage. Access to a private plane from a friend was close enough that she was also granted access to the safe deposit boxes with the fraudulent money, and who made $3 million from the scheme that the defendant is charged with.

She has foreign travel, including unreported travel to Mexico, and then misrepresented --

THE COURT: What more do we know, if anything -- what more does the government have to proffer about that Mexico trip?

MR. BUTLAND: All I know is that there was a border stop and it identified the location in March -- at the end of March.

THE COURT: Thank you.

MR. BUTLAND: So all of this to say, Your Honor, that the government submits that there is no condition or combination of conditions that will assure this defendant's return to court.

She has the means and the friends to be able to flee the jurisdiction and live very comfortably abroad, and for those reasons, detention is appropriate here.

THE COURT: Thank you, Mr. Butland.

Mr. Lowther, do you have any evidence, proffer,

argument?  You may stay there, or you may come to the podium.

MR. LOWTHER:  Proffer, Your Honor.

THE COURT:  Thank you.

MR. LOWTHER:  As Mr. Butland mentioned, as the Court knows better than I, this is not a presumption case.

So 3142 requires the government to prove, by a preponderance of the evidence, that there's no condition or combination of conditions that will assure Ms. Gehrke's appearance in court, or prove by clear and convincing evidence that there's no condition or combination of conditions that will protect any other person or the community if she is released.  And very respectfully, the government hasn't met either burden.

THE COURT:  And so we are not here about the clear and convincing evidence standard.  The government is not requesting detention.  This is the first time in what we would consider what's, I think it's is a very outdated term, but a white-collar case where the government has not argued unsuccessfully to me that they can seek detention based on danger.

So we are not dealing with -- I read the Bail Reform Act that for this kind of crime, it is not only not a presumption case, it is not -- for these crimes, the government can't argue for detention based on danger; therefore, we are only looking at the preponderance standard.

I do believe that if I release someone on conditions, I read the Bail Reform Act to not allow me to detain someone based on danger in these circumstances, but to set conditions that address danger, and they need to be least restrictive.

MR. LOWTHER:  I agree, and that was my very next line.

So since we do agree on that, and that is my understanding, the Court is correct, obviously, I would like to talk about the statutory factors first, address the government's argument, and then I would like to discuss the proposed conditions that I do believe would be appropriate in this case, conditions of release, obviously.

So for the statutory factors, the nature of the offense.  Obviously it is a health care fraud conspiracy.  It is a financial crime.  It's serious, but candidly, all federal felony cases are.

What it's not is a crime of violence, sex trafficking, terrorism, and it doesn't involve violence -- excuse me, a minor victim, controlled substance, or a firearm.

And I mention that because obviously in the statute, you know, Congress sought fit to specifically enumerate those types of offenses for the Court to give greater consideration before bail is set.  We are not in that category whatsoever.

Yes, it's a serious case, but again, all health care fraud cases are.

Weight of the evidence.  The Ninth Circuit, and really

27

all circuits, say that that's the least important factor in these cases, for obvious reasons.  I mean, the evidence, at this point, always is ostensibly strong.

She was -- Ms. Gehrke was arrested on June 17th.  She has been in detention, obviously, the entire time.  The discovery process hasn't begun.  So we don't know what evidence actually the government has so we can challenge that evidence.

Not to belabor that point, because I know the Court well understands it, but, for example, the kickback component, if you want to call it, of this case is a substantial part of loss.

Well, it just so happens, for example, that Ms. Gehrke sought advice on how to bill from company 1, and company 1 had sought advice from two prominent health care compliance law firms, which passed that advice to Ms. Gehrke.  Is that our defense in the case?  I have no idea.  But that's just one example that when we have an 87-page complaint, and we have a 21-page indictment, obviously the evidence looks overwhelming at that point, but it is not always.

And again, I think that should be the least factor. If the Court gave any undue weight to that, nobody would be released on bail essentially in any case.

More importantly, the history and characteristics of the person.  Ms. Gehrke is a person of good character.  She has an excellent reputation in her community.  There's absolutely

no evidence to controvert that.  As a matter of fact, her family is present in the courtroom today to support her.

Physical and mental condition.  She's in excellent physical condition.  That was reported in the Pretrial Services Report, and she is in good mental condition.  She was diagnosed at 14 with ADHD.  She suffers some mild anxiety.  But she treats -- or she manages both of those issues with prescription medication.

