UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:24-cr-01040-ROS |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 9, 2024 |
| Jeffrey King, | ) | 9:05 a.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |
|_____| ) | |

BEFORE:   THE HONORABLE ALISON S. BACHUS, MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

CONTINUED DETENTION HEARING

Transcriptionist:
Elva Cruz-Lauer
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

UNITED STATES DISTRICT COURT

A P P E A R A N C E S


For the Government:

        U.S. Department of Justice - Criminal Division
        Public Integrity Division
        By:  SHANE RITCHIE BUTLAND, ESQ
        1400 New York Ave. NW, 12th Fl.
        Washington, DC  20005

        U.S. Attorney's Office
        By:  MATTHEW WILLIAMS, ESQ.
        40 North Central Avenue, Suite 1800
        Phoenix, AZ  85004

For the Defendant Jeffrey King:
        Kurt M. Altman PLC
        By:  KURT M. ALTMAN, ESQ.
           ASHLEY FITZWILLIAMS, ESQ.
        12621 N. Tatum Blvd., #102
        Scottsdale, AZ  85032

INDEX

SUMMARY OF COURT PROCEEDINGS                          PAGE:

Argument presented by Mr. Butland                    7, 35

Argument presented by Mr. Altman                     23

Judge Bachus takes matter under advisement           37

INDEX OF EXHIBITS

| GOVERNMENT'S EXH. NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 1 | Office | 7 |
| 2 | Itemization of Assets | 7 |
| 3 | Handwritten Notes | 7 |

| DEFENDANT'S EXH. NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 1 | Mr. King's Children | 7 |
| 2 | Mr. King's Son | 7 |
| 3 | Mr. King's Son | 7 |

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

THE CLERK:  Case number CR24-1040, United States of America versus Jeffrey King, set before the Court for a detention hearing.

MR. BUTLAND:  Good morning, Your Honor.  Shane Butland on behalf of the United States, the Department of Justice Fraud Section.  Also at counsel table is AUSA Matt Williams.

THE COURT:  All right.  Thank you.  Welcome to you both.

MR. ALTMAN:  Good morning, Your Honor.  Kurt Altman and Ashley Fitzwilliams on behalf of Mr. King, who is present at counsel table in custody.

THE COURT:  Thank you.  Welcome to you all.

This is the time set for the detention hearing in this matter.  For the record, the Court has reviewed what has been docketed in this case, with the exception of Docket 23, for the reasons that are evident on the record.

But I just want to make clear to the parties, and for the record, that the Court has not read Docket 23.

So included, of course, among the things that have been docketed are the charging instrument in this case, the motion filed by the government, as well as Mr. King's response thereto.

We look forward to hearing your presentations here this morning.  For the record, at the beginning of every

detention hearing, I do like to ask some housekeeping issues.

So first, how are the parties planning on proceeding today, by proffer or -- go ahead.

MR. BUTLAND:  Yes, Your Honor.  The government intends to proceed by proffer.

THE COURT:  All right.  And while you're standing, I take it that the government's basis for seeking detention of the defendant is serious risk of flight and that alone; is that correct?

MR. BUTLAND:  That's correct.

THE COURT:  And does the government believe this is a presumption case?

MR. BUTLAND:  No, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Altman, with respect to proffer, I take it Mr. King is amenable to proceeding in that fashion?

MR. ALTMAN:  He is, Your Honor.

THE COURT:  All right.  So Mr. King, how this is going to work, sir, is the government has the burden, and so that means that they will go first in their presentation.  And then we will hear what your lawyer has to say on your behalf.

Then because the government has the burden, that means that they get to have the last word.  So that is not because we are favoring the government.  It is because they carry the burden.  So that is how we will proceed.

We will hear argument from the government.  We will hear argument from Mr. King's lawyer, and then the government can finish up with whatever it would like to say.

I will be taking notes on my computer.  This is because my handwriting is atrocious, and I type faster than I write.  So when I am looking at my screen, please understand that's what I am doing.  I am not surfing the Internet, or something like that.  I know sometimes people wonder, what is she doing up there?  I am just taking notes.

All right.  So with all of that housekeeping out of the way, is there anything else that either counsel wants to raise before we do hear proffer?

MR. BUTLAND:  Not from the government.

MR. ALTMAN:  Judge, I would just say, I know that the government provided your staff some exhibits, and we did as well.  We just, to speed things along, we would have no objection to those when Mr. Butland wants to admit them.  So we would stipulate right now to those being admitted for the hearing.

THE COURT:  We have been handed some exhibits here.  Is it just one exhibit for each side?

MR. BUTLAND:  I have three photographs, Your Honor.

THE COURT:  Okay.  Okay.  I see.  So with respect to exhibits, what's the government's thought on that?

