GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Jeffrey King,<br>Defendant. | No. CR-24-01040-PHX-ROS<br><br>**UNITED STATES' RESPONSE TO JEFFREY KING'S MOTION TO REVOKE PRETRIAL DETENTION ORDER** |

Defendant Jeffrey King's ("KING") Motion to Revoke the Pretrial Detention Order [ECF No. 32], entered by U.S. Magistrate Judge Alison S. Bachus on July 9, 2024, after an evidentiary hearing, should be denied. The government reiterates the arguments made in its detention motion [ECF No. 18] and proffered at KING's detention hearing [ECF No. 31], and limits the instant response to addressing the points made in KING's Motion. KING's motion should be denied because he is a significant flight risk and there

is no condition or combination of conditions that will reasonably assure his appearance if released. KING's risk of flight is demonstrated by the following:

- KING, through a company he owned and controlled, received over $90 million in unlawful kickbacks for his role in a $900 million Medicare fraud scheme.
- KING is charged with seven offenses. Count 1 has maximum penalty of 20 years' imprisonment, and KING faces a combined maximum penalty of 75 years' imprisonment.
- The charges are serious and sophisticated crimes of deceit. KING conspired to submit thousands of false and fraudulent claims to Medicare for medically unnecessary wound grafts applied to elderly Medicare beneficiaries, the majority of whom were in hospice care.
- KING currently has access to millions of dollars in personal bank accounts and there are millions more that have not been accounted for.
- KING controlled and accessed safe deposit boxes containing hundreds of thousands of dollars of cash, gold, silver, luxury watches, cryptocurrency, and instructions, handwritten by KING's wife and co-defendant, Alexandra Gehrke ("Gehrke"), on how to transfer the cryptocurrency.
- Items located within KING's residence, including a book entitled *How to Disappear: Erase Your Digital Footprint, Leave False Trails, and Vanish Without a Trace*, and notes, handwritten by Gehrke, directing the house sitter to notify Gehrke in the event of an indictment, evinced awareness of looming charges and an intent to flee if charged.
- KING, through his wife's friend, has access to a private airplane.
- KING and Gehrke possessed a Criminal Law Handbook and three burner phones in carry-on luggage when arrested at the Phoenix Sky Harbor International Airport ("PHX").
- KING lied to Pretrial Services concerning his net worth, value of his assets, and recent foreign travel to Mexico.

- KING lied to Customs and Border Protection ("CBP") when he failed to claim $10,402 in cash and 1,500 euros when traveling to London, England, on June 17, 2024, the date of his arrest.

## PROCEDURAL HISTORY

On June 17, 2024, a criminal complaint was filed charging KING and Gehrke with one count of conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349). That evening, law enforcement arrested KING and Gehrke at PHX as they boarded a flight to London, England.

On June 18, 2024, KING and Gehrke were indicted for conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States and to pay and receive kickbacks (18 U.S.C. § 371), solicitation and receipt of kickbacks (42 U.S.C. §§ 1320a-7b(b) and 18 U.S.C. § 2), and transactional money laundering (18 U.S.C. §§ 1957 and 2). [ECF No. 6.] The Indictment also seeks forfeiture of assets belonging to KING and Gehrke, including two residences; four luxury vehicles; over $500,000 of gold bars, gold coins, and jewelry; over $52 million held in 11 bank accounts; and two $8,000,000 life insurance policies. *Id.* at 18–20.

The Indictment alleges that KING and Gehrke orchestrated a massive scheme to defraud Medicare by targeting elderly patients, many of whom were terminally ill in hospice care, and causing medically unnecessary and highly expensive amniotic wound dressings ("allografts") to be applied to these vulnerable patients. *Id.* at 2. From November 2022 through May 2024, KING, Gehrke, and their co-conspirators, individually and through companies they owned and controlled, caused more than $900 million in false and fraudulent claims to Medicare for these medically unnecessary allografts applied to less than 500 patients. *Id.* at 2–3. Medicare and other health care benefits programs paid over $600 million based on these false and

fraudulent claims. *Id.* at 3. KING and Gehrke received over $330 million in unlawful kickbacks as a result of their fraud scheme. *Id.*

KING and Gehrke were ordered to be detained after evidentiary hearings on July 9, 2024, and July 8, 2024, respectively.

