GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Alexandra Gehrke, a/k/a "Lexie" Gehrke,<br><br>Defendant. | CR-24-01040-PHX-ROS<br><br>**UNITED STATES' RESPONSE TO ALEXANDRA GEHRKE'S MOTION TO REVOKE PRETRIAL DETENTION ORDER** |

Defendant Alexandra Gehrke's, a/k/a "Lexie" Gehrke's ("GEHRKE") Motion to Revoke the Pretrial Detention Order ("GEHRKE's Motion") [ECF No. 60], entered by U.S. Magistrate Judge Deborah M. Fine on July 8, 2024, after an evidentiary hearing, should be denied. The government reiterates the arguments made in its detention motion [ECF No.

18] and proffered at GEHRKE's detention hearing [ECF No. 45], and limits the instant response to addressing the arguments made in GEHRKE's Motion and those made by the government that GEHRKE did not address.

GEHRKE's Motion should be denied because she is a significant flight risk and there is no condition or combination of conditions that will reasonably assure her appearance if released. GEHRKE's risk of flight is demonstrated by the following:

- GEHRKE, through companies she owned and controlled, received over $240 million in unlawful kickbacks for her role in a $900 million Medicare fraud scheme.
- GEHRKE is charged with eight offenses. Count 1 has a maximum penalty of 20 years' imprisonment, and GEHRKE faces a combined maximum penalty of 85 years' imprisonment.
- The charges are serious and sophisticated crimes of deceit – GEHRKE conspired to submit thousands of false and fraudulent claims to Medicare for medically unnecessary wound grafts applied to elderly Medicare patients, the majority of whom were terminally ill and in hospice care.
- GEHRKE currently has access to tens of millions of dollars.
- GEHRKE controlled and accessed safe deposit boxes containing hundreds of thousands of dollars of cash, gold, silver, and luxury watches, an unknown amount of cryptocurrency, and handwritten instructions on how to transfer the cryptocurrency in her absence.
- GEHRKE's closet contained a book entitled *How to Disappear: Erase Your Digital Footprint, Leave False Trails, and Vanish Without a Trace*, and atop her kitchen island were notes that she handwrote directing her housekeeper to notify her in the event of an indictment. These items recovered from GEHRKE's residence evinced awareness of looming charges and an intent to flee if charged.
- GEHRKE's best friend has access to a private airplane.
- GEHRKE and her husband, co-defendant Jeffrey King ("King"), possessed a Criminal Law Handbook and three burner phones in carry-on luggage when arrested

at the Phoenix Sky Harbor International Airport ("PHX").

- GEHRKE lied to Pretrial Services concerning her net worth, the value of her assets, her drug usage, and her recent foreign travel to Mexico.

## PROCEDURAL HISTORY

On June 17, 2024, a criminal complaint was filed charging GEHRKE and King with one count of conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349). That evening, law enforcement arrested GEHRKE and King at PHX as they boarded a flight to London, England.

On June 18, 2024, GEHRKE and King were indicted for conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States and to pay and receive kickbacks (18 U.S.C. § 371), solicitation and receipt of kickbacks (42 U.S.C. §§ 1320a-7b(b) and 18 U.S.C. § 2), and transactional money laundering (18 U.S.C. §§ 1957 and 2). [ECF No. 6]. The Indictment also seeks forfeiture of assets belonging to GEHRKE and King, including two residences; four luxury vehicles; over $500,000 of gold bars, gold coins, and jewelry; over $52 million held in 11 bank accounts; and two $8,000,000 life insurance policies. *Id.* at 18–20.

The Indictment alleges that GEHRKE and King orchestrated a massive scheme to defraud Medicare by targeting elderly patients, many of whom were terminally ill in hospice care, and causing medically unnecessary and highly expensive amniotic wound dressings ("allografts") to be applied to these vulnerable patients. *Id.* at 2. From November 2022 through May 2024, GEHRKE, King, and their co-conspirators, individually and through companies they owned and controlled, caused more than $900 million in false and fraudulent claims to Medicare for these medically unnecessary allografts applied to fewer than 500 patients. *Id.* at 2–3. Medicare and other health care benefits programs paid over $600 million based on these false and fraudulent claims. *Id.* at 3. GEHRKE and King received over $330 million in unlawful kickbacks as a result of their fraud scheme. *Id.*

GEHRKE and King were ordered to be detained after evidentiary hearings on July 8, 2024, and July 9, 2024, respectively.