Now, she takes daily medication for ADHD, and for anxiety only as needed.  She also has not had any of the prescription for the ADHD since, you know, she's been detained.  But of course that's how she actually manages that issue.

I say that because obviously it's important because it was mentioned in the Pretrial Services Report, and I know it is a consideration for the Court.

Employment.  She has worked in the medical sales field for years.  She wasn't working at the time of her arrest because she had sold her company.  I say that simply because that's not exactly unemployed.

If the Court sees fit to release her on bail, she's certainly employable.  She can find and maintain gainful employment the entire time that she was on release.

Financial resources.  The government has essentially seized her assets.  When I say "essentially," as far as I can tell, the government has all of her assets.

I don't know exactly, and there are two parts to this, because number one, the government says there's money out there that we don't know about. And more importantly I think, is that the government alleges that Ms. Gehrke was less than candid with Pretrial Services.

But we know the situation where Ms. Gehrke obviously didn't know she was going to get arrested on June the 17th. She was detained, and Pretrial Services interviewed her for the bail report. I mean, that's just how it happens.

But in cases -- in different types of cases, in drug cases and gun cases, what assets do you have? Well, the money that the police took from me when I just got arrested.

You know, she doesn't know -- well, she knows now, because obviously she and I have been discussing the case, but in the moment she didn't know what the government had seized; what the government didn't seize.

So nonetheless, you know, to say that her being less than candid in that circumstance, I don't think that's an accurate picture of the situation.

Regardless, if there is any money that she has, she can't use it. If she trans- -- I mean, the government says, all of this is traceable to a fraud. If she transacts anything with proceeds of a fraud, obviously it's money laundering. Not to mention it would obviously be a violation of conditions of any release this Court sees fit to set.

What the Court can do, and I will get to the conditions later, but as we are talking about it now, the Court could order her to provide a financial accounting.

I mean, she can't do it off the top of her head, it's a little too complex, but I can consult with her accountant, financial planner. We can present that information to the Court. We don't have any issue doing that whatsoever.

But for the third time, and I apologize for belaboring it, to say that she was less than candid under the circumstances -- and there's no other way Pretrial Services can do this, you have to meet the person in detention and ask, but I'm just saying, in this particular case, I don't think that -- I know that wasn't Ms. Gehrke being less than candid.

Length of residence in the community. She is a lifelong resident of Phoenix, with the exception when she was in California for four years for school and a short work. Her immediate and extended family. Again, some who are present in court, all are from and have lived and continue to live in the Phoenix area.

I am learning the geography here. As I understand, Scottsdale is close also, but it's still in the area. Certainly live in the District of Arizona.

THE COURT: We consider it all the valley.

MR. LOWTHER: Now I know. And I will know how to reference it next time. Again, her friends and colleagues live

here.  Her late father was member of the bar in Arizona, in Phoenix.

And, you know, among her family, her mother is present in court today.  She has been with her every time.  I say that, because obviously the family is very supportive, and they are here, and they'll do whatever they need to do to support her while she deals with this case.

Past conduct and criminal history.  She has no criminal convictions.  At 38 years old, she has never been accused of a crime until now.  And notably, the allegations in this case are for the past two years.  So that's a pretty good record of never, again, not only not having been convicted, but never even charged with a crime.

Record of appearance in proceedings.  Very straightforward like the last.  She has never had any proceedings to fail to appear, and she wasn't under any supervision at the time of arrest, because obviously, she has never been convicted of a crime.

Nature and seriousness of the danger to any person or the community.  The Court addressed this earlier.  There's just simply no evidence that she poses any danger to the community that the Court would even need to address in any condition of release if you saw release was fit.

The government's argument.  You have read obviously, the government's motion for detention.  You have heard the

government's argument.  I don't want to go bit by bit, because I think we can do that for a long time, both sides.

But just to give four examples.  She was fleeing the country.  If the government didn't say "She was boarding a flight to never come back," it certainly implies that was a possibility, and that simply is not what happened.

She was going on a honeymoon with her husband, Jeff King, codefendant in the case.  The smoking gun note that the government references said it was a 36-day trip.  She obviously planned on returning, and she had a return flight.  She had already booked that.

And of course if you are going to flee the country, England, Italy and Greece, they aren't the best locations that she should do that.  Obviously, if there were a pending arrest warrant, if she was in any one of those countries, she would be arrested, detained, and extradited to the United States, barring any exceptions.