MR. BUTLAND:  Yes, I would seek to admit defense

counsel's exhibits as well.

THE COURT:  So sounds like we are going to agree to stipulate to admission of all the exhibits for each side.  So those are admitted on the parties' mutual stipulation.

(Government's Exhibits and Defendant's Exhibits are received.)

All right.  So counsel for the government, whenever you are ready to go, Mr. Butland.

MR. BUTLAND:  Thank you, Your Honor.

As noted, the government is seeking detention based on risk for flight.  As this Court is aware, that is a two-step inquiry.

The first step is to determine whether the defendant presents a serious risk of flight.  That needs to be proven by the government by a preponderance of the evidence.

Then the second step is to determine whether there is any condition or combination of conditions that can ensure the defendant's return to court.  I think, based on the evidence that will be proffered, it will be clear that there are no such conditions.

The Courts are to look at four factors:  The nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the defendant, and any nature -- and the seriousness of that danger posed by the defendant's release.

Given that the nature and circumstances of the offense are one of those factors, I will briefly describe the nature of the scheme.

The defendant and his wife, who is the codefendant, are charged in a massive, serious, and sophisticated fraud scheme whereby they caused the application of highly expensive wound grafts to dying Medicare beneficiaries to steal money that was intended for legitimate medical care for elderly patients and those with disabilities.

The codefendant was the co-owner and chief executive officer of a company called Apex Medical. The codefendant contracted with sales representatives, none of whom had any prior medical experience, to locate Medicare beneficiaries, primarily those on hospice care, to find those patients who had any wounds whatsoever, assess those patients, and then order these expensive -- or recommend the ordering of these expensive allografts.

This defendant quite literally wrote the manual that was passed out to those sales representatives. It was called The Apex Sales Representative Manual, and it provided instructions as to how these beneficiaries were supposed to be identified and then signed up for the application of these grafts.

Those beneficiaries were then referred to, among other providers, APX Mobile Medical, which this defendant co-owned,

and APX Mobile Medical contracted then with nurse practitioners who were hired simply to put the grafts on the Medicare beneficiaries.

This defendant pressured the nurse practitioners with whom he contracted to apply whatever grafts were ordered and recommended to be ordered by the sales representatives, even when the nurse practitioners did not believe that the grafts were medically necessary or appropriate for the treatment.

This defendant even held meetings with the nurse practitioners in which the nurse practitioners were specifically told that they were paid to apply the grafts and not to conduct any independent medical assessment of the patients.

As a result, these wounds grafts were applied to Medicare beneficiaries without any meaningful assessment of the patients' wounds, without coordinating with the patients' primary care physicians, or any other medical personnel treating then in hospice care, and without even reviewing the patient's medical records.

The defendant was therefore in this unique position where he was providing training to the sales representatives who referred the patients, and then also co-owned the company who hired the nurse practitioners to apply the grafts.

Most relevant to the risk of flight is that these are crimes of deception.  They not only lied to the patients

concerning the medical necessity of these grafts, but the defendant and his codefendant submitted thousands of false and fraudulent claims to Medicare over the course of this conspiracy.

There's also, as the indictment indicates, a staggering amount of money involved in this conspiracy. Between just November of 2022 and February of 2024, the defendant and his codefendant caused $900 million of false and fraudulent claims to Medicare for these medically unnecessary grafts. And Medicare paid over $600 million for those claims.

Now, these claims were for fewer than 500 Medicare beneficiaries, which indicates there were over a million dollars of these grafts per beneficiary on average.

Just to give the Court some context, I just Googled, you know, some of the most expensive medical treatment in the United States. A double-lung transplant costs around $800,000, less than the average amount of wound grafts placed on these beneficiaries.

As a result of this scheme, the defendant was indicted on seven different charges. The top count, conspiracy to commit health care fraud and wire fraud, has a statutory maximum of 20 years' incarceration.

The combined statutory maximums for all seven charges are 75 years' incarceration, and the sentencing guidelines has a range of life imprisonment.

UNITED STATES DISTRICT COURT

So certainly the severity of the charges and the potential penalties give this defendant a tremendous incentive to flee the jurisdiction.

Moving on to the weight of the evidence.  I understand that it is not the primary factor to be considered, but it is one factor.  The weight of the evidence here is extremely strong.

The government has cooperating witnesses, two of whom are nurse practitioners who contracted with APX Mobile Medical, the defendant's company, and who applied medically unnecessary wound grafts.  They are scheduled to plead to informations in this district next month.

We have audio and video recordings, internal company documents, bank and financial records showing the kickbacks that this defendant, through his company, received.  Medical records of patients who received these medically unnecessary grafts, and statements from the caretakers and other health care professionals who were treating these beneficiaries who received these unnecessary grafts.