## LEGAL STANDARD

The Bail Reform Act ("BRA") provides that a defendant should be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required . . . ." 18 U.S.C. § 3142(e)(1). This analysis involves a "two-step inquiry." *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019–20 (D. Ariz. 2006). *Id.* First, the Court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at 1020 (quoting 18 U.S.C. § 3142(f)(2)). The government bears the burden of proving such risk of flight by a preponderance of the evidence. *Id.* Second, if the defendant is likely to flee, the Court next must determine whether any condition or combination of conditions for the defendant's release will reasonably assure the appearance of the defendant. 18 U.S.C. § 3142(f).

The BRA provides the following four factors for courts to consider when determining whether to detain a defendant: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, which includes, among other things, the defendant's financial resources, past conduct, and history related to drug abuse; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release. 18 U.S.C. § 3142(g).

Under 18 U.S.C. § 3145(b), a person who is ordered detained by a magistrate judge may file a motion for revocation or amendment of the order with the court having original jurisdiction over the offense. The motion is to be determined promptly. *Id.* The district court is to "review of the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *United*

*States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The district judge may hold additional evidentiary hearings if "necessary or desirable," and "its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate." *Id.* (citing *United States v. Delker*, 757 F.2d 1390, 1394-95 (3d Cir. 1985)).

## ARGUMENT

The evidence establishes by a preponderance of the evidence that KING presents a serious risk of flight, and there is no condition or combination of conditions of release that can reasonably assure his appearance as required.

### I. KING Has Access to Millions of Dollars.

On or about June 18, 2024, law enforcement executed search and seizure warrants on, among other things, 11 bank accounts, 2 life insurance policies, 3 safe deposit boxes, and KING and Gehrke's joint residence. Law enforcement seized $68 million from the bank accounts and life insurance policies. *See* 24-MB-8360 to 24-MB-8372.

Notably, the money seized overwhelmingly belonged to Gehrke; of the $68 million seized from bank accounts and life insurance policies, only one $8 million life insurance policy was in KING's name. The remainder of the money that KING made from his role in the fraud was either not found by law enforcement or unable to be sufficiently traced for purposes of forfeiture due to the manner in which KING moved the money between his various accounts.

Within KING and Gehrke's joint residence, law enforcement recovered a spreadsheet in KING's home office itemizing the assets that he owned and controlled. This spreadsheet was introduced at KING's detention hearing as Exhibit 2. The spreadsheet indicates that KING held $13,150,617 in bank accounts in his name and the name of LLCs he owned and controlled at Victory Capital Management, JP Morgan Chase ("JPMC"), Coinbase, USAA, and Scottsdale Assurance Group. According to this spreadsheet, only

$859,870 of that amount was jointly held with Gehrke, leaving KING with over $12 million.

This $12 million does not include the other assets of significant value itemized on the spreadsheet, such as KING's $8,000,000 life insurance annuity; luxury watches valued at $136,499; a $500,000 "movie investment"; real estate valued at $8,095,000; 121 gold coins valued at $115,000; $400,000 of recording equipment; a $280,000 Ferrari; and a $90,000 Mercedes-Benz.

Bank records reflect that on April 26, 2024, KING withdrew approximately $6,700,000 from bank accounts in the names JKing Holdings Inc., JKing Ventures Inc., and King Medical Consultant LLC, all of which KING owned and controlled. KING's argument that these withdrawals were in response to "direction from the bank to close his account" [ECF No. 59 at 11]—and not an effort to avoid detection—not only lacks any evidentiary support, but is directly refuted by the fact that all three accounts remained open with positive balances after the withdrawals: one of KING's JP Morgan Chase accounts, from which KING withdrew $4,769,212.17 on April 26, 2024, had a balance of $5,000 on April 30, 2024; the second account, from which KING withdrew $336,890 on April 26, 2024, had a balance of $4,878.25 on April 30, 2024; and the third account, from which KING withdrew $1,528,133 on April 26, 2024, had a balance of $3,057.63 on May 31, 2024.