## LEGAL STANDARD

The Bail Reform Act ("BRA") provides that a defendant should be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required . . . ." 18 U.S.C. § 3142(e)(1). This analysis involves a "two-step inquiry." *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019–20 (D. Ariz. 2006). *Id.* First, the Court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at 1020 (quoting 18 U.S.C. § 3142(f)(2)). The government bears the burden of proving such risk of flight by a preponderance of the evidence. *Id.* Second, if the defendant is likely to flee, the Court next must determine whether any condition or combination of conditions for the defendant's release will reasonably assure the appearance of the defendant. 18 U.S.C. § 3142(f).

The BRA provides the following four factors for courts to consider when determining whether to detain a defendant: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, which includes, among other things, the defendant's financial resources, past conduct, and history related to drug abuse; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release. 18 U.S.C. § 3142(g).

Under 18 U.S.C. § 3145(b), a person who is ordered detained by a magistrate judge may file a motion for revocation or amendment of the order with the court having original jurisdiction over the offense. The motion is to be determined promptly. *Id*. The district court is to "review of the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The district judge may hold additional evidentiary hearings if "necessary or desirable," and "its power to do so is not

limited to occasions when evidence is offered that was not presented to the magistrate." *Id.* (citing *United States v. Delker*, 757 F.2d 1390, 1394–95 (3d Cir. 1985)).

## ARGUMENT

The evidence establishes by far more than a preponderance of the evidence that GEHRKE presents a serious risk of flight, and there is no condition or combination of conditions of release that can reasonably assure her appearance as required.

### I. The Nature and Circumstances of the Offense Are Extremely Serious

As noted above, the charges against GEHRKE are extremely serious: GEHRKE is charged with eight felony offenses for orchestrating a massive scheme to defraud Medicare and other insurance programs by ordering and causing the ordering of extraordinarily expensive wound grafts that were applied to elderly and often dying patients without medical necessity. GEHRKE designed the operation to generate as much money as possible without concern for the reasonableness or medical necessity of the treatment: she paid illegal kickbacks to a group of sales representatives based on the number of grafts they ordered and that were applied to the patients; she trained the sales representatives to order and recommend the ordering of excessively large grafts; she instructed the sales representatives to target Medicare beneficiaries—with an emphasis on terminally ill patients receiving hospice care—because those patients could generate the most money for her and her company; and she imposed a default 10-week "treatment" program to maximize her profits per patient.

In approximately 1.5 years, Medicare was billed approximately $900 million for the grafts applied to fewer than 500 beneficiaries. And because the health of the patients was secondary to profits, medical records reflect that grafts were applied on infected wounds, wounds that had already healed, and on patients who died on the same day as the treatment.

### II. Weight of the Evidence

As reflected in the Indictment, the evidence proffered at the detention hearing, and the government's Motion for Pretrial Detention, the weight of the evidence is extremely strong. It consists of cooperating witnesses, bank and financial records, medical records,

and audio and video recordings. *See* ECF No. 45 at 13. GEHRKE is even quoted in paragraph 29(j) of the Indictment directing the sales representatives to order excessive allografts ("only in sizes 4x6 centimeters or larger") without considering whether those sizes were medically necessary ("even if the patient's wound 'was the size of [GEHRKE's] little fingernail.'"). *See* ECF No. 6 at 10. This statement encapsulates the brazenness of GEHRKE's scheme: GEHRKE made this statement—which amounts to an explicit instruction to commit health care fraud—during a company meeting that she led and knew was being recorded.

When it comes to the weight of the evidence, GEHRKE wants to have it both ways. She simultaneously asks this Court to disregard the evidence because it has "yet-to-be-examined" [ECF No. 60 at 5] and to also find that this unexamined evidence "is not extraordinary" and "typical of any alleged health care fraud scheme." *Id.*

In response to the latter point, this case is anything but typical—the government knows of no cases charged in the District of Arizona with a loss amount approaching that alleged in this Indictment. Moreover, the variety, amount, and quality of evidence in this case not only distinguishes it from other health care fraud schemes, but other criminal cases more generally. Though the government identified cooperator testimony among the categories of evidence against the defendants, some of the most probative evidence does not depend upon the credibility of witness. Some of this evidence includes video and audio recordings, internal documents, emails and text messages sent and received by GEHRKE, and voluminous bank records showing the exorbitant illegal kickbacks that GEHRKE received as well as the web of financial transactions that GEHRKE conducted to obfuscate the location and source of the fraudulent proceeds.

Though the government recognizes that the 9th Circuit has characterized the weight of the evidence as the "least important of the various [18 U.S.C. § 3142] factors," *see United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008), it is nevertheless a factor to be considered. And in this case, the weight of the evidence is very strong.