That's not the situation where, for example, she is a foreign national, even lawfully present in the United States. I have had that issue, and I understand that's sometimes insurmountable.

For example, if you are a -- I am just thinking of this from the last case, if you were a Ukrainian national and you are lawfully in the United States, if you happen to get back to Ukraine, doesn't extradite any of its citizens no

matter what.  That's not the situation here.  Obviously she is an American citizen.

So it's not that she has a place abroad where she can go.

Instructions to access cryptocurrency.  Those instructions were much like what the Court observed.  And I was going to make that point, on the note.  I mean, you're going on a 36-day trip.  You essentially leave instructions about what to do with your house.

I mean, obviously there are -- there are exhibits in that motion for detention I prefer not to deal with, but that's not what they actually were.

And again, like the cryptocurrency, the government has that, but the notes, this is how to access this.  What if she got hit by a bus in Greece, and I am not trying to be cute by that, but all of these things -- check on this, the house. Here is access to the cryptocurrency.

That's not a note to a housekeeper.  That's someone who is going on a one-month-plus trip, albeit she's planning on returning.

Access to a private plane.  My last point.  I understand and I appreciate the government's advocacy.  I get that.  But that is one of the best examples that the scenario -- that the situation isn't what it is.

Here is a private plane, granted, but if you are going

to flee the country on that plane, I mean, you saw a picture of it.  You are going to have to do it 250 miles at a time every time you stop to refuel.

Her friend, who owns the plane, is not a pilot.  So you are going to have to not only figure out the logistics of escaping on this plane, but you're going to have to find a pilot who is willing to be charged, I guess, in the concealment phase of a $900 million health care fraud conspiracy to do that.  It's just not logical that these are steps that she would take.

And not only is it not logical that these are steps she would take, she could not do that.  And again, I agree, we concur with Probation's recommendation on release.  I do think that there are some additional conditions, and I am not trying to argue against myself, but essentially Probation recommends -- or Pretrial Services recommends an unsecured bond with the standard conditions and home detention.

And of course I believe that's sufficient.  I mean, if you think about that, Ms. Gehrke would be released to her residence.  If she is on home detention, the only way she can be on home detention, obviously is with an ankle monitoring, which is location monitoring.

Her passport is already in the government's possession.  She has no other travel documents.  She wouldn't be able to obtain any other travel documents.

And I don't want to use this word -- I don't want to be hyperbolic, but it is almost farcical to think that Ms. Gehrke, with no passport, no travel documents, could, you know, cut off an ankle monitor and somehow escape the country before she was arrested. I mean, it's just -- it's not that easy.

It's just like the $350,000 that the government says we found in her house in a lock box. I guess someone could live comfortably abroad on $350,000, but she didn't take the money with her. The government has it now, and it's not that easy to get any money, much less $350,000 abroad, if you wanted to do it.

I am just saying, logistically -- while again, that's why I say, I understand, I appreciate the advocacy, but practically it's just not feasible.

What the Court could do, is the Court could set -- if the Court is not comfortable with a personal recognizance bond, the Court could set a $1 million unsecured bond. Obviously, Ms. Gehrke's responsible for that. It's her bond.

Ms. Gehrke's mother, who is present in court today. She could be a cosigner on that bond. She's also willing to be a third-party custodian.

I understand that Pretrial Services has interviewed her about what it means -- what the obligations of third-party custodian are, and she's willing to do that.

If the Court has any concerns about Ms. Gehrke's being released to her own residence, she can stay with her mother. Her mother owns a home here. It is very close to the courthouse. Obviously --

THE COURT: Isn't that where your client's driver's license returns to, and is your client the owner?

MR. LOWTHER: She's not, Your Honor. She deeded that house over to her mother, and it's -- her mother is the sole owner of the residence now.

THE COURT: Is there any lien on that residence?

MR. LOWTHER: There is not.

So nonetheless, I mean, I do think Pretrial Services' recommendation is appropriate, but again, the Court can certainly make that personal recognizance bond an unsecured bond. That is not a situation -- well, I mean, it's not even like a surety bond, for example.

I mean, if someone wants to flee, of course they're going to post the money and go. She's not going to do that. But the last thing she is going to do is ever leave her mother, her family member in a situation like that.

So essentially, she has everything she needs already in place, which again, would assure the Court she has a place to be. You know where she is.

When I say, "All the standard conditions of bond," again, the Court is more familiar with those than I. But

again, she would have to seek and maintain gainful employment, not commit any federal, state, or local crime, and of course, report to Pretrial Services.