Now, the history and characteristics of the defendant strongly suggest that there are no conditions that could assure his return to court.  To start, this defendant has millions of dollars.

Counsel, in his response to the government's detention motion, said that the defendant has no money to flee because

all of his assets had been seized.  That is just simply factually inaccurate.

This defendant, through APX Mobile Medical received over $90 million of kickbacks from company 1.  A significant percentage of that was transferred to his own personal accounts.

It is true that the government did execute search warrants on various bank accounts and life insurance policies and received approximately $68 million from those accounts the day after the defendant's arrest.

However, only $8 million of that was -- belonged to the defendant.  It was a life insurance annuity policy that he had.  The other $16 million came from accounts in the codefendant's name, as well as an $8 million life insurance annuity that she had.

So looking at Government's Exhibit 1, this is a photograph of an office within the joint residence of this defendant and his codefendant.  As you will see in the back left corner, there's a safe.

It is difficult to determine, but on the left-hand portion on the upper-left corner there were three diplomas on the wall.  I can represent to the Court that those bear the name of this defendant on those diplomas.

On the right-hand portion, about halfway down is a table with several folders on it.  Within those folders are

Exhibits 2 and 3.  I will start with Exhibit Number 2.

This is an itemization of the assets that belong to Jeffrey King, the defendant, not even including the bottom portion with the real estate and the Rolexes.  By my calculation, there's over $14 million in liquid assets identified on this spreadsheet alone.

That doesn't include the $8 million life insurance annuity that was seized, and doesn't include the $8 million of property, or the tens of thousands of dollars of watches that are also included on that spreadsheet.

Additionally, on Exhibit 3 there are other handwritten notes that were recovered from a folder on that same table within the defendant's office.  Now, at this point, the government does not know whether the handwriting is that of the defendant's.

But I would like to point out to this Court, the bottom half of this page, underneath the recommendations, handwritten note.

The first says, dual citizenship in Malta to go to Euro countries.  I have learned that wealthy individuals can actually purchase citizenship to Malta, and you can do so for about $750,000 euros, as per publicly available information, which when you look to the right-hand portion of that in the margin, it says 1,200,000, that's the approximate exchange rate for that Maltese citizenship.

As it turns out, when you obtain Maltese citizenship, you can move to any country in the European Union without having to complete any additional paperwork, which is why Maltese citizenship is sought after from wealthy individuals.

Underneath that is a note saying, "Banking vis-à-vis Cook Islands to Swiss banks." And then to the right of that in the margin it indicates that there was $10 million contemplated being placed into Swiss bank accounts.

I explained the significance of the Maltese citizenship note, but I think this Swiss bank account is important in two different ways. First of all, it indicates that there may be money offshore we just don't know about. You know, it makes a reference to the Cook Islands. You know, that's beyond the reach of law enforcement. We are unaware if there's any money stored there.

But it also shows that there was an intent to store significant amounts of money generated from this fraud, $10 million, as noted in this exhibit, to Swiss bank accounts, again, that are beyond the reach of law enforcement.

Additionally, bank records show that on April 26th, 2024 alone, this defendant withdrew almost $7 million from bank accounts in his own name. Around that time, it is clear he began liquidating his assets from bank accounts.

The spreadsheet that I put into evidence shows that he had accounts under various LLCs' names, King Medical

Consultant, King Ventures Incorporated, Capital Is King, J. King Holdings.

And the defendant was very creative in how he was withdrawing money, depositing it in other accounts, and moving it around, suggesting that he was doing so for the purpose of concealing it from law enforcement.

And we have not been able, to date, to be able to trace all of the money in those various accounts that was withdrawn.  What we do know, as of June 1st, 2024, the defendant had approximately $6 million sitting in investment accounts that we were unable to trace.  And assuming that amount hasn't been withdrawn, that is sitting in his accounts today.

Also impacting history and characteristics of the defendants are the fact that the evidence suggests that the defendants knew that criminal charges were imminent, and he and his codefendant had made preparations to flee the jurisdiction.

During the execution of the search warrant at his and his codefendant's joint residence, there were handwritten notes contained in a notebook on the kitchen island in the main area of the house.

The notes indicate -- the notes were in the codefendant's handwriting.  The notes indicated that the codefendant and Mr. King planned to travel around Europe for 36 days going to at least the countries of England, where they

were flying into, Italy, and Greece.

As Your Honor knows from the government's submission, this defendant and his codefendant were arrested at the Phoenix International Airport prior to this trip.  There's also a handwritten note to either a housekeeper or some other trusted individual, it is not clear on the note, to notify the codefendant if there was an indictment or any further harsher legal escalations, to quote from that note.

Clearly, the defendants believe that there was a chance that they were going to be charged while they were traveling abroad, and they wanted to be notified of that immediately via this note to whoever was taking care of their house.