Moreover, as of June 1, 2024, bank records reflect that KING held approximately $6 million in two investment accounts in his name. Even assuming that all $6 million in those accounts was derived from the $6.7 million money that KING withdrew on April 26, 2024, there remains approximately $7 million that has not been accounted for.

Instead of denying this accounting or offering an explanation or defense, KING adopts his prior counsel's argument that the government merely "speculate[s]" that it is "probable" that KING "may have money out there." [ECF No. 59 at 10]. But those words were KING's counsel's alone; the transcript shows no such hedging by the government. The government reiterates what it proffered at the hearing: "What we do know, as of June

1, 2024, [KING] had approximately $6 million in investment accounts that we were unable to trace. And assuming that amount hasn't been withdrawn, that is sitting in his accounts today." [ECF No. 57 at 15].

## II. Safe Deposit Boxes Controlled by KING Contained Myriad Valuable Assets and a Note Referencing Swiss Bank Accounts and Maltese Citizenship.

Exhibit 3, which the government introduced into evidence at KING's detention hearing, is a 1-page document containing handwritten notes concerning the cost of purchasing Maltese citizenship and transferring $10 million to Swiss bank accounts via the Cooke Islands. The notes are compelling both because they reflect that fraudulent proceeds may be held offshore beyond the reach of law enforcement, and because those with Maltese citizenship can travel freely and reside in any country within the European Union.

At KING's detention hearing, the government unintentionally misrepresented where Exhibit 3 was found. The government proffered that the notes were recovered from KING's office [ECF No. 57 at 13], but they were actually recovered from safe deposit box #3961 at the Mountain Vault storage facility.[1] Though Exhibit 3 was not recovered from KING's office, the safe deposit box from where it was recovered was also accessible and controlled by KING.

---

[1] This misstatement was not made in bad faith. Exhibit 2 (KING's itemized spreadsheet of assets) was found within a navy blue folder in KING's home office. Exhibit 3 was found within a navy blue folder in safe deposit box #3961. In conversations with law enforcement discussing items recovered from a "blue folder," the government confused the two and believed at the time of the representation that both Exhibit 2 and Exhibit 3 were recovered from the blue folder in KING's home office. Government counsel realized the mistake when KING's counsel requested photographs of the specific location where Exhibit 3 was found. Government counsel immediately notified KING's counsel of the misrepresentation, clarified the correct location, and produced all photographs taken by law enforcement during the execution of search warrants on the three safe deposit boxes associated with KING and Gehrke, including safe deposit box #3961.

Records for safe deposit box #3961 show that KING was "Client #2" on the safe deposit box's access card, and Gehrke's mother was "Client 1":

**SAFE DEPOSIT BOX ACCESS CARD**

| | | | |
|---|---|---|---|
| Client #1 JoAN Gehrke | | Box/Account # 3961 | |
| Client #2 Jeffrey A. King | | Size 15X15 | |
| Client #3 | | Key Deposit 75.00 | |
| Date | Time | Authorized Signature | Attendant Signature |
| 5/14/24 | 3:40 | [signature] | DG |
| 5-29-24 | 11:19 | [signature] | DG |

KING, along with Gehrke's trusted friend ("J.T."), was listed as an "additional client" on the safe deposit box lease addendum:

**ADDITIONAL CLIENT:**

By: [signature]
Name & Title: Jeffrey A. King
Date: 5-14-24
Address: 6246 E. Hillcrest Blvd
Telephone No. 480-692-1606
Mother's Maiden Name: WAltmAN
Place of Birth: Garden City

Importantly, KING signed the lease addendum on May 14, 2024, the same day that Gehrke and her mother executed the lease, and the same day that Gehrke's mother accessed the safe deposit box (as noted on the Safe Deposit Box Access Card, above). This shows that KING, Gehrke, Gehrke's mother, and J.T. were present at the Mountain Vault storage facility on May 14, 2024, where they executed the lease and lease addendum and stored items within the safe deposit box. Because the lease addendum afforded KING the same rights and subjected him to the same obligations under the lease as all other signatories, KING practically and legally had control over the safe deposit box and its contents.[2]