### III. History and Characteristics of GEHRKE Support Detention

GEHRKE argues, in conclusory fashion and without evidence, that she has "excellent character" and an "excellent reputation in her community," and that "there is absolutely no evidence to controvert that." [ECF No. 60 at 6].

In fact, contrary to GEHRKE's assertion, there is substantial evidence controverting the excellence of GEHRKE's character, including: the existence of an indictment charging her with 8 felony charges related to her orchestration of one of the largest—if not the largest—health care fraud schemes in the history of the District of Arizona; falsely certifying to Medicare (on more than one occasion) that she would comply with the laws and regulations attendant to the Medicare program; laundering millions of dollars of fraudulent proceeds by purchasing luxury items, such as designer clothes, jewelry, vehicles, real estate, gold, silver, and cryptocurrency; involving her mother and step-daughter in the fraudulent scheme; and lying to Pretrial Services. This evidence is further detailed below.

#### 1. GEHRKE's Physical and Mental Condition Support Detention

GEHRKE represents that she is in "excellent physical condition, and in good mental condition." [ECF No. 60 at 6].

Pretrial Services disagrees. As it noted in GEHRKE's Pretrial Services report, GEHRKE "poses a risk of nonappearance based upon . . . lack of candor regarding her substance use history, and possible mental health issues." [PSR at 4]. It is apparent that this conclusion stems from the circumstances surrounding GEHRKE's urinalysis. Pretrial Services reported that GEHRKE refused to answer questions about her use of illicit substances (other than marijuana) and initially declined to submit to a urinalysis as part of the Drug Identification and Treatment Program. *Id*. When GEHRKE ultimately agreed to submit to a urinalysis several hours after the initial bail interview, the sample tested positive for both amphetamine and methamphetamine. *Id*. Despite the positive test, GEHRKE denied using methamphetamine. *Id*.

Judge Fine discounted the result because it was an "initial test" that had "not been sent off to the lab," and surmised that the result may have been a false positive based on GEHRKE's use of prescription amphetamine. [ECF No. 45 at 47]. The government respectfully disagrees. This Court should not discount such evidence as it not only reflects upon GEHRKE's mental and physical health, but her candor and credibility with an arm of the Court.

Preliminarily, GEHRKE's physical condition, mental condition, and history relating to drug or alcohol abuse, are statutorily delineated factors to be considered when assessing an individual's risk of flight. *See* 18 U.S.C. § 3142(g)(3)(A).

Additionally, the available evidence suggests that GEHRKE's positive urinalysis result for methamphetamine was not a false positive. GEHRKE reported to Pretrial Services that she is prescribed Adderall, a legal amphetamine, to treat her Attention-Deficit/Hyperactivity Disorder ("ADHD"). [PSR at 3]. Adderall and methamphetamine are not the same: Adderall is an amphetamine that is available by prescription to treat ADHD and narcolepsy. *See* https://pubmed.ncbi.nlm.nih.gov/23796480/. According to IQVIA, a health care data and analytics company, over 41 million prescriptions for Adderall were dispensed in the United States in 2021. *See* https://www.axios.com/2022/11/15/adderall-shortage-adhd-diagnosis-prescriptions. Today, Desoxyn is the only product legally available by prescription that contains methamphetamine. *See* https://test.deadiversion.usdoj.gov/drug_chem_info/meth.pdf. Only approximately 8,000 prescriptions for methamphetamine were dispensed in 2021. *Id*. Much more commonly, methamphetamine is used illegally for non-medical purposes due its stimulant and euphoric effects. *Id*. Methamphetamine can be smoked, snorted, injected, or orally ingested, and it remains one of the most commonly misused stimulant drugs in the world. *See* https://nida.nih.gov/publications/research-reports/methamphetamine/how-methamphetamine-misused.

The difference between the two drugs is underscored by the fact that Pretrial Service's urinalysis tests for both; if the presence of one would yield a positive result for the other, there would be no need to test for both.

Moreover, GEHRKE's behavior is consistent with someone who was attempting to conceal illicit drug use. She admitted to taking Adderall—a prescribed controlled substance—daily, *see* PSR at 3, but refused to answer questions concerning her use of any illicit substances other than marijuana. Her consciousness of guilt explains why she refused to discuss her drug usage and why she initially refused to submit to the urinalysis; had she only ingested Adderall, a positive result for amphetamine could be easily explained. Not so for methamphetamine.

Though GEHRKE's use of methamphetamine is certainly concerning and relevant to her physical and mental health, of greater concern is her willingness to lie to Pretrial Services. As further explained below, GEHRKE's dishonesty was not limited to her substance abuse—she also lied to Pretrial Services about her finances and foreign travel.