Lastly, if there's any concern, she did screen positive for amphetamine and methamphetamine. Ms. Gehrke denies any use of methamphetamine, but certainly the positive test for the amphetamine was based on her Adderall.

Nonetheless, for mental health issues or any drug issues that the government mentioned, the Court can order drug and alcohol screening and counseling is recommended, if and as recommended by Pretrial Services. The same with drug -- drug screening, excuse me, and counseling treatment if necessary.

So essentially, I don't want to speak too broadly, but you -- we don't agree with the scenario that the government presents, obviously.

But you could believe all of that and there still would be conditions -- a condition or combination of conditions, rather, that would assure Ms. Gehrke's appearance and would protect the community very clearly. And we would ask that you set those conditions for release.

THE COURT: Thank you, Mr. Lowther.

Mr. Butland, any additional argument? And you may also feel free to come to the podium.

MR. BUTLAND: Thank you, Your Honor.

THE COURT: It may seem like I bite, but I don't.

MR. BUTLAND:  Just a couple of very, very brief points in response.  Defense counsel noted that the defendant did not know how much money was seized at the time of her arrest, which to me makes her lowballing of her net worth to Pretrial Services even that much more egregious.

Had she known that $60 million was seized, you know, maybe some kind of colorable argument could be made that only $17 million was left.  But there was $60 million sitting in accounts in her name that was taken by the government, seized by the government, that she didn't know was seized, and still told Pretrial Services that she only had $17 million.

I think that kind of just underscores the lack of truthfulness and candor that she had with Pretrial Services.

Defense counsel never addressed the presence of five phones on her -- in her carry-on luggage, the criminal law handbook with her when she was flying to Europe, as well as the book on how to disappear without a trace.

I never argued that at the time she was arrested at the Phoenix airport, she was going to flee the country for good.  What I did say, is that she had set things in place, that if she wanted to stay in Europe, she had the ability to do so.

She had people with access to safe deposit boxes who could transfer money.  She had money that the government was unaware of, tens of millions of dollars.

She was looking into getting Maltese citizenship to transfer $10 million to a Swiss bank account. And defense counsel says that, well, you know, she didn't take her cash with her which would have been an indication she tried to flee.

You can't travel with over $10,000 in cash without reporting it. There's over $367,000 in cash found in the defendant's residence and her safe deposit boxes. This was cash that people don't normally keep around their homes.

Those -- that amount of money, I submit to you, was specifically set aside for the purpose of fleeing if things got tight and her bank accounts were seized as the government had done.

So the last couple of points. The defendant's mother is not a good cosignatory for any kind of a bond if this Court was entertaining that argument. The defendant's operation was run out of her mother's house in the very beginning.

Her mother was a paid employee of these companies that the defendant owned and controlled, and herself made a substantial amount of money, over a million during her time with the companies.

So she was, you know, I submit to you, based on her relationship with her daughter, very aware of what was going on. She saw her daughter come into extraordinary wealth, profiting off of it herself, and then was also one of the four people who had access to those various safe deposit boxes that

contained the fraudulent proceeds and the cryptocurrency instructions.

So all of this is to say that there does not appear to be any kind of reasonable explanation for some of the facts that the government presented, in terms of the books that she had, the phones that she had, and there is no way for us to assure the defendant would remain in the District of Arizona with the amount of means she has and her close friend with a plane.

So thank you, Your Honor.

THE COURT:  Thank you.  Mr. Lowther, I am going to give you the last word, if there's anything that you want to add.

MR. LOWTHER:  No, Your Honor.

THE COURT:  Thank you.  This is a detention hearing. It is not a trial.  It is an early hearing for the Court to determine whether the defendant should be released pending trial, and if so, on what conditions or whether the defendant should be detained as the matter proceeds.

Nothing that I say today is intended to or should be construed as affecting the defendant's presumption of innocence.  At all times, the defendant is entitled to the presumption of innocence.

And when we were -- when the lawyers and I were talking about this not being a presumption case, that was not

regarding the presumption of innocence.

It was regarding a very small group of cases under the Bail Reform Act where there are extra hurdles that need to be cleared in the analysis before someone can be released on conditions under the Bail Reform Act.  This is not a presumption case in that respect, but it is like all other cases where persons are facing charges at a detention hearing. A case where the defendant is entitled to the presumption of innocence at all times.