There's also a date book with handwritten entries from the codefendant with a November 22nd, 2023 entry indicating that the defendant bought burner phones, in her words.

Sure enough, in the carry-on luggage that this defendant and his codefendant brought with them on to the plane, or were going to bring on to the plane to London, there were three phones recovered in the luggage, in addition to the phones that each this defendant and the codefendant had on their persons.

Now, defense counsel takes issue with my representation of that in the motion, saying that there's no indication as to which bag belonged to which defendant.

Agents with Customs and Border Protection were the ones who made the initial apprehension of the defendants. They then collected the luggage and put it into a holding room, where it was then searched by the FBI.

So I cannot say who was carrying which bag, but it is clear that the bags were being brought on to the plane by both defendants and, therefore, either was either actively or constructively in possession of all of those belongings.

Also during the search warrant of this defendant's joint residence with his codefendant was a book literally titled, How to Disappear, Erase Your Digital Footprints, Leave False Trails, and Vanish Without a Trace.

Now, defense counsel says you can read whatever you want in America and so the significance of this book is null because of that right. Of course you can read what you want. That's certainly not the issue.

But if somebody is suspected of robbing a bank, and in their house is a book titled How to Rob a Bank, that is certainly something that this Court can consider and would be relevant to that issue.

Also in the defendant's house was over $100,000 in cash. Now, when the defendants were arrested at the Phoenix airport, I indicated they had the three phones in the carry-on luggage, and there was also a criminal law handbook in the carry-on luggage with these phones.

There is no reasonable explanation for bringing that particular book on a five-week trip to Europe, other than if you expected charges to be filed while you were there and wanted to do your own homework.

In addition, this defendant had two Audemars Piguet watches.  I am not a watch aficionado.  I had to look these up.  These are extraordinarily expensive luxury watches.  One of the watches that he had retailed over $30,000 for that one watch.  The other one retails for over $50,000.

So he had over $80,000 in just two watches that he brought with him.  And I don't think it's any accident that this defendant brought his two most expensive watches with him to Europe contemplating that charges may be filed.

In addition, there were search warrants that were executed on three safe deposit boxes in the names of this defendant and the codefendant.  Within the safe deposit boxes were flash drives that contained cryptocurrency.

Next to the cryptocurrency were Post-it notes handwritten by the codefendant, giving instructions in how the cryptocurrency could be transferred without -- in the absence of the codefendant.  And it gave the password that the codefendant would have to give in order to effectuate this transfer.

Again, this is strongly suggestive of, you know, the codefendant providing instructions to a trusted individual to

be able to transfer potentially significant amount of virtual currency to her while she was abroad and not in the United States.

There was also $260,000 in cash within the safety deposit boxes.  There were gold coins, gold bars, silver bars, and expensive jewelry, and luxury watches.

In addition to all of this, we know this defendant has access to a trusted friend's private plane.  Now, this defendant's name is Jamie Tryba.  She herself was the owner of the plane.  She and codefendant Alexandra Gehrke actually had a photo shoot at the airport next to the plane at the Scottsdale airport.

This is an extremely trusted friend of both the defendant and the codefendant's.  She spoke at their wedding. She was employed as a sales representative for these companies and made over $3 million in the course of the fraud.

And importantly, she was one of the authorized individuals who was allowed to access these safe deposit boxes that contain substantial amounts of fraudulent proceeds and the instructions on how to transfer the cryptocurrency.

There would be no ability for law enforcement to detect, if this defendant decided to get on his friend's private plane and flee the country to Mexico, as obviously you do not need to purchase electronic tickets or check in before flying.

And then finally, this defendant has demonstrated an inability to be honest with Pretrial Services and other law enforcement entities.  The defendant had over $10,400 in cash with him when he was at the airport, at the Phoenix airport, and 1500 euros.  None of that was claimed to CBP as required.

He then is interviewed by Pretrial Services upon his arrest.  He stated to them his net worth was approximately 2-and-a-half-million dollars.

Now, we know that he withdrew over three times that amount on April 26th alone.  We know that the government seized an $8 million life insurance annuity.  And we know from the spreadsheet that he has $8 million in real estate.  None of which was disclosed to Pretrial Services.

The defendant said he had $10,000 in cash.  $100,000 was recovered from his own residence, and another over $260,000 was recovered from the safe deposit boxes in his name.

He said he only had 2.1 million in stocks and bonds. We know from bank records he has approximately $6 million in investment accounts, and it existed in that amount two weeks prior to his arrest.

Even the value of his car he claimed was $60,000.  He purchased the car for $90,000 on August 7th, 2023 himself.  But I think the most concerning aspect of the misrepresentations to Pretrial Services are with respect to his foreign travel.