[2] KING conflates "access" with "control" when arguing that the probable cause affidavit in support of the criminal complaint is inconsistent with the government's proffer and

This safe deposit box also contained $117,320 cash, among other items:





KING and Gehrke had been together for several years before marrying in February 2024. They leased safe deposit box containing Exhibit 3 three months after their wedding and 1 month prior to their arrest. It defies logic that Gehrke was not only making secret plans to transfer $10 million to Swiss bank accounts, obtain Maltese citizenship, and flee to Europe without her husband's knowledge, but that she thought the best way to conceal this secret plan was to place documentation of its existence in a safe deposit box accessible to him.

Box #3961 was not the only safe deposit box controlled by KING. The week prior, on May 8, 2024, KING and Gehrke leased safe deposit box #4007 at Mountain Vault. Records show that KING was the only individual who accessed the box, and that he did so on May 8, 14, 15, 17, 22, and 31, and on June 11, 2024:

---

evidence. The probable cause affidavit accurately states that although records show that Gehrke's mother *accessed* the safe deposit box, KING had *control* of it. *See* ECF No. 3 at 42-43.

| SAFE DEPOSIT BOX ACCESS CARD | | | |
|---|---|---|---|
| Client #1 Jeff A. King | | Box/Account # 4007 | |
| Client #2 Alexandra Gehrke | | Size 15X10 | |
| Client #3 Joan Gehrke | | Key Deposit 75.00 | |
| Date | Time | Authorized Signature | Attendant Signature |
| 5-8-24 | 3:05 | | |
| 5-14-24 | 2:55 | | |
| 5-15-24 | 2:12 | | |
| 5-17-24 | 2:52 | | SAL |
| 5-22-24 | 2:42 | | |
| 5-31-24 | 3:48 | | SAL |
| 6-11-24 | 12:58 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| The above signed, claiming to be entitled to admission to and control of the contents of this safety deposit box in the vault of Security Mountain Vault, hereby applies for access thereto. | | | |

Within that safe deposit box were gold coins, gold bars, luxury watches, and a green folder labeled "Lexie's Finances: in case of emergency defined as . . . incarcerated or death or incapacitated for > 6 months ex: coma. For Jeff King only":



There was also a bag labeled "London Gold." Records from London Gold reflect that KING and Gehrke purchased over $110,000 of gold in September 2023, during the charged conspiracy:

JEFF & LEXIE KING (No. 164262)
6246 E. HILLCREST BLVD
SCOTTSDALE, AZ 85251

Clerks: BA CP DA
09/22/2023 Sale: S50266B

| Sku No. | Qty | Description | Price Each: | Total: |
|---|---|---|---|---|
| BLN-00001 | 89 | 1/4 OZ BRITISH GOLD<br>NO REFUNDS OR EXCHANGES<br>*ALL BULLION SALES FINAL* | 510.00 | 45,390.00 |
| BLN-00001 | 6 | 1 OZ US EAGLE GOLD<br>NO REFUNDS OR EXCHANGES<br>*ALL BULLION SALES FINAL* | 2040.00 | 12,240.00 |
| BLN-00001 | 15 | 1 OZ MAPLE LEAF GOLD<br>NO REFUNDS OR EXCHANGES<br>*ALL BULLION SALES FINAL* | 2040.00 | 30,600.00 |
| BLN-00001 | 3 | 1 OZ BRITISH GOLD<br>NO REFUNDS OR EXCHANGES<br>*ALL BULLION SALES FINAL* | 2040.00 | 6,120.00 |
| BLN-00001 | 8 | 1 OZ AUSSIE GOLD<br>NO REFUNDS OR EXCHANGES<br>*ALL BULLION SALES FINAL* | 2040.00 | 16,320.00 |
| | | PAYMENT RECEIVED TODAY:<br>09/22/2023 Check 116 110,670.00 | | |

KING and Gehrke also leased safe deposit box #3972 at Mountain Vault on May 14, 2024, the same day they leased box #3961. Records show that KING accessed this box on May 17, 2024, and May 22, 2024. Within that safe deposit box were USB drives containing cryptocurrency, instructions on how to transfer the cryptocurrency, $149,800 cash, and a black case full of gold coins.