**2. Family Ties**

The government has no reason to dispute GEHRKE's self-reported family ties to the Phoenix area; however, the government notes that GEHRKE's only immediate local relative—her mother—was involved in the fraudulent scheme.[1] In the early days of the fraud, GEHRKE's company was operated out of her mother's residence. Thereafter, GEHRKE employed her mother at Apex Medical LLC, one of the companies that GEHRKE created and used to perpetuate the charged fraud. Bank records show that between October 2022 and December 2023, GEHRKE paid her mother over $1.8 million. And in only two months between August 2023 and October 2023, bank records show that GEHRKE transferred an additional $3.5 million of fraudulent proceeds to an account in the name of APX Med LLC, which she and her mother jointly controlled.

[1] GEHRKE reported to Pretrial Services that her father is deceased and she has no siblings.

Additionally, GEHRKE, her mother, and KING were the lessees of three safe deposit boxes that contained over $260,000 cash, cryptocurrency, instructions on how to transfer the cryptocurrency, luxury watches, gold coins and bars, and assorted jewelry, among other fraudulent proceeds.

Thus, GEHRKE's strongest tie to the Phoenix area is an individual who reaped significant profits from GEHRKE's fraudulent scheme and could use that money to visit GEHRKE wherever GEHRKE flees.

**3. Financial Resources**

The government reiterates here what it proffered at GEHRKE's detention hearing: of the $240 million in kickbacks that GEHRKE received from Company 1 through companies she owned and controlled, bank records reflect that she diverted approximately $100 million to her own personal accounts and accounts in the names of companies she owned and controlled. [ECF No. 45 at 14]. The government has seized approximately $60 million from GEHRKE's bank accounts and a life insurance annuity, which means that approximately $40 million is unaccounted for. *Id*. As the government represented, it has been unable to trace those funds "based on the way this defendant was shifting money around between various banks and bank accounts in the names of LLCs that did not serve any legitimate business purpose." *Id*.

Contrary to GEHRKE's assertion, simple math and deductive reasoning establish by a preponderance of the evidence that GEHRKE has access to tens of millions of dollars.

GEHRKE represented to Pretrial Services that her net worth was $17,414,000. The amount of money seized by the government alone is more than three times that amount. And the $60 million seized doesn't include the additional $40 million that the government has not accounted for, nor GEHRKE's omission of several other extremely valuable assets: GEHRKE's luxury vehicles were worth over $890,000 (her Mercedez G63 was worth approximately $361,000; her Ferrari 488 was worth approximately $304,000; and her Mercedes AMG Roadster was worth approximately $230,000); she and King purchased hundreds of thousands of dollars' worth of gold coins, gold and silver bars, jewelry, and

designer clothes and accessories; and over $360,000 in cash and cryptocurrency was seized from her safe deposit boxes and personal residence. The government adopts Judge Fine's assessment of GEHRKE's assets:

> What also struck me was the complexity of not only the underlying alleged events, but of the web of financial assets that the defendant had control over at the end of this very short period of time. . . . [T]he defendant is highly intelligent and was extremely organized. Whether eventually the defendant is convicted of any crime, there's just no doubt that the defendant is capable of extremely complex business and financial and other planning and logistics.

[ECF No. 45 at 46-47].

While GEHRKE would like this Court to believe that her underrepresentation to Pretrial Services can be attributed to her inability to accurately estimate her asset portfolio while in custody, *see* ECF No. 60 at 7, the suggestion that an honest mistake is to blame for a $45 million rounding error stretches credulity.

**4. Cryptocurrency Access**

GEHRKE discounts the recovery of cryptocurrency from a safe deposit box leased by GEHRKE and GEHRKE's handwritten instructions on how to transfer it because the cryptocurrency was seized by the government and "there is no evidence that [she] left this note for the purpose of someone's transferring any cryptocurrency abroad." [ECF No. 60 at 9].

The fact that GEHRKE did not date her handwritten transfer instructions or otherwise specify that she wanted the cryptocurrency transferred to her while she was abroad is of no consequence—the purpose of the instructions was to enable someone other than GEHRKE to access the cryptocurrency in GEHRKE's absence and transfer it to her wherever she was physically located in the world.

The government has never suggested that GEHRKE intended to flee when boarding the flight to England; in fact, at GEHRKE's detention hearing, the government stated, "I never argued that at the time she [GEHRKE] was arrested at the Phoenix airport, she was going to flee the country for good. What I did say, is that she had set things in place, that

if she wanted to stay in Europe, she had the ability to do so." [ECF No. 45 at 38]. That representation holds true.