Under the Bail Reform Act -- well, first I want to start with a big picture of the Bail Reform Act, which is the Bail Reform Act is from the latter part of the 20th Century. It reformed bail so that persons would not be unnecessarily detained because they lacked the financial means to raise a bond instead.  And the United States Supreme Court has approved this as constitutional.

There is a system in the Bail Reform Act where the Court is, depending on the kind of case, to determine factors -- here only serious flight risk, not danger, for detention -- and use these guiding legal principles and factors, not monetary amounts alone, to determine if someone is released or detained pending trial.

It doesn't mean that a Court can't set bond.  Bonds are appropriate in some cases.  They're rarely appropriate in cases, at least we feel that, as I believe a bench based on

our -- based on our rulings in cases that we -- I rarely see anyone released with a signatory bond or a secured bond. Rather, bonds are reserved for cases where they are necessary as part of other conditions to reasonably assure the person's appearance at further court proceedings.

And there are cases where bonds are appropriate under the Bail Reform Act.  So the Bail Reform Act didn't completely eliminate bonds.  I will be talking a little more about bonds later because that's one of the things I need to consider in the analysis.

In the Ninth Circuit, there is -- when it's not a presumption case, when it's not one of those small group of cases, there is -- I wouldn't -- I don't know if you call it a presumption, but there's this -- there's a strong push to release people pending trial.

I believe our district does a good job of that, of following the spirit and letter of the law in evaluating cases under the Bail Reform Act.  Indeed, under the Bail Reform Act it was contemplated, and hopefully in practice is employed, that most people are released pending proceedings while -- meaning while their criminal case is being litigated.

And so with that backdrop, the Bail Reform Act requires that I determine whether by a preponderance of the evidence, which is essentially more likely than not, it's a fairly low legal standard for a criminal case.

Clear and convincing evidence for danger is higher. And of course for guilt later, beyond a reasonable doubt is an extremely high standard.

So preponderance of the evidence is basically more likely than not that the defendant is a serious flight risk; not just a flight risk, but a serious flight risk.

And flight risk can encompass nonappearance at court. It is not just leaving the district. It's not submitting oneself to the court proceedings, not appearing for court.

But it also means, what we believe in the larger sense flight risk means, which is someone actually fleeing, leaving, trying to avoid prosecution.

If the government shows by a preponderance of the evidence that someone is a serious flight risk, then the Court is to turn to whether there are conditions that the Court can set to reasonably assure appearance at further court proceedings. And I believe also, consider to impose conditions that reasonably ensure the safety of the community.

If the Court can set conditions that reasonably assure the person's appearance at further court proceedings, the Bail Reform Act requires that those be the least restrictive conditions that do so.

And as counsel for both parties have well pointed out, the factors that the Bail Reform Act requires the Court to consider include the nature and circumstances of the alleged

offenses, and that includes the possible penalties, which are extremely serious here.

The weight of the evidence against the defendant, but that's the least important factor in the Ninth Circuit and everywhere, underscoring that the Bail Reform Act is designed so that even people who appear very guilty at this early stage can be released pending trial.

The history and characteristics of the defendant, including the defendant's physical and mental condition, family ties, employment, length of the residence in the community, community ties, past conduct, criminal record, history of drug or alcohol abuse, record of appearance at prior court proceedings, and whether the defendant was on conditional release of some sort at the time of the alleged offenses.

Pretrial Services Division of the Probation office serves an important function in that Pretrial Services does interviewing, investigation, and prepares reports to the Court, which are informative.  The parties have the Pretrial Services Report and addendum.

The original Pretrial Services Report recommended detention pending electronic monitoring, investigation, and the addendum to the Pretrial Services Report recommends that the defendant be released on conditions.

Both of them assess the defendant as a risk of nonappearance and assess that there are conditions available to

the Court to reasonably assure the defendant's appearance at further court proceedings.

The Court is not bound by Pretrial Services' recommendation or suggested conditions or assessment even, but I take it into account as part of the factors, as well as importantly, the information that is in the Pretrial Services Report and addendum regarding the Bail Reform Act factors.

So here I have reviewed the indictment.  I reviewed the motion for detention, and I have considered everything that has been presented today in court.

I have also reviewed the codefendant's response to the United States' motion for detention, even though Judge Bachus is going to be hearing that tomorrow.

Some observations.  One is, Mr. Butland is right, that the defense did not address every single matter that the government has raised today in support of the argument for detention of serious flight risk, and that's the defense's prerogative.  They don't have to.