He stated that his last foreign travel was to the

Bahamas in February or March of 2024.  Law enforcement databases do show that he traveled to the Bahamas in early March 2024.  However, it also shows he and his codefendant reentered the United States from Mexico on March 31st, 2024 at the Lukeville border crossing in Arizona, which is about two hours and four minutes away from Phoenix.

Certainly this defendant, with the proximity to Mexico, has the ability to simply walk across the border and not return to court.

And just to address a couple of the arguments made by defense counsel in response to my motion.  He indicates that these handwritten notes were made by the defendant's -- by the codefendant and not the defendant himself.

These notes were written by the defendant's wife and codefendant, and they were located, at least with respect to the note to the housekeeper, on a kitchen island in their joint residence in plain view.

The crypto instructions were written by the defendant's wife, but also in the safe deposit boxes where he also kept significant amounts of fraudulent proceeds.  These weren't notes written by a friend or co-worker.  This is the defendant's wife, his coconspirator, and located in areas that are jointly accessible and owned by him.

The defense counsel says there is a quote, "zero risk of flight," based on the defendant's family ties in Arizona.

If the ties to the community were dispositive, then that would be the only factor this Court would have to consider.

But of course the statute details the wide range of factors that a Court looks at in determining whether or not detention is appropriate. And we know from the Pretrial Services Report, the defendant has two children, one of whom is a minor.

But we know from the codefendant's Pretrial Services Report, that the minor son stayed with this defendant and his wife every other weekend. So if detained, this is not a situation in which the sole provider and caretaker would be taken away from the minor child.

And then with respect to the defendant's health. Defense counsel says that due to his sepsis, you know, diagnosis, he is simply too unhealthy to be able to flee. This fact is simply disproven by the fact that he was traveling to Europe for five weeks to travel around to various countries.

He was healthy enough to take that extended leave, but apparently not healthy enough to travel to Mexico that's less than three hours away.

So to conclude, it is hard to imagine any additional facts that would demonstrate a stronger likelihood that this defendant would flee.

He has an incredible amount of financial resources, and the diversity is shocking. He has financial resources in

bank accounts, brokerage accounts, life insurance policies, gold and silver, luxury watches, cryptocurrency, real estate, you know, pretty much everything possible, which he would still have access to if granted a bond.

His potential sentence provides a strong incentive to flee. The books in his and his wife's possession literally titled How to Disappear Without a Trace, and the criminal law handbook, suggests that they were preparing to do just that.

Notes containing obtaining dual citizenship and hiding money in Swiss bank accounts. Instructions on how to transfer cryptocurrency while they were abroad. Access to a private plane. Foreign travel. Lies to Pretrial Services, and possession of burner phones.

I think taking -- although one of these things by itself may not be, you know, dispositive in terms of risk of flight, I think everything, taken together, there can be no doubt this defendant is a serious flight risk and that there are no conditions to ensure his return to court.

Thank you.

THE COURT:  Thank you.

Mr. Altman.

MR. ALTMAN:  Thank you, Judge.

Just to start, Your Honor, I will say, as this Court noted earlier, this is not a presumption case. Government is seeking detention based on serious flight risk only, not -- or

24

not danger.  So I am not going to get into the fourth factor of the statute about danger.

I wanted to start and tell this Court why Mr. King should be released, why he will appear for court, and why there are conditions, even minimal conditions, that will assure that.

But I can't go without addressing some of the arguments made by the prosecution.  I would like to say I don't want to go through each one individually and talk about everything, but I think some of them definitely need to be addressed.

To begin with, we are always in a position at a detention hearing where the nature and circumstances of the case are bad.  Certainly a fraud of this nature, allegations of a fraud of this nature, are very serious, and we don't doubt that.

But we are also at a stage in the case where we haven't received discovery.  We don't know the facts other than what the government is just trying to portray to this Court.

And I will note that in a lot of the things they say, in proffering to the Court, they say, "there may be money out there," "that might have been," or "it's probable."  They haven't really presented any evidence that Mr. King has money hidden somewhere that they don't have.

They go through a list of assets, Exhibit Number 3, that they are aware of.  That they have seized.  That he is

spending an inordinate amount of time on watches.  They have the watches.  They have all of the property.  They have the bank accounts.  They have the cars.  They have the house.

So to say that there just might be other stuff out there that is not accounted for that he could use, I think is a little bit of a stretch in a detention hearing such as this.

I do want to address, again, a couple of very important things.  Mr. Butland talked a lot about Mr. King's ownership in APX, which was one of the companies that is allegedly involved in this fraud.

And it is a medical fraud, according to the allegations, Judge, it's a Medicare fraud with medical providers.

The co-owner of that company, APX, there's a guy named Dr. Keith Goss, a physician, who is not in this courtroom, who is not on the indictment, who apparently isn't a cooperating witness.