In sum, KING had access to and control of three safe deposit boxes, all of which contained substantial amounts of cash and/or other fraudulent proceeds, and one that contained notes referencing transferring millions of dollars to Swiss bank accounts via the Cooke Islands and purchasing Maltese citizenship. This note, combined with the diversity of assets in these safe deposit boxes—cryptocurrency, gold, silver, cash, and luxury watches—and instructions on how to transfer the cryptocurrency demonstrate that KING had access to valuable items and cryptocurrency that could be used to fund his flight if his and Gehrke's U.S.-based bank accounts were seized.

### III. Items Actually and Constructively Possessed by KING Evince Intent to Flee.

As proffered by the government at KING's detention hearing, law enforcement recovered a note on KING and Gehrke's kitchen counter, handwritten by Gehrke, directing whoever had access to the house during KING and Gehrke's European travels to notify Gehrke in the event of an "indeitment" [*sic*] or other harsher legal consequences." [ECF No. 57 at 15-16]. Law enforcement also recovered a book entitled *How to Disappear: Erase Your Digital Footprint, Leave False Trails, and Vanish Without a Trace* from KING and Gehrke's residence. *Id*. That book was located on a bookshelf in Gehrke's closet.

Any doubt as to whether KING and Gehrke believed that criminal charges were imminent is cleared up by their possession of three cellular telephones (in addition to their personal cellular phones) and a Criminal Law Handbook in their carry-on luggage when arrested. KING's prior counsel did not address the possession of these items at the detention hearing, and his current counsel does not do so now. Presumably, this is because there is no reasonable explanation for possessing five cell phones and a criminal law textbook on a five-week European jaunt other than to avoid detection when fleeing the criminal charges that KING and Gehrke suspected were looming.

The belief that the three phones in KING and Gehrke's luggage were intended to shield their communications and avoid detection is bolstered by Gehrke's entry in a small datebook that law enforcement recovered from her and KING's residence. On November 22, 2023, GEHRKE wrote that she "bought burner phones":



The items recovered from KING and Gehrke's house and luggage are sufficiently connected to KING to factor into the risk of flight assessment.

**IV. KING Has Access to a Private Plane.**

The government proffered evidence and photographs establishing that J.T., a close friend of KING's wife, owns an airplane.[3] [ECF No. 57 at 19]. The government noted that J.T. was involved in KING's and Gehrke's fraudulent scheme, made millions of dollars during the scheme, gave a speech at KING and Gehrke's wedding, and was included on the leases of the safe deposit boxes containing proceeds of the fraud. *Id*. Accordingly, due to the close relationship between J.T. and KING's wife, it is reasonable to believe that J.T. would be willing to use her plane to assist KING's flight from prosecution.

KING argues that this argument is immaterial because J.T. was Gehrke's friend, not KING's, and there is no evidence that KING had ever "accessed or [flown] on this plane." [ECF No. 59 at 8].

While it is true that J.T. was friends with KING's wife and not KING, it is also true that J.T. became wealthy as a result of her role in the fraudulent scheme that KING and Gehrke orchestrated together and acquired enough money to afford the private airplane at issue. And based on her involvement in KING and Gehrke's scheme, she knew that KING and Gehrke were keenly aware of her potential criminal exposure. This provides a strong incentive for J.T. to help KING flee.