The importance of the cryptocurrency and transfer instructions is less about its monetary value than what it says about GEHRKE's mindset: GEHRKE, believing that criminal charges were imminent, obtained a source of transferable, digital income that she could receive instantaneously anywhere in the world and use to live abroad while evading prosecution. That supports the conclusion that she presents a strong risk of flight if released.

**5. GEHRKE Has Access to her Best Friend's Plane**

GEHRKE argues that her access to a friend's private plane is inconsequential, as the plane's "range is short," her "friend is not a pilot," and GEHRKE "has no passport on which to travel internationally." [ECF No. 60 at 9].

GEHRKE's claim that the plane's "range" was too short to allow GEHRKE to flee is false. Publicly available information indicates that the plane is a Cirrus SR22 single-engine aircraft that can fly over 1,200 nautical miles. *See* https://bwifly.com/cirrus-sr22. The Mexico border is less than 200 miles away.

Moreover, GEHRKE's argument that her access to the plane presents no risk of flight because the owner isn't a pilot is specious. No one buys a plane if they can't use it. A plane, a pilot, and a favor are all that GEHRKE would need to flee: GEHRKE's friend—who spoke at GEHRKE's wedding and made millions of dollars from GEHRKE's scheme—has access to a plane and a pilot, and her relationship with GEHRKE suggests that she may grant the favor.

**IV. Items Actually and Constructively Possessed by GEHRKE Evince Her Intent to Flee.**

GEHRKE does not address her possession of handwritten notes, books, and burner phones that indisputably evince her intent to flee.

As proffered by the government at GEHRKE's detention hearing, law enforcement recovered a note on GEHRKE and King's kitchen counter, handwritten by GEHRKE,

directing whoever had access to the house during their European travels to notify GEHRKE in the event of an "indeitment" [*sic*] or other harsher legal consequences." [ECF No. 45 at 16]. Law enforcement also recovered a book entitled *How to Disappear: Erase Your Digital Footprint, Leave False Trails, and Vanish Without a Trace* from GEHRKE's closet. *Id*.

Any doubt as to whether GEHRKE believed that criminal charges were imminent is cleared up by her and King's possession of three cellular telephones (in addition to their personal cellular phones) and a Criminal Law Handbook in their carry-on luggage when arrested. There is no reasonable explanation for possessing five cell phones and a criminal law textbook on a five-week European jaunt other than to avoid detection when fleeing the criminal charges that GEHRKE suspected were looming.

The belief that the three phones in GEHRKE and King's luggage were intended to shield their communications and avoid detection is bolstered by GEHRKE's entry in a small datebook that law enforcement recovered from her and King's residence. On November 22, 2023, GEHRKE wrote that she "bought burner phones":




## V. GEHRKE Lied to Pretrial Services

A pattern of lies, omissions, and deceit can be found in GEHRKE's statements to Pretrial Services.

In addition to GEHRKE's lies concerning her drug usage and net worth, discussed above, she also lied about her foreign travel. GEHRKE reported to Pretrial Services that her last foreign travel was to the Bahamas in February 2024 for her honeymoon. [PSR at

2]. While travel records show that this was accurate, law enforcement databases also reflect that GEHRKE and King reentered the United States from Mexico on March 31, 2024, at the Lukeville border crossing in Arizona. Judge Fine noted that Mexico can be reached from Phoenix in less time than it takes to watch the movie Oppenheimer. *See* ECF No. 45 at 48. And GEHRKE would not need travel documents to make her way across the border and beyond the reach of law enforcement.

## **CONCLUSION**

GEHRKE asks this Court to discount the severity of the offenses, weight of the evidence, her substantial financial resources, positive drug test and subsequent denial, access to a private plane, possession of burner phones and a how-to-disappear book, and misrepresentations to Pretrial Services. Any one of those factors may have an innocent explanation, but all of them cannot. As Judge Fine determined at GEHRKE's detention hearing, "[w]hen you look at the whole—all of it, there is just no question that by a preponderance of the evidence, indeed far more than that, this defendant is a serious flight risk." [ECF No. 45 at 49]. The government has proven by a preponderance of the evidence that GEHRKE has the means, the sophistication, and the intent to flee the District of Arizona if released from custody, and there is no condition or combination of conditions that can obviate that risk. Accordingly, pursuant to 18 U.S.C. § 3142, the Government urges the Court to detain GEHRKE pending trial and deny her motion to revoke the detention order.

Respectfully submitted,

,

GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
District of Arizona

GLENN S. LEON
Chief

Criminal Division, Fraud Section
U.S. Department of Justice

By: */s/ Shane Butland*
SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

Dated: August 9, 2024