The burden is not on the defense.  And the burden is on the government, and there are multiple things that are in the defendant's favor.  Indeed, a lot of the proffers, circumstances -- not all, but a lot of the matters that the government has pointed to in support of detention can individually be argued away as less significant.

It's the Court's role to synthesize all of these

46

things and consider them both individually and also as a whole.

Here, the defendant has extremely strong ties to the community, and the defendant has absolutely no criminal record before these charges.  These charges are very serious.

The government proffers that they -- that if the defendant is convicted, the guidelines are so high it is an effective life sentence if the defendant were to be convicted and sentenced in the guideline range.

The defendant has incredible incentive to flee.  The defendant has -- so that's against the defendant.  The defendant -- I am going to just talk about the matters that counsel have raised and other things that I have observed in weighing the matters.

The defendant has strong personal ties, not just to this district, to people in this district.  What struck me in reviewing the indictment, in particular, and the motion for detention, is the alleged events are over a relatively short period of time for the amount of money that is at issue in the case.

I think that somewhere around -- mid to late 2022, to early to mid 2024, and the amount of money that is at issue is extremely large.

The extent of the alleged fraud, kickbacks, these are very large amounts of money.  What also struck me was the complexity of not only the underlying alleged events, but of

UNITED STATES DISTRICT COURT

the web of financial assets that the defendant had control over at the end of this very short period of time.

I found myself thinking over and over again, that's a lot to keep track of, and that the defendant is highly intelligent and was extremely organized.

Whether eventually the defendant is convicted of any crime, there's just no doubt that the defendant is capable of extremely complex business and financial and other planning and logistics.

Further, in considering the factors, the issue of the positive for methamphetamine -- and maybe I am discounting this too much -- but it's an initial drug test.  It has not been sent off to the lab.  And the defendant takes ADD or ADHD medication, and it seems to me, maybe I am wrong, that a false positive for a methamphetamine when we expect an amphetamine for one of the screening tests isn't terribly shocking.

Further, even if the defendant, who does have a previous serious substance abuse problem, is using/abusing methamphetamine, there are likely conditions that I can set that address that.

I don't think that substance use and abuse are the root of flight risk here.  Also, the information to Pretrial Services, what most concerns me about the Pretrial Services information provided regards the foreign travel.

That there's no mention of having been to Mexico after

traveling to the Bahamas in February 2024, and being arrested at the airport about to board a flight for the United Kingdom. That's distressing.

With the geographics of Arizona, I disagree with Mr. Lowther's proffer and argument that it's impossible, preposterous, or otherwise even very difficult to leave this district without travel documents. We are just several hours away.

We are like the movie Oppenheimer, time to get from here and cross over into Mexico, and you need not have any travel documents whatsoever to do that.

That the defendant has recently traveled to Mexico and did not report that to Pretrial Services is profoundly concerning to the Court in the context of the rest of the information before the Court.

The -- you know, we live in this time of cryptocurrency, and that creates this financial wild card for any kind of case like this, because it is so hard to know how much -- it is so easy in some ways to secrete, transfer, and it looks like the defendant has extremely trusted people that when she's leaving the district, knowing -- I mean, it is very clear she knows an indictment is coming and I want to -- and wants to be notified and has this elaborate system about hair dye -- she colored her hair, and all of this, again, extensive planning.

Given the amount of money, all of the information -- I

don't have to go through it bit by bit.  In the United States' motion for detention, and in the context of even the things in the defendant's favor, strongly -- like her ties to the district insofar as having lived here for a long time and having family and friends here, it's also that she doesn't have minor children of her own here.

And also she's recently transferred a lot of property, for example, to her mother, the residence that's been proffered.  When you look at the whole -- at all of it, there is just no question that by a preponderance of the evidence, indeed far more than that, this defendant is a serious flight risk.

There are tens of millions of dollars unaccounted for. $14 million that's not been seized, and who knows how much in cryptocurrency.

You know, Arizona is a -- you know, it's, unfortunately, a hub of the drug cartels.  So leaving Arizona through the airport with large sums of cash would be profoundly difficult.

But having trusted people left behind who could somehow get those in other ways to the defendant, I think that from this evidence it's clear to me that the defendant, one, knew that she was imminently to be facing extremely serious criminal charges.  That she had a large amount of money.

The amount -- the amount and in which forms, I don't

think that it may even be possible for the government to track down, given the age that we live in today.