Because we heard there are two nurse practitioners that we are unaware of that are cooperators, but not the actual owner of APX, the physician who has to have a medical license to run something like this.  Just important to note.

I know that I addressed much of what the government said in our response, Judge, but I do want to touch on a few things.  He talked about -- Mr. Butland talked about on April 26th, Mr. King withdrew and transferred money from a

bunch of his bank accounts to different places.

What he doesn't tell you is that on April 26th or April 25th, actually, a couple of days before, Mr. King received notices from Chase Bank.  Chase Bank was where he banked, and I think many of these accounts that are on Exhibit Number 2 show that they are from Chase Bank.

But he received the notice going, "Get your money out.  Get it out.  We don't want you to be a customer anymore."  So he had no choice but to transfer his money.

The government wants you to believe it was transferred in order to hide it, to deceive the government, to move it, to move it here, to confuse people.

The reality is Chase Bank probably got a subpoena from the government, not allowed to tell Mr. King that they got a subpoena from the government, but they can certainly go, "We don't want to mess with your money anymore, get it out."  And that's why he was moving money.

Handwritten notes, Judge, and I alluded to this in our response.  The government is happy to use these things yesterday in a detention hearing with the codefendant, Ms. Gehrke.  And then kind of try to apply them to Mr. King too.

They told you as they stood up here that those handwritten notes that had some of this information, I think one of them -- no, Exhibit 3 is not one of them -- that are

contained in their motion were written by the codefendant, not Mr. King.

They have no evidence that Mr. King was aware of those. They have no evidence that Mr. King was aware of some indictment coming, or even the communications between he and his wife.

And frankly, the note on the kitchen table, it says, hey, let me know if the police show up or there's an indictment or something. I don't think that's unreasonable when somebody is taking a 36-day trip to Europe and they know that their bank accounts -- Ms. Gehrke knows her bank accounts has been shut down.

She has had some contact with folks. Of course she would want to know. Maybe she wrote that because she wanted to come back and make sure that she answered these charges.

So the assumption the government wants you to make in a lot of these things are a leap. And, Judge, we don't have the evidence to say that those leaps should be confirmed or they shouldn't at this point.

THE COURT: And the Court recognizes as well, Mr. Altman -- not to interrupt you -- that we did note that attached to your response to the government's motion was the fact that they had bought a round-trip ticket as opposed to a one-way ticket on American Airlines.

MR. ALTMAN: Yeah. Then I won't belabor that, Judge.

Some of the books, one that was found in the house about how to disappear.  It is my understanding that that book, one, was not found in any possession of Mr. King's, not in his room, his office, his safe, or anything like that.

It's also my understanding that book is about how to avoid stalkers and get off social media, and things like that. A book in the luggage of somebody on the way to Europe about criminal law.

We hear that that's something somebody wouldn't take on vacation.  Well, it could be something that somebody studying for the bar to take or wants to be a lawyer in California where you don't have to go to law school.

And a good investigation, the FBI that went through this in the back of the airport where the stuff was seized, would have noted what luggage that was found in, not just luggage.

So again, to attribute that book, and even knowledge of that book to Mr. King is a leap.  Maybe it is not an unreasonable leap.  Maybe it is not a super stretch, but it is a leap.  There's no evidence that he had any idea that there was a book like that in their luggage.

Cash, watches, all the things that they say that he has, he no longer has.  They have seized everything.  They want this Court to believe that maybe, possibly, there could be other money out there somewhere that he can access, but there's

no evidence of that either.

They did open his safe.  There was a safe in that office.  I think that's Exhibit Number 1.  And all his financial records were in that safe.  Everything was there.  It is all now in the possession of the government.  So to say and argue that he has all this ability to flee is just not the case.

Finally -- oh, the airplane.  Judge, the airplane of a "trusted friend."  You can see the airplane in the motion that they filed.  The airplane can fly about 250 miles, so that's not taking them anywhere overseas.

Neither Jamie Tryba, the friend, Mr. King, even codefendant Ms. Gehrke, are pilots.  In order to flee, as the government wants to argue, they would have to hire a pilot, a pilot that was willing, you know, to risk their license, their ability to earn a living, to take them out of the country.

It just doesn't make sense that a small airplane owned by a friend is something that can be attributed to Mr. King as a reason to flee.

And then finally, his Pretrial Services Report, Your Honor.  Mr. King, as you know, you have read the Pretrial Services Report, and I will argue in a moment, never been in custody, never been arrested, never had any issues like this.

And about 12 hours -- or actually they sat in custody, because it was a holiday, for a couple of days.  About 48 hours

in CCA or Core Civic, whatever we call it now.  An interview with no documents, no nothing, when you are in handcuffs, terrified by a Pretrial Services officer, you don't get everything right.  You can't do the math.