The argument that KING could not possibly flee on the airplane because there was no evidence he had flown on it previously is unpersuasive. Passports are routinely seized from defendants at their initial appearances without proof that the defendants had traveled internationally. It is the access to transportation, combined with an incentive to use that

[3] KING's prior counsel erroneously represented that this airplane could only fly 250 miles. This is false. Publicly-available information reflects that this airplane is a Cirrus SR22 single-engine aircraft that can fly over 1,200 nautical miles. *See* https://bwifly.com/cirrus-sr22. But even if KING's counsel's representation were true, Mexico's border is fewer than 250 miles away from Phoenix, Arizona.

transportation to flee, that are of concern. Here, KING has a strong incentive to flee and his wife's best friend, who was also involved in the fraud scheme, owns a plane. KING's professional and personal connection to J.T. is a factor that should be considered when assessing KING's risk of flight.

## V. KING Lied to Pretrial Services and CBP.

KING dramatically underrepresented his net worth to Pretrial Services, claiming he was worth approximately $2.5 million when an itemized spreadsheet recovered from his home office (Exhibit 2) reflected that he had approximately 5 times that amount in liquid assets alone.

Notably, KING does not deny that he made material misrepresentations concerning his net worth to Pretrial Services; but instead he blames the government for not providing evidence concerning the length of Pretrial Service's interview, the manner of questioning, and KING's demeanor. [ECF No. 59 at 9]. The truth should not change depending on the length of an interview or tenor of questioning. Nervousness does not explain reporting to Pretrial Services that he had $10,000 in cash when he actually had $100,000 cash in his house and over $260,000 cash in safe deposit boxes that he was leasing. The length of an interview does not explain reporting $2.1 million of stocks and bonds when he had $6 million sitting in two brokerage accounts when questioned. And the manner of questioning does not explain KING's failure to disclose his travel to Mexico on March 31, 2024, when that trip was more recent than other international travel that he did disclose. The blame for false statements made by KING during that interview lies with KING himself, not the government or Pretrial Services.

KING's deception wasn't limited to Pretrial Services—he lied to CBP as well. KING did not claim $10,402 in cash and 1,500 euros in his possession when arrested at PHX after passing all security checkpoints. [ECF No. 57 at 20].

### VI. KING's Ties to the Community Do Not Overcome His Risk of Flight.

The government acknowledges that KING has ties to the community; however, those ties are insufficient to overcome KING's substantial risk of flight.

KING mentions that he is the father of two children. [ECF No. 59 at 11]. What KING does not mention is that his adult child was involved in the fraud scheme; she worked for two companies identified in the indictment—Apex Medical and Viking Medical—from approximately September 2023 through March 2024, and she received at least $22,000. She is also listed as Apex Medical's "Back Office Billing Specialist" in an Apex Medical staff directory.

Furthermore, if convicted, KING faces potentially decades away from his family while incarcerated. The length of his potential sentence provides a strong motivation to flee and live comfortably, domestically or abroad, where his family could regularly travel to see him while he evades prosecution.

## CONCLUSION

KING would like this Court to believe that he was entirely unaware of the contents of his safe deposit boxes, notes on his kitchen counter, the how-to-disappear book in his house, the burner phones and a Criminal Law Handbook in his and Gehrke's carry-on luggage, his own net worth, his travel to Mexico, and the cash and euros he failed to report to CBP. But that position is inconsistent with the evidence and common sense.

As detailed above and as proffered by the government at KING's detention hearing and motion for detention, there is substantial evidence that KING poses a significant risk of flight and that there is no condition or combination of conditions that can reasonably assure his return to court. He is charged with multiple, serious offenses, for which there is abundant evidence supporting his guilt and lengthy potential prison sentence if convicted. He has access to millions of dollars. And based on the items recovered from his house, luggage, and safety deposit boxes, the evidence establishes that he was aware criminal

charges were imminent and was making preparations to flee. Finally, he lied to Pretrial Services and therefore cannot be trusted to comply with this Court's directives.

Accordingly, pursuant to 18 U.S.C. § 3142, the Government urges the Court to detain KING pending trial and deny his motion to revoke the detention order.

Respectfully submitted,

,

GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
District of Arizona

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By: */s/ Shane Butland*
SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

Dated: July 30, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of July, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants who have entered their appearance as counsel of record.

*s/Daniel Parke*
U.S. Attorney's Office