And she had trusted persons, people close to her. Those very same people who have the ties, behind her notes in her own handwriting reflect that, that would do everything from check on the pet sitter, but also access the cryptocurrency and the cash.

I mean, this defendant is an extremely serious flight risk.  So I have to turn to, if there are conditions I can set that reasonably assure the defendant's appearance for further court proceedings -- and the conditions that are recommended by Pretrial Services are very restrictive for the kinds of conditions we see recommended in all kinds of cases, whether it is a serious violent crime or whether it's a financial fraud case that's very serious.

There is home detention recommended.  Of the four levels of electronic monitoring, home detention is the -- is not the most restrictive, but it's one down from the most restrictive.

The most restrictive is home incarceration, and Pretrial Services recommends a plethora of other conditions directed to matters that are appropriate to the assessments that Pretrial Services have made.

But I -- after giving this a tremendous amount of thought before the hearing, during the hearing, and now in

reasoning it through -- first of all, the defendant can -- I could put her on home incarceration.

I could put her at her mother or some other trusted-to-her person, someone she's close to.  I don't really have trust in the persons around her, particularly given the government's proffer that her mother benefited from this scheme.

And it gives me no pleasure to make these comments. Often my comments are directed only to the defendant themselves, but it's clear from the government's motion that there were trusted people to assist the defendant -- I don't know if it's her friend with the small plane, her mother, other people, or all of them.

I don't think the plane is enough to get her very far, insofar as to Europe or the UK, but it could get her easily to Central America, and so the plane is a concern.

The Government's Exhibit 1, when you put that with -- yes, it's not in her handwriting, but it looks like there's -- there's lots of planning here.  There's lots of information.

This Malta citizenship, and the implication it has for ready travel through the EU is profoundly concerning.  It is of no matter to me really of whether the defendant had purchased a return ticket or not or said her plans were to go for 36 days.

It's clear to me that she had the means and ability to be gone for a much longer period of time and indefinitely.  The

number of phones that she and the codefendant had.

So when I look at, "Are there conditions?"  I think that she has really no -- despite strong ties to the district, no real incentive to stay and face these charges.

And I think her own writings recognize that, if not directly, by implication in the excerpts that the government has put in its motion for detention.

If I put her on the most restrictive conditions, which would include home incarceration, she could just cut that ankle monitor off.  She can use any computer.

It would be very hard for me to restrict someone from any computer use, particularly in a case where they have to defend financial fraud and kickback-type allegations.

If she is out of custody, she needs to have access to assist her counsel, and I don't take it lightly detaining someone when they need that kind of access to assist their counsel, even in custody.

But there are orders that the district judges enter to accommodate those things so that they can effectively assist their lawyer in their defense.

I don't think a third-party custodian, even if there's a reliable one, even if there's a reliable place for her to be on electronic monitoring, none of that is sufficient with any of these other conditions that are available to the Court.

And I thought about a bond, including the mother's

home.  There's reference to the -- that she owns a business that owns an office building.  And as Mr. Lowther has suggested, an accounting of her assets for a secured bond in addition to an unsecured bond.

But I think given the amount of money that's at issue here and unaccounted for, its incredibly varied forms, the number of bank accounts and the safe deposit box and the gold bars and the cash, the liquidity and the cryptocurrency, I find not only by a preponderance of the evidence that the defendant is a serious flight risk, but considering the -- all of these possible conditions, even together, and even -- and that's why I began with the issue of the bond.

I have been mulling what could be put together for a secure bond.  What would be so painful to watch family members, friends, and her own loss of -- that would tie the defendant to this district sufficient to show up to face these charges, and unfortunately, my conclusion is that, based on the information before the Court at this time, there is not even a secured bond that could do that under these circumstances.

I find by a preponderance of the evidence the defendant is a serious flight risk and there are not conditions that I could set that reasonably assure the defendant's appearance for further court proceedings.

The defendant will be detained pending further proceedings.

54

Is there anything further today from the government?

MR. BUTLAND:  No, thank you.

THE COURT:  Anything further from the defense?

MR. LOWTHER:  No, Your Honor.

THE COURT:  Thank you everyone.

We are adjourned on these proceedings.

(Proceedings concluded at 2:57 p.m.)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 15th day of July, 2024.


                                    s/Elva Cruz-Lauer
                                    Elva Cruz-Lauer

UNITED STATES DISTRICT COURT