I don't think it's reasonable to say that he was trying to deceive this Court or trying to deceive the Pretrial Services officer.  He forgot that they traveled to Rocky Point to go to the beach.  I think that's a common thing in Arizona.

They asked him about foreign travel, he said the last one I think was the Bahamas.

So to argue that he is continuing a deceit and he is deceitful because he didn't give Pretrial Services all of the accurate information is just -- I just don't think it should be given that much weight.

Judge, finally, as this Court knows, the weight of the evidence in a case like this is the least important factor. The Ninth Circuit almost has -- I guess I wouldn't call it a presumption, but a presumption for release unless there's a preponderance of the evidence that shows that Mr. King in this case is a serious flight risk, and there's no conditions.

So let me get to the actual physical, mental characteristics of Mr. King and why he should be released. First of all, as you heard, he was born and raised primarily in Phoenix.  He moved some with his parents, and then was out of the state for some time while he served in the military.

In the military -- as a result of his military service, he is a disabled veteran.  Obviously you know his issues, it was in our motion, about the sepsis and the medicine he needs and the issues that has on him.

Incidentally, I didn't say he would be too sick to travel in the motion.  I said he is actually too sick periodically daily to stay in custody, and being out would be a benefit to his physical health, which of course we are concerned about.

He actually owns a company or co-owns a company where he can go back to work, Judge.  Scottsdale Music Company.  I think there's a link in the motion to the Scottsdale Music Company.

There are members of that company in the back of the courtroom today, who, by the way, have been here -- I think this is the third attempt at a detention hearing, and they've been here every time.  He clearly has support in the community.

Unlike his codefendant, Judge, he has two children that live here.  One is a minor who lives with his mother in Mesa, I believe, who Mr. King is very close with.  And one is his daughter, who is in the back of the courtroom here, who is 23 years old.

And I am not sure what the exhibit numbers are, but he wanted this Court to make part of the record the photos, Judge.  So if -- those are his children.  Judge, he has a lot of

support and family ties to the community.  His mother's family, aunts, uncles, everybody from his extended family lives in Phoenix -- in the Phoenix area.

Mr. King is not going to flee.  He is not going to leave those people.  He understands that if he took off and never came back, he would never see his loved ones again.  They are here.  They support him all the way.  They will also support him through this case and make sure he appears.

Judge, one of the things I always talk about, too, is -- especially in a case like this, we are talking about an allegation of $900 million in fraud.  I don't know what the discovery is going to look like.  There are cooperators.  There's evidence all over the place, according to the government.

It is a substantial detriment to a defendant and their exercising of their rights to defend themselves, to stay in custody when there are conditions that can assure their appearance.

A case like this is going to require extensive help, frankly, from Mr. King in order to defend, in order to understand what's going on and what kind of role he may or may not have had.

Judge, I think that there are conditions in this case.  One, Mr. King would show up.  I don't think there needs to be anything other than an OR.  But you have plenty of options that

can keep tabs on Mr. King and that can assure his appearance in this court.

He can be released to a third party.  Mia King, his daughter, is here.  She would take custody of him.  He can be released on an ankle monitor, GPS monitoring, where there will be continuous monitoring, where we will know where Mr. King is. That will help ensure to this Court that he will appear.

I think there's even, you know, home detention or home incarceration release, where you can confine him on a GPS to his home.

All places where he is able to be out of custody to help in his defense, to appear in court, and to not have access to any potential money that maybe might could be potentially out there, according to the government.

You can put restrictions on his computer use, his phone use.  There's lots of things that can be done rather than him sitting in custody without his medications, without access to the medical care and the VA that work with him currently.

Judge, if I could just have one moment?

THE COURT:  Yes, you may.

MR. ALTMAN:  And I always forget something, Judge.

You also can't travel internationally without a passport.  And they had those -- both Ms. Gehrke, his codefendant, and Mr. King had those.

When they were arrested, they were confiscated by the

34

government.  They are in the government's hands.  They just don't have the ability.

Mr. King just does not have the ability nor the desire, with his family and loved ones, to go anywhere other than appear in this court and answer these charges.

Again, the facts look bad, Judge.  The nature and circumstances are serious.  But that's always the case at this stage of a matter like this.

What this Court needs to decide is, is Mr. King going to show up for court?  And is he a serious flight risk?  And if he's not, then he should be released.  If he is, are there conditions?

And again, Judge, Pretrial Services believes there's conditions, and we've presented this Court with some conditions.  And I know this Court knows the conditions that are available to her, so I will stop there and ask that he be released.

THE COURT:  All right.  Thank you.  We understand from reading the documents before us that your client is a United States citizen and a veteran of the armed forces.  We thank him for his service.  Recognize the people who are here on his behalf here today.

I take it he is not a citizen of any other country; is that right, Mr. Altman?

MR. ALTMAN:  That is correct, Judge.

THE COURT:  All right.

From the government, anything else?

MR. BUTLAND:  Yes, Your Honor.  I will try to keep this brief.

First of all, I would just like to note for the record that the codefendant, Alexandra Gehrke, was detained yesterday by Judge Fine after a detention hearing, and I would submit that this defendant is similarly situated to his codefendant.

Counsel is essentially pointing the finger at the codefendant.  That she was the one who wrote the notes.  She was the one who had the intent to flee.  This defendant had no idea what she was doing.

As if this defendant, you know, didn't know what she was reading, didn't know what she was writing, didn't know what she was bringing on planes.  And yet he was intimately involved in this fraudulent scheme from the very beginning.

He is her codefendant.  He co-owned the entity where the referrals were coming to.  He saw that she was profiting incredibly from this fraudulent scheme, as was he, which enabled them to jointly purchase multi-million dollar houses, and his $50,000 watch that he had on him when he was flying out of Phoenix.

Defense counsel mentions that it would be a burden for him to be able to effectively represent his client if detention was granted.  Certainly this would not be the first defendant

to be detained pretrial in this district.

Other attorneys have found a way to effectively represent their clients, and I would submit that, you know, Your Honor, should look to the other factors contained in 3142 when making this determination as to risk of flight.

And lastly, the repeated contention that all this defendant's money is seized is just simply not found in the evidence nor the facts.

As I indicated to Your Honor, of the $68 million seized by law enforcement, $8 million of that was the defendant's, and that was strictly in a life insurance annuity that the defendant had.  There was no money in any bank accounts of the defendant's that was seized by law enforcement.

His own spreadsheet found in his office reflects $14 million in liquid assets that he had control of.  We know that as of June 1st, he had $6 million in a brokerage account.  That remains there, unless somebody else withdrew that between June 1st and today.  That was unable to be traced to the fraud by law enforcement, so that remains in that account.

So that means there's an additional $8 million from his own spreadsheet, not even including his properties or his jewelry, that law enforcement has not identified.

That being the case, you know, there's evidence to believe that this defendant has over $10 million that hasn't been identified by law enforcement that he could use to flee

the country and live comfortably as a fugitive.

And then lastly, to say it's impossible for this defendant to flee the country without a passport is also just not accurate.  We are less than three hours away from the border of Mexico.

You certainly don't have to cross into Mexico at a checkpoint, and there's not as much monitoring for U.S. citizens going into Mexico as there is coming the opposite direction.

It would be very easy for this defendant to convince the family friend, who received millions of dollars for herself, to use her private plane to take him across the border, or to simply walk across the border himself.

I submit to you, Your Honor, that there are no conditions that would ensure this defendant's return to court. He has significant assets that can be used to flee.

He has trusted individuals that can help him get money to flee the jurisdiction, and for those reasons, we request detention.

THE COURT:  All right.  Thank you.

The Court will take this matter under advisement.  I do want to look through the exhibits here that have been provided to the Court in more detail and take that in conjunction with the argument that has been made by counsel and what's been filed in this case.  So we will issue a written

ruling.

What this means as a practical matter, Mr. King, I am going to go back to chambers, read through everything, and make my final decision.

I also want to make clear to you, and for the record, that the Court does its analysis of whether or not it will detain you for you individually, regardless of what Judge Fine may have ordered for your codefendant.  So I just want to make sure that that is clear.

As a practical matter, Counsel, I have a 9:30, a 10:00, a 10:30, an 11:00, multiple 11:00s, and an 11:30.  So I won't be going back to chambers right now.  I am going right into my next hearing, and for that I apologize.

So I will not be getting a written ruling out to you in the next 15 minutes.  It may not be until the end of the morning.

If I order that Mr. King be released, then what will happen is we will come back into the courtroom.  I will talk to you, sir, about what those conditions are, answer any questions that you may have, and then you will go about your day.

If the Court orders you detained, then we would not be bringing you back into the courtroom; rather, a detention order will issue, and then your lawyer will talk with you about the contents of that order and what your next steps may be.

So, Counsel, I don't mean to keep you hanging on, but

unfortunately, the morning calendar is what it is.  So I would anticipate getting something out to you or having you back into the courtroom by the end of the morning.

So if you could just keep that in mind and not go too far away from the courthouse, I would appreciate it.  But I would anticipate having something out by the end of the morning.

Anything else this morning from the government, at this time?

MR. BUTLAND:  No, thank you, Your Honor.

THE COURT:  From the defense?

MR. ALTMAN:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  We will stand at recess.

(Proceedings concluded at 9:52 a.m.)

40

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 19th day of July, 2024.

s/Elva Cruz-Lauer
Elva Cruz-Lauer

UNITED STATES DISTRICT COURT