**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America,          ) | |
|                                     )   No. **2:24-cr-01040-ROS** | |
|            Plaintiff,               ) | |
|                                     ) | |
|            vs.                      )          Phoenix, Arizona | |
|                                     )          August 27, 2024 | |
| Jeffrey King,                       )          1:37 p.m. | |
|                                     ) | |
|            Defendant.               ) | |
| _____ ) | |

**BEFORE:   THE HONORABLE ROSLYN O. SILVER, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**MOTION TO REVOKE DETENTION AS TO JEFFREY KING**</u>

**APPEARANCES:**
For the Plaintiff:
    U.S. ATTORNEY'S OFFICE
    By:  **Mr. Matthew Williams, Esq.**
    2 Renaissance Square
    40 N Central Ave., Ste. 1800
    Phoenix, AZ 85004

For the Defendant:
    RAFFERTY LAW, LLC
    By:  **Mr. Brian T. Rafferty, Esq.**
    1575 Johnson Rd., NE
    Atlanta, GA 30306

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**P R O C E E D I N G S**

COURTROOM DEPUTY:  This is case number CR 2024-1040, United States of America versus Jeffrey King.  This is the time set for oral argument on defendant's motion to revoke detention order.

Will the parties please announce for the record.

MR. WILLIAMS:  Good afternoon, Your Honor.  Matt Williams for the United States.

MR. RAFFERTY:  Good afternoon, Your Honor.  Brian Rafferty on behalf of Jeffrey King.

THE COURT:  All right.  Mr. Rafferty, you filed the motion.  Let me hear what you have to say.

MR. RAFFERTY:  Thank you.  May I come to the podium?

THE COURT:  Yes, please do.

MR. RAFFERTY:  Your Honor, to begin with, what I want to start with are those facts and issues that I think are undisputed, beginning with one of the four factors that the Court should consider under the Bail Reform Act, that's the personal history and characteristics of Mr. King.

The government didn't dispute that Mr. King has very deep ties to this community.  He's virtually a life-long resident of Arizona.  He has two children, one of whom is in the courtroom here today, the other who is in school in San Diego.  He's hoping to enlist in the Army after he graduates from high school, just like his dad.

Mr. King is a decorated -- he was a veteran.  He's a disabled veteran.  He served this country proudly and honorably for several years.  He has no criminal history whatsoever.  He has no history of alcohol abuse; no history of drug abuse; no history of nonappearance at all in connection with any case.  And in light of the fact that that's one of the four factors that the Court should consider, his personal history and characteristics, I submit it weighs heavily in favor of his release.

What's also undisputed is that the law makes clear that to the extent that detention is being considered, it should only be considered in the rarest of cases.  And if there is any question or doubt, that doubt or question should be in favor of Mr. King.

What's also clear is that Mr. King has two Pretrial Services reports that have now been issued, the initial Pretrial Services report when he was first interviewed, and the more recent Pretrial Services report that was just issued yesterday.  And what's undisputed is that in both of those reports --

THE COURT:  Well, let's see.  I'm not sure I have that report.

MR. RAFFERTY:  It was --

THE COURT:  I may have it.  Okay.  Hold on.

Yes.  Thank you.

MR. RAFFERTY:  It was filed yesterday.

THE COURT:  Yes.  Yes.

MR. RAFFERTY:  The earlier report was filed.  And both reports, both reports recommend that Mr. King be released, that he be released on conditions, and, in fact, be released on conditions that are less than the conditions that I've offered up for this Court that I believe would ensure Mr. King's future appearance in court and alleviate any concerns of the government about his future nonappearance.

What's also undisputed, Your Honor, is that -- and I'm not making any intentional -- I'm not saying it was intentional, but it's clear that at the detention hearing the government misrepresented some critical facts that the government believed tied Mr. King to evidence of flight, these handwritten notes that were represented by the government as being in his home office and which connected him to evidence about going to Malta and opening Swiss bank accounts.

After I got involved in this case, Your Honor, I asked for the evidence that that actually shows that those notes were in his office, and, in fact, the government conceded that that was incorrect, that there is no evidence connecting Mr. King to those notes as represented by the government at the detention hearing.

And, more importantly, Your Honor, the magistrate court who took its time after that hearing and sent the parties

for a few hours to think about the evidence, came back and issued a written order that specifically cited to the evidence that the government now concedes isn't accurate at all.  And so it's undisputed that the Court relied on factual errors by the government in detaining Mr. King in the first place, so that's also undisputed.

So what else do we have?  We have evidence of books that were in the possession of Mr. King's wife.  Evidence of notes that appear to be the notes of Mr. King's wife.  And connections to a plane, which I'll get to in a moment, that the government contends somehow makes Mr. King a risk of flight.

But the government offers no evidence, Your Honor, none, that connects Mr. King to the handwritten notes of his wife; that connects Mr. King to the books of his wife; that connects Mr. King to this plane.

And speaking of the plane, Your Honor, one thing that has happened since all of the papers were submitted is that the woman who was the owner of the plane has now been interviewed and appears to be cooperating with the government.  And the government provided a reported interview of that person.  And I won't name her in court here today out of deference to the government's continuing investigation.  I have copies of her interview, Your Honor.  But there are certain things that are in that report --

THE COURT:  Tell me what the interview is just

synoptically.

MR. RAFFERTY:  I will just use her initials as JT. She was interviewed by the FBI pursuant to a proffer agreement. She was interviewed about a lot of different issues, most of which relate to Ms. Gehrke and not Mr. King.  But she was specifically asked, Your Honor, about Mr. King, and what she said is she knew Mr. King through Gehrke.  She said Tryba did not know Jeff's role at APX, which is one of the companies at issue in this indictment.  She was surprised to find out that Jeff even owned APX.  And Gehrke, Mr. King's wife, told Tryba that Jeff was an idiot, in quotes.  Gehrke and Jeff fought a lot and Gehrke didn't want Jeff working there at all.

The interview goes on, Your Honor, and talks about assets, and talks about how Ms. Gehrke, and not Mr. King, was meeting with a Swiss banker at the airport the day before they flew -- they were scheduled to fly to London.  Mr. King is not connected to that at all.  They spent hours with this witness, JT, and there is no reference at all with anything to do with an airplane or Mr. King's intention to use it.

The last thing I'll say, Your Honor, is they asked her about assets and cryptocurrency.  And the witness said Gehrke gave Tryba crypto ledgers and told her to keep it a secret from Jeff because she didn't want him to know.

So, in essence, Your Honor, you have a cooperating witness for the government who I've never spoken with.  I've

never interviewed.  The government had the opportunity to interview and ask all the questions it wanted to about Mr. King.  And, clearly, the tone of this interview is that while the government may have assumed that the relationship between my client and his wife was like a lot of husbands and wives, it clearly wasn't.  Wives and husbands don't call each other idiots, as the government's witnesses are saying.  Wives and husbands who are so close aren't hiding things from each other, as was clearly the case here.

And so that not only raises questions, Your Honor, about the risk of flight, because, again, it was this plane and Mr. King's purported connection to it that the government spoke to frequently, but also it goes to a question about the overall strength of the evidence, which is another one of these factors.

The government assumed, I believe, and it's set forth in both the indictment and the criminal complaint that was filed, that because they were husbands and wives, they worked hand in glove on a lot of things.  But the witnesses, including JT, demonstrate that that may not have been the case.

And, again, they did not have an opportunity to interview JT before they took a charging decision against Mr. King, before they moved to detain him, before they filed all their detention memos.  This only came to light to me in the last two weeks, and I believe the government only learned

of it in the last two weeks.  And so I submit it puts a different light on the whole argument about planes.

But there are other witnesses that I have reports of interview for who say similar things.  Dr. G, who was the owner of APX, according to the evidence that I've seen, the coowner of this business APX, he said he did not know Jeff King other than Goss went to King and Gehrke's wedding.  Goss did not know that King was a 50 percent owner of APX.

The point of that, Your Honor, is this.  They're supposedly co-owners of the business, but Dr. G doesn't even really know Mr. King, according to his own interview.  And the documents show that a lot of the financial records about money changing hands, a lot of that money goes to Dr. G and not to Mr. King.

The last witness I just wanted to point Your Honor out to is a witness whose initials are DB.  DB was also interviewed after they moved for detention and made all the arguments that they made about Mr. King.  DB was asked about Jeff King.  DB stated that King was known as the practice owner but he wasn't at the practice a lot.  DB felt that King just got wrapped up with the wrong lady.  DB believed that King was employed at APX to allow more money to be syphoned to Ms. Gehrke.

Again, I'm not making arguments about the strength of the overall evidence in this case, Your Honor, I'm simply making arguments here about the strength of the evidence

against Mr. King, because that's another factor that the government emphasized. Although it's clear that that's one of the least important factors, but it certainly was one factor, and it was a factor cited in that same detention order that the government emphasized about why Mr. King should be detained.

And I think these reports, this new evidence sheds a different light on this case, and certainly sheds a different light on this issue about Mr. King, his risk of flight, and this airplane.

So what are we left with, Your Honor? We're left with allegations that Mr. King lied to Pretrial Services and lied to CBP. Your Honor, I've been doing this for a long time. I've participated in a lot of Pretrial Services interviews. And, in my experience, when Pretrial Services does an interview, they're simply trying to determine in as quick amount of time as they can what assets a person has, what kind of money they have, and whether they can post a bond.

That's clearly what this interview was. It was 15 minutes. They were asking him questions, and he disclosed the existence of millions of dollars in assets. He wasn't being asked about his net worth, or about Ferraris or whatever else the government thinks. He was simply being asked: What kind of assets do you have? He disclosed millions of dollars to the probation officer, who still believes to this day that he should be released on conditions. And there are conditions

that I'm going to get to in a moment that I think would assure his future appearance in court.

The last point that I'm going to make, Your Honor, is about CBP, the circumstances surrounding that. He's literally walking on the plane and he gets arrested on the gangway. They're putting handcuffs on him and they ask him, do you have any cash on you? And he panics. I don't know what I have. What am I being arrested for? And they accuse him of lying under those circumstances. He clearly didn't lie.

So, Your Honor, I submit to you that given everything that we've heard and seen, and the evidence that's been presented, there are -- there are conditions, or combinations of conditions that would ensure Mr. King's future appearance in court. And I've suggested some of those to the government before this hearing, last week before our hearing. Over the weekend I spoke with members of the fraud section who were not able to be here offering up conditions.

And I have some things in mind, if I could just go back to my table for a moment. The government spoke about Mr. King's children in one of their pleadings, that he could easily just go across the border and his kids could come with him. I'll alleviate those concerns, Your Honor. Not only has Mr. King already given the Court his passport, I have the passports of his two kids. I'm prepared to surrender those today.

As I said, Mr. King's passport is already in the possession of Pretrial Services.  I've talked about electronic monitoring.  He will wear an electronic monitor.  I've explained that to him.  He would have to pay the cost of that.  It would basically mean he's in his house 24 hours a day unless Pretrial Services wants him to work or something else.  And we'll agree to that.

And I don't think, Your Honor, it's enough to say, well, because we're in Arizona, he could just cut it off and cross the border.  That can't possibly be the standard that the Court should apply about whether to impose electronic monitoring, that somebody could cut it off.  Because, by that logic, then every defendant who is on a border state would have to be detained, because every one of them could cut that ankle monitor off.  And I just submit the Court should not give credence to that kind of an argument.  He is willing to wear an electronic monitor and do whatever else the Court deems necessary to assure his future appearance in court.

And when it comes to finances, I've told the government -- I've heard their concerns about his money.  I've expressed a willingness to work with the government in any way to identify assets that they think exist, to make those available.  I've offered to the government to give them whatever assets they claim were traced, to put them in some kind of an account so that the government could have them

pending the outcome of this case.

But there are conditions, there clearly are.  Pretrial Services has already said that twice.  And I would just ask the Court to set those conditions, to allow Mr. King to be released to help me help him defend what isn't a very complicated case with a lot of evidence that I could use his benefit -- the benefit of his work to help me get through it.

And with that, Your Honor, I turn it back to the government.

THE COURT:  Okay.  Let me ask you some questions.

So, as I'm reading all the papers that have been provided to me, it appears that the $7 million, or $6.7 million has not been accounted for, correct?  Is that the potential funds?

MR. RAFFERTY:  I believe the government has made that allegation, but at the same time, Your Honor, in the discovery that I've been provided, they have the records of that account. The question is -- they just haven't gotten around to tracing it back to seizing it.  And as I expressed, I'm prepared to work with the government to give them that money.  There is other money that I can identify I found.

There was a construction project that Mr. King was scheduled to build out a studio.  I've talked to the lawyer who was handling that project for his client.  I've told him we're not doing the project, and I told him that I wanted to have the

13

money returned so I could give it to the government.  That's what I told them today.  And I'm prepared to do whatever other steps I need to do in order to alleviate the concerns about the money, because that is really it.

THE COURT:  Let me ask the government.  As I read your response to the motion, it seems that the -- you are arguing, or you're assuming, or you have evidence that this $7 million is unaccounted for; am I correct?

MR. WILLIAMS:  You are correct, Your Honor.

THE COURT:  And so when you say -- you can -- you can be seated.

Both of you can be seated.

MR. RAFFERTY:  Thank you, Your Honor.

THE COURT:  And when -- as I read it, it's unaccounted for.  What evidence do you have that it still exists and is potentially accessible to the defendant?

MR. WILLIAMS:  Your Honor, when it comes --

THE COURT:  Please be seated so I can hear you.

MR. WILLIAMS:  Oh, sorry.

Your Honor, when it comes to the finances in this case, defense counsel is correct, this is a rare case.  In this case, the defendant is charged in connection with what has been described to me as the largest healthcare fraud scheme in the history of the District of Arizona, potentially one of the largest in the history of the United States.  Specifically, in

UNITED STATES DISTRICT COURT

this case, the government has alleged that this defendant, along with his wife and co-defendant --

THE COURT:  Yeah, I know.  I know what you contend.  So -- and, you know, that -- that means there was probable cause to believe that a crime has been committed.

MR. WILLIAMS:  Yes.

THE COURT:  And probable cause to believe that the defendant committed the crime.  But what -- let's answer my questions.

Because it is critical to my determination that funds that the government believes are available to the defendant are, in fact, available to the defendant.  In your response to the motion, you implied that this $6 million was unaccounted for, or you couldn't find it, or the government couldn't find it.  Is that still your position?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  And when you say that, do you have reason to believe that he still has access to it?

MR. WILLIAMS:  I do not believe that --

THE COURT:  Even, you know, what I'm saying, other than guessing, take me through that that $7 million, or $6.7 million -- it's cash, right?

MR. WILLIAMS:  I believe it is, Your Honor.

THE COURT:  Well, counsel, you are here.

MR. WILLIAMS:  Yes.

THE COURT:  It is -- this is -- this is a trial de novo.

MR. WILLIAMS:  Yes.

THE COURT:  So the government continues to have the obligation by a preponderance of evidence to establish that the defendant should be detained or that his detention should be -- should remain.  This is a critical issue.  It was raised by the government.  Mr. Rafferty has, to some extent, responded to it, but if the defendant has access to these funds, that is an issue that concerns me.

MR. WILLIAMS:  Yes.  As the government stated, Your Honor, in its -- in its motion and response on page 6, as of June 1st, 2024, bank records reflected that King had approximately 6 million in two investment accounts in his name.  Even assuming that all that 6 million of those accounts was derived from earlier referenced 6.7 million that King had withdrawn from his other accounts in April 26, '24 -- '24, there remains approximately 7 million which hasn't been accounted for.  That refers back to --

THE COURT:  Okay.  So let me stop you.  It sounds like -- you are saying bank accounts.  It sounds like it was cash.  Is that what you're saying?

MR. WILLIAMS:  There was a cash withdrawal, Your Honor.

THE COURT:  Yeah, I know there was a withdrawal, but

what you are telling me, which I return to this issue, is is there any reason to believe that the defendant still has access to 6.7 or $7 million?

THE COURT: Well, you know what, I don't have those exhibits.

MR. WILLIAMS: Your Honor, if I may direct your attention to -- I believe the government provided some exhibits.

THE COURT: Well, you know what, I don't have those exhibits.

MR. WILLIAMS: I'm sorry. I provided them to the courtroom deputy, Your Honor.

THE COURT: Oh.

MR. WILLIAMS: They're three yellow sheets.

THE COURT: Counsel, attach them to your motion. I read these motions.

MR. WILLIAMS: My apologies.

THE COURT: All right. You want me to look at what?

MR. WILLIAMS: These are the exhibits that were originally admitted at the detention hearing before Magistrate Judge Bachus.

If I can refer your attention to Exhibit 2. When we're discussing the numbers in this case, as far as coming -- arriving at these different sums, as referenced in the government's motion, Docket Number 64, we discuss this Exhibit Number 2, which is a spreadsheet that was taken from the defendant's home office from a blue binder.

In this spreadsheet, he delineates the assets for which he has.  And it goes through and it includes items like the 2016 Ferrari, you know, valued at $280,000, that is titled under another business and belongs to him and is his sole and separate property.

In going through in -- in this case, Your Honor, when the government was able to initially conduct its seizure operations to try and seize money and accounts belonging to this defendant and the co-defendant and various other LLCs, the government was able to seize $68 million, approximately, $8 million of which we were able to seize from an account in the defendant's name.

That's reflected here.  If you look at the line just above the blank space where it says investment annuity, Sentinel Security Life Insurance Company, $8 million, that was what the government was able to seize at the time of the defendant's arrest for his -- that was an account in his name.

Now, taking out the other items, such as the real estate investments that are listed at the bottom, the homes valued at $2 million and $2.8 million held in JK -- JKing Holdings, LLC, and Capitalist King, also owned jointly by co-defendant, and also eliminating the luxury items, we shall say, the Rolex watches, the Audemars Piguet Royal Oak watches, the remaining amount in the accounts is what adds up to this $13,150,617.

Now, in trying to trace that amount and locate that amount of money, the government did see in his tractions, in the defendant's transactions, the bank records reflect that on April 26, 2024, King withdrew approximately $6.7 million from the bank in the name --

THE COURT:  And that was cash?

MR. WILLIAMS:  I believe it was cash, Your Honor.  I'm sorry, I don't have that record in front of me.

THE COURT:  Or was it a --

MR. RAFFERTY:  It was a cashier's check, Your Honor.

THE COURT:  Okay.

MR. WILLIAMS:  So we're moving --

THE COURT:  And that was April, right?

MR. WILLIAMS:  That was April 26th, 2024, yes, Your Honor.

THE COURT:  Okay.

MR. WILLIAMS:  So with that, also with the records that reflect that the defendant held approximately $6 million in two investment accounts in his name --

THE COURT:  Well, these investment accounts, though, what I want is what I have assumed in your motion, that is potentially accessible to him.  And that's $6 million is what -- and you're looking at the spreadsheet.  I assume that after your calculations, and because he withdrew in a cashier's check, he was given a cashier's check of 6.7 million and you

haven't been able to account for it, that you think that he has access to that cash?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  And -- and am I -- what -- what documents are you going to give me, and math that you can give me that establishes that that $6.7 million is still accessible to Mr. King?

MR. WILLIAMS:  Your Honor, for that --

THE COURT:  I mean, it's important that you -- you have certainly seized and you have accounted for a substantial amount of funds.

MR. WILLIAMS:  Yes.

THE COURT:  But it is when he withdrew at the end of April, $6.7 million, and apparently was given a cashier's check for that amount, you have no way to determine up to today if that money still exists in cash.

MR. WILLIAMS:  I do not have that information at this time.

THE COURT:  Okay.  Let me ask you this.  You know, I'm not a financial expert, but I know a little bit about banks, and if he was given a cashier's check, then that check, if it's still available, would be available to him, but if it's been negotiated, then the government would -- I would think, would have that information available to provide the Court.

MR. WILLIAMS:  I am unaware of whether or not that

check has been negotiated.

THE COURT: Okay. So --

MR. RAFFERTY: Your Honor, if I could just be heard.

As I mentioned, you know, the government has provided me hundreds of bank accounts in discovery. And my belief is that that check -- the accounts were closed, we argue, because the banks were closing these accounts. And that check was, in fact, put into a Charles Schwab account that the government is aware of. They've given me the bank records for that.

THE COURT: So when you say that, what evidence do you have that it was placed in that account?

MR. RAFFERTY: My understanding, Your Honor, from both speaking with the government prosecutors that aren't here, and then speaking with my client, is that --

THE COURT: Okay. Let me -- let me tell counsel right now that I am -- we are going to have another hearing. The government, I'm going to give you an opportunity to establish for me that that $6.7 million is still accessible to Mr. King.

Now, I hear from Mr. Rafferty that apparently that money was placed in a Schwab account, and that seems to me it would be -- that information would be accessible to the government. And this cash, check though, was -- was given -- or the money, essentially, in a cashier's check, right?

Is that your understanding?

MR. RAFFERTY: That is my understanding, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Okay -- in a cashier's check at the end of April.  And he was indicted early part of June.  That is, to me, potentially available funds.  I don't know.

If you have evidence to give the government that it is no longer in Schwab and it doesn't exist because it has -- it's in somebody else's hands, then that would be very important for the government and for me.

And as I -- as I have said a number of times, this is the government's burden.

MR. WILLIAMS:  Yes.

THE COURT:  And this is significant to me.  It was significant enough that you included it in your motion.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  So -- all right.  Let me tell you the other questions.  That's, to me, the most significant.

I -- I understand that the defendant's annual income was something like $400,000 a year, correct?

MR. RAFFERTY:  That's correct, Your Honor.

THE COURT:  Okay.  He has a business, and -- and as I understand, it's a music business, right?

MR. RAFFERTY:  It was a studio, yes, Your Honor.

THE COURT:  Okay.  Does it have a fair market value?  And that's -- I will say this, Mr. Rafferty, you know, you're a very qualified attorney.  If I'm asking questions where your client can take the Fifth, then don't answer them.

MR. RAFFERTY:  I understand, Your Honor.

With respect to the business, I will say, Your Honor, that as a result of this case, there has been quite a bit of media publicity.  The business itself is circling the drain. You know, folks are not really interested in doing business with an individual who has been characterized in the media as Mr. King has been characterized.  So it's difficult for me to estimate the value of the business at this point.

THE COURT:  Well, let's say before he was indicted, what -- what would you estimate the value of the business to be?

MR. RAFFERTY:  Your Honor, I'm not really qualified to --

THE COURT:  Okay.

MR. RAFFERTY:  -- to testify about or say.

THE COURT:  But it was -- if he's making $400,000 a year, it has a, probably substantial value, right?

MR. RAFFERTY:  It does, Your Honor.  And I'll note that, you know, some of the things that are on this spreadsheet that's been marked as Government Exhibit, I think it was 2, has some of that on there.

For example, the property at the very bottom of this list that's listed as real estate commercial -- and I believe the government may have misstated that as a domestic or residential property -- it's actually a studio.  And if you

look at that studio, Your Honor --

THE COURT:  And the studio -- let's see.  Where is it?

MR. RAFFERTY:  It's the third line from the bottom, Your Honor.  It's valued at $2 million.  And there is no mortgage or loan on that.  That is owned outright.  And so, in terms of property, that could be placed today.

THE COURT:  Okay.  So is it in your client's name?

MR. RAFFERTY:  It's in JKing Holdings, which it's -- it's his business.  And so he has the ability, Your Honor, to post that by the end of the week.  I just have to get the deed.  I think the deed has been -- was seized by the government when they executed search warrants at the house.  I would need to get that.

I would also -- Your Honor, if you look at Captive Insurance, that's the -- on the -- it's right in the middle.  It's three lines from that break in the page, you'll see Captive Insurance, Scottsdale Insurance Group.  I could also make that money available to the government by the end of the week.  Because Captive Insurance -- I'm no finance expert, but it's some sort of self-insured policy that you can use as an investment vehicle that's commonly used by folks.  That's what this is.

THE COURT:  Is that insurance for the business?

MR. RAFFERTY:  It's actually personal insurance for Mr. King.  You know, it was established with the advice of a

tax advisor.  But because, again, of this, that is no longer really going to be a viable entity.  And so by the end of the week, I could probably get a check cut to the government in the full amount of 2.58 million.  That would be placed in some sort of an account that the government could put in an interest bearing account pending the outcome of this case.  So those two assets alone, Your Honor --

THE COURT:  Okay.  Let me stop you.  I presume a number of -- on this list, a number of the assets have been either seized by the government or are not accessible to Mr. King; is that right?

MR. WILLIAMS:  Yes, some have, Your Honor.  I can list the ones that I'm aware of.

THE COURT:  Okay.  You need to do that for me.  I -- you know, we're going to set this matter very quickly.  And it's the government's obligation to prove that these funds will be accessible to him so he could flee, and I'm not satisfied with what you've given me.  So in your motion that's what you claim, but I need -- I need, and Mr. Rafferty needs to be able to look at it.

So I presume all these luxury items have been seized?

MR. WILLIAMS:  Your Honor, I am aware that we have seized two Royal Oak Audemars Piguet watches from the defendant.  There were also some Rolexes that were taken from the safe deposit box.

THE COURT:  All right.  Get the list of what you seized.

MR. WILLIAMS:  Yes.

THE COURT:  I assumed from your motion that those items have been seized by the government and not accessible to Mr. King.  So the point is that I need to know what is accessible to him when he walks out of this courtroom that would provide a basis for him to flee.  Is that clear?

MR. WILLIAMS:  That is clear, Your Honor.

THE COURT:  All right.  So other questions?

MR. RAFFERTY:  Your Honor, I do have a notice of seizure that I could present after this hearing today that the FBI sent to my client.

THE COURT:  Okay.  Yeah, the two of you work that out.  That's fine.

So we don't know if the -- is the music business, is it -- it's not being operated, or is there a CEO or a CFO that is operating?

MR. RAFFERTY:  The music business was really just Mr. King.  You know, I have been working with Mr. King's daughter to try and figure out what they're going to do with some of the equipment, where to store it and what to do.

As I mentioned, there was a build-out project that we had to cancel because it's just not a feasible future opportunity.

THE COURT:  So give me an idea -- I'm not sure I understand.  When you say music business, does it sell music, or what are we dealing with here?

MR. RAFFERTY:  There is a few different aspects to this, Your Honor.  There is a sale of musical equipment.  So there are guitars and other pieces of equipment that one -- you know, if you're into that thing, I'm not, but if you're --

THE COURT:  So those kinds of assets?

MR. RAFFERTY:  Those kinds of things could be used, but it's also, you know, a production studio.  So if folks want to make music, there are certain places they need to go in order to do that.

THE COURT:  So what you're saying when you said nobody is knocking at his door is because of the indictment that he has no customers?

MR. RAFFERTY:  That is correct, Your Honor.

THE COURT:  Okay.  Then -- then that's another issue for me.  Provide that information to the government.  That is -- I take it it's -- it's not an operating business, right, Mr. Rafferty?

MR. RAFFERTY:  We've been trying to keep it open, Your Honor, but Mr. King is the principal and has been in custody, and so it's -- it's still floating but barely.

THE COURT:  Okay.  That's -- that's an issue for me too.  If it's -- if it's, you know, producing a profit and

those profit -- it's his business, and if those funds are available to him, that's an issue.  So let's see what else.

So on this one -- there are a number of notes.  The one note regarding potential fleeing to Maltese and Switzerland that was found, is it clear who drafted that note?

MR. WILLIAMS:  It is not clear to the government who drafted that note, Your Honor.  I can provide you some evidence surrounding that note.

THE COURT:  Well, I would think if it's handwritten, and that if you're attributing it to the defendant, you would have handwriting experts.

MR. WILLIAMS:  We do not have a handwriting expert, Your Honor.

THE COURT:  Okay.  Well, then that is an issue for the government, for the -- should be an issue for the government.  It's a critical piece of evidence for the government and Mr. Rafferty understands that.  I mean, it indicates on its face potential opportunity to flee.  So that I will tell you is extremely important to me and it should be to you, because if that was written in Mr. King's handwriting, then I certainly would consider it.  If it's not in his handwriting, then that inures to his benefit.

MR. RAFFERTY:  Your Honor, I believe it's undisputed that it's not in his handwriting.  It's not his note.

THE COURT:  Is that right?  Okay.  You don't know?

You know that I want to know that.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  And on other relevant documents, I presume that it's clear that Mr. King's bank accounts were opened by him and it's uncontested, the ones that the government seized?

MR. RAFFERTY:  Those -- those were bank accounts in either Mr. King's personal name or in the name of his business.

THE COURT:  Okay.  So the handwritten note is -- is discussed on page 7 under the headline, Safe Deposit Box Controlled By Mr. King, and it says the handwritten notes concerning the cost of purchasing Maltese citizenship to Swiss bank accounts.  So I guess this is just a note.  There was no evidence that these bank accounts had been opened?

MR. WILLIAMS:  I do not have evidence of those bank accounts being opened, Your Honor.  And if you'd like to refer to it, this copy of this note is attached -- or now provided to the Court as Exhibit 3 that was previously admitted at the detention hearing.

THE COURT:  This is a de novo hearing.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  So you need to put the documents in front of me, counsel.  This is a de novo hearing.

And the -- the spreadsheet was found -- again, is it uncontested as to who prepared this spreadsheet?

MR. WILLIAMS:  The spreadsheet is what's --

THE COURT:  I can't recall where it was found.

MR. WILLIAMS:  This spreadsheet that is Exhibit 2 before Your Honor was found in a blue binder in the defendant's home office.

THE COURT:  Okay.  It was in his home office.  Thank you.

MR. WILLIAMS:  And Exhibit 3, Your Honor, that's before the Court in that same packet that was presented at the beginning of this hearing, Exhibit 3 was the note that's discussed in the safe deposit box.  That was located in a blue binder in a safe deposit box.

THE COURT:  Right, in the safe deposit box that you claim Mr. King owned, right, or he controlled, although there is -- and then he had access to it?

MR. RAFFERTY:  Your Honor --

THE COURT:  I mean, what -- hold on.  And he -- he controlled it because he opened it.  And he opened it with Ms. Gehrke and also her mother on a certain date.  Is that what you're saying?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  And then --

MR. RAFFERTY:  Your Honor, if I --

THE COURT:  -- after that there were times when it was accessed.  It was a whole list of times in May when it was accessed, I would say about seven, eight times, but then I read

later that there was only attributed to him two dates in May, one was the 11th, and then there was another one at the end of the month.

So can you tell me, is that what you meant, that he accessed them, or that they were accessed by somebody and you cannot attribute it to Mr. King?

MR. WILLIAMS:  Your Honor, the individuals who are on the box we're discussing, that's Box Number 3961.  On that, as listed in page 8 of the government's filing at Docket 64, refers to --

THE COURT:  Page 8 of the motion?

MR. WILLIAMS:  Of the government's response --

THE COURT:  Oh, the response.

MR. WILLIAMS:  -- to the defense motion at Docket 64.

THE COURT:  Which page now?  I'm going to look for it.

MR. WILLIAMS:  Oh, this is on page 8.

THE COURT:  Okay.

MR. WILLIAMS:  So --

THE COURT:  All right.

MR. WILLIAMS:  So the records from the safe deposit box access card application show that when it was applied for and they signed up, that the defendant's mother-in-law, the co-defendant's mother, Joan Gehrke, was listed as client one, client two is listed as the Defendant Jeffrey King, also four additional individuals that are allowed to access, Your Honor.

THE COURT:  Yes, I understand.  And no one disputes that's his handwriting, correct, in opening this box, that that's his handwriting?

MR. RAFFERTY:  I'm not really -- I'm not prepared at this point to stipulate to anything, Your Honor.

THE COURT:  Okay.

MR. RAFFERTY:  But if I could just be heard for a moment.

The evidence that the government has conceded that they put in the search warrant affidavits is that Mr. King never accessed that box.  So, to be clear, the Court may have thought that from all the pleadings that there is evidence that Mr. King accessed the box where this note was found.  The undisputed evidence from the government is --

THE COURT:  Okay.  Let me say, on the next page 9, paragraph -- or lines 17 and 18, King was the only individual who accessed the box, that he did so on those dates.

MR. RAFFERTY:  Your Honor, we're talking about two different boxes.  To be clear, we're talking about -- you know, the note was found in one box, which has this evidence that the Court referred to about Malta and Swiss bank accounts.  That's one box.

There are other boxes that the government references in their pleadings where other items were found, money and cash.

32

THE COURT: This is Box 3961, so what --

MR. WILLIAMS: Yes.

THE COURT: -- what was -- what was included in that box?

MR. WILLIAMS: In 3961, Your Honor, is a note -- is the note we're referring to, or discussing the dual citizenship in Malta. And --

THE COURT: That was the note and that Mr. King accessed it all those dates in May?

MR. WILLIAMS: No, Your Honor.

THE COURT: It says, King was the only individual who accessed the box -- we're talking about 3961 -- and that he did so on a number of days in May.

MR. WILLIAMS: Your Honor, the government is alleging that he accessed -- of those dates, he accessed another box, Box 4007. The government stated that box --

THE COURT: So it's absolutely not clear. So no wonder I can't figure out -- I mean, it seemed to be the government's position that he controlled the box initially but you couldn't prove that he accessed it. And then, surprise, I see that he accessed this Box 3961. That's incorrect?

MR. RAFFERTY: That is incorrect, Your Honor.

MR. WILLIAMS: If I may, Your Honor?

The information the Court -- I'm sorry, that the government has regarding this box is that on the -- the date

that it was -- the account was opened, the parties that were present to sign for the box included the Defendant Jeffrey King, his mother-in-law Joan Gehrke, also another authorized individual was JT, who we refer to -- who defense counsel referred to previously, and the co-defendant/wife.  So those four individuals had access -- were on the list of authorized individuals who on that date opened the box -- or filled out the paperwork together.

However, the authorized signatures below that, as you can see on page 8, of accessing individuals, you see twice, once on May 14, 2024, at 3:40 p.m., that is the signature of Joan Gehrke, the mother-in-law, and then again on 5-29-24, that's the same signature.

And so we do not have a signature of this defendant on a separate date accessing the box, but he was present when the box was -- when the account and the box was opened.

THE COURT:  Well, okay.  So what you're saying is certainly he had access to the box when it was opened, right?

MR. WILLIAMS:  Yes, and it's his box, Your Honor. He --

THE COURT:  Yeah, I got that, but the accessing is different.  So the only time you know he accessed the bank -- or the box was when he opened it?

MR. WILLIAMS:  Yes.

THE COURT:  Okay.

MR. WILLIAMS:  That's the government's position.

THE COURT:  All right.  Both boxes?

MR. WILLIAMS:  The second box -- actually, there is three boxes.  I'm sorry, there is three boxes, Your Honor.  If I can draw your attention to, again, to page 9.  There is another box that was numbered 4007.  All these boxes --

THE COURT:  This is on page 9?

MR. WILLIAMS:  Yes, page 9 of --

THE COURT:  Oh, I see.  Oh, I'm sorry.  So that was -- that was the -- that's the only -- the other box --

MR. WILLIAMS:  Yes.

THE COURT:  -- that he accessed for all those dates?

MR. WILLIAMS:  Yes.  And so --

THE COURT:  Okay.

MR. WILLIAMS:  -- the individuals that had access to Box 4007 included the defendant, his co-defendant/wife, his mother-in-law.

THE COURT:  Okay.  Let me make sure I understand this.

There are at least two boxes that we're talking about here, one is 3961, one is 4007.

MR. WILLIAMS:  Yes.

THE COURT:  Okay.  He accessed the box to 4007 on these dates in May at line 18, correct?

MR. WILLIAMS:  Yes.

THE COURT:  So -- and what was contained in that box

when you seized it?

MR. WILLIAMS:  Your Honor, that information is laid out on page 10 of the government's brief.  So there you can see on the top of page 10 a snippet of the signature line, getting access times for that Box 4007.  And within --

THE COURT:  Yeah, I see.

MR. WILLIAMS:  Okay.

THE COURT:  But what was in the box?

MR. WILLIAMS:  Within that safe deposit box were gold coins.

THE COURT:  Okay.

MR. WILLIAMS:  Gold bars.

THE COURT:  That's the physical evidence, the luxury items?

MR. WILLIAMS:  Yes.  And then also there was a folder labeled Lexie's finances, and it delineated in case of emergency, defined as incarcerated or death or incapacitated for greater than six months.

THE COURT:  Yeah, I'm familiar with that.  And so that's all that was in there was the luxury items and that -- and that statement by someone, right?

MR. WILLIAMS:  And there was also a bag labeled London Gold and --

THE COURT:  A -- oh, bag.  Okay.

MR. WILLIAMS:  This is continued on page 11.  There

was also a bag labeled London Gold.  Records from London Gold reflect that the defendant and co-defendant/wife purchased over $110,000 of gold in September of 2023 during the time period covered by the -- charged the indictment.

THE COURT:  So it could be that what you seized pertains to this 101,000 -- or 110,000, right?

MR. WILLIAMS:  When you say that, Your Honor, are you referring back to Exhibit 2?  I'm sorry.

THE COURT:  What I'm saying is these gold bars that were in 4007 also contained this document that says London Gold, and that the defendant and Gehrke purchased over 110,000 of gold.  So that may support what was seized?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  And that's your position, correct?

MR. WILLIAMS:  Yes.  And it may be reflected in the Exhibit 2 when it refers to 100 -- referring back to Exhibit 2, Your Honor, there is a line approximately an inch above the break where it refers to gold, 121 gold coins, 54.25 ounces, and listing the purchase price at $110,000, and then listing out the assets valued at 115,000.

THE COURT:  Okay.  So let me now change to this document, or ask some questions about it.

Everything that is in this document is no longer accessible to the defendant, right?  All of this, at least the -- the fair market value, or the value that's listed there,

it's not accessible to the defendant?

MR. WILLIAMS:  Everything that was -- when you say the document, everything that was seize -- everything that was seized from the -- from the --

THE COURT:  It's all in the --

MR. WILLIAMS:  -- safe deposit boxes --

THE COURT:  It's all in the government's possession now, right?

MR. WILLIAMS:  Everything seized from the safe deposit box, yes, is in the government's possession.

THE COURT:  And this list, is everything listed -- that is listed here as an asset --

MR. WILLIAMS:  Not --

THE COURT:  -- is that no longer in the defendant's care, custody, and control?

MR. WILLIAMS:  Not everything that is listed on -- in Exhibit 2 is in the government's possession, Your Honor.

THE COURT:  Okay.  Is any of this accessible to him today?

MR. WILLIAMS:  It is my belief that it is, Your Honor. And as you said that -- you indicated you would like a full accounting of what -- from the government of what --

THE COURT:  The issue is what can he access?

MR. WILLIAMS:  Yes.

THE COURT:  That's what I need to know.

MR. WILLIAMS:  Yes.

THE COURT:  So let's go back to these boxes.  So you said there are three.  And what was in now 3972 is -- is the -- which one had the note?

MR. WILLIAMS:  The note was contained in 3961, Your Honor.  And that is the first one mentioned on page 7.

THE COURT:  So the three boxes for 3961, 4007, right?

MR. WILLIAMS:  Yes.

THE COURT:  And then there is one more.

MR. WILLIAMS:  Box 3972.

THE COURT:  And, now, with respect to that box, what evidence do you have that the defendant accessed it?

MR. WILLIAMS:  So, again, with the signature lines on -- people authorized to access that box.

THE COURT:  Okay.  Let me go back.  Did he -- did he open the box?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  Did he open it with -- open it with somebody else?

MR. WILLIAMS:  The authorized individuals, Your Honor, include the defendant, his wife/co-defendant, JT, who was referenced earlier by defense counsel, and the mother-in-law.

THE COURT:  So it was opened that time, right?

MR. WILLIAMS:  Yes.

THE COURT:  It's no -- you have no idea what was

deposited -- I mean, that the note was deposited that -- when they opened the box.

MR. WILLIAMS:  I'm sorry, Your Honor, I was referring to Box 3972.  My apologies.  3961, the box with the note that's in Exhibit 2, the information that I have is that they -- the signatures of these four individuals, the defendant, his co-defendant/wife, the individual referenced by defense counsel, JT, and his mother, were all present to sign.

However, the date that it was opened, the access log signature for a date and time for a person accessing the box -- this is Box 3961 -- lists the defendant's mother-in-law, Joan Gehrke.  This is depicted in the image on the top of page 8 of the government's filing.  You can see there it lists the mother, Joan -- mother-in-law, sorry.

THE COURT:  Okay.  So it was -- it was -- so I'm trying to -- I'm trying to figure out, counsel, when your -- when Mr. King could have placed that note in the box.  So did he open it like the other situation, so that at that time he might have -- he might have placed the note in the box?

MR. WILLIAMS:  He --

THE COURT:  Who opened the box?

MR. WILLIAMS:  The application to open and purchase the box was filled out by the defendant.  And --

THE COURT:  So the application -- so when you --

MR. WILLIAMS:  Yes.

THE COURT: -- fill out an application --

MR. WILLIAMS: So he was present there that day.

THE COURT: And then so the box is opened. So when you -- you apply by application to purchase or lease this box, then you have access to it then, correct?

MR. WILLIAMS: Yes.

THE COURT: So you can open the box --

MR. WILLIAMS: Yes.

THE COURT: -- and place something in it.

MR. WILLIAMS: Yes.

THE COURT: Okay. Is that -- after that do you have any evidence that he accessed the box?

MR. WILLIAMS: No.

THE COURT: Okay. So your position is that when he opened the box, he could have placed all the items in the box?

MR. WILLIAMS: Yes.

THE COURT: Okay. But the -- we don't have -- it was a handwritten note, correct?

MR. WILLIAMS: Yes.

THE COURT: And you don't know who wrote the note? You don't have handwriting or anything?

MR. WILLIAMS: I don't have -- no, I don't have handwriting evidence, no.

THE COURT: Is it -- have you looked at it to see, you know, in your own judgment?

Anyway, that's something for you -- that's important to me as to who authored that note.

And Mr. Rafferty is certainly, he's indicated to me he's going to dispute the handwriting.

MR. RAFFERTY:  Additionally, Your Honor, I think that if Mr. King had actually, when he opened the box, accessed it, there would be an entry on the log showing that he accessed it. Because every time you go in the box, even when you open it, you have to actually log in and say, okay, you accessed the box.

So when he opened it, if he had, in fact, accessed it, as the government has suggested, there would be an entry under authorized signature at the top of page 8 in that safe deposit box access card.  There is no Jeff King on there.

THE COURT:  So what the government has suggested further on, concerning another of the boxes, when you open the box, you can access it.  You file the application, you go to the box, and you put something in the box.  And that, you know, that makes sense -- but, I mean, that's the way I understand the government's position.

MR. RAFFERTY:  Correct, Your Honor.  But if you look at these access cards, the whole purpose of having the access cards is every time somebody goes in there and puts something in there, they have a record who did it.

THE COURT:  Okay.

MR. RAFFERTY:  Even on the date --

THE COURT:  When was the box opened and when was the first evidence of access?

MR. RAFFERTY:  The first evidence of access is on 5-14 of 2024.

THE COURT:  And when was the box opened?

MR. WILLIAMS:  On 5-14 of 2024, Your Honor.

THE COURT:  Okay.  So that -- that is an access the same day.  It's a potential access, but I'm -- we're not going to discuss that now.  You can discuss it --

MR. RAFFERTY:  If I can just point out, on 5-14 of 2024, the date it was opened, the document shows that it was accessed by Joan Gehrke and not by Jeff King.

THE COURT:  Okay.

MR. RAFFERTY:  So he never accessed the box.

THE COURT:  Okay.

MR. RAFFERTY:  The government has no evidence --

THE COURT:  When it was opened -- when you open the box, do you sign your name?

MR. RAFFERTY:  Correct.  There is a signature above for Joan Gehrke, there is a signature for Jeff King, and then there is a signature for when it was accessed on 5-14.  And that signature belongs to Joan Gehrke, which suggests Jeff King did not access the box and never did.  And the government has never disputed that in any of the pleadings.

What they have disputed is that, quote, he has control over it because he's a co-signature.  They cannot establish that he ever accessed the box.

THE COURT:  Right.  Right.  I understand that.  I assumed that he was there and he could have accessed, but it looks like from what -- what counsel is saying, that there is no evidence that he accessed the box at any time so --

MR. RAFFERTY:  And the government has conceded that in their papers, Your Honor.

THE COURT:  I just -- I guess I just asked counsel and he seemed to say he could have accessed, but -- all right. Let's see what else I have.

So with respect to the airplane, where is that airplane?  Is it in Arizona?  Is it in Phoenix?

MR. WILLIAMS:  Your Honor, I don't have the exact information before me, but I believe it is in Arizona here.  I believe it may have been in Lake Havasu City or Bullhead City.

THE COURT:  Well, what's important to know is if the relationships with that -- first of all, where is the plane, or the airplane, and is there any reason to believe that Mr. King is a licensed pilot, and any reason to believe that this person who owns the airplane still owns it and would, even though he's been indicted, would give him access?

MR. RAFFERTY:  Your Honor, if I can be heard?

Mr. King is not a licensed pilot.  He cannot fly a

plane.  And the witness who was interviewed, I mentioned, JT, who is a cooperator working with the government, she has not indicated any indication at all --

THE COURT:  Okay.  That's important to know.

Okay.  Maybe counsel know, but I think our Pretrial Services officer would know, in terms of the electronic monitor, can that actually be cut off?  When people escape, what happens?  Can you really cut that off?  Is it leather?  Is it -- is it metal?

PRETRIAL SERVICES OFFICER:  Yes, Your Honor.  You can cut it off.

THE COURT:  Okay.

PRETRIAL SERVICES OFFICER:  There is different methods.

THE COURT:  So it's leather, a leather?

PRETRIAL SERVICES OFFICER:  It's sort of like -- it's plastic but combined with metal as well, but there is different ways you can cut it without actually cutting the bracelet.  So it's just a matter of how, I guess --

THE COURT:  Is it -- when it's cut off, there is no way to tell that it's actually --

PRETRIAL SERVICES OFFICER:  No, we can -- we can tell if it's tampered with at any point.

THE COURT:  Okay.  So that -- and is it -- how accurate is that?

PRETRIAL SERVICES OFFICER:  So if it's actually off the person's ankle or hand, wherever we place it, we will get an alert.

THE COURT:  Okay.

PRETRIAL SERVICES OFFICER:  Of course it's -- everything has a delay, right, depending on signal, but we do get the alerts really quick.  We try to, right away, make an attempt to locate the individual.

THE COURT:  Okay.  That's what -- you've answered.  Okay.

All right.  As you know -- is it -- is it Mr. Williams?

MR. WILLIAMS:  Mr. Williams, yes, Your Honor.

THE COURT:  Okay.  Mr. Williams, you have heard Mr. Rafferty offer a number of -- and we've talked about -- a number of conditions of his release.  And so I want you to discuss with Mr. Rafferty whether that would satisfy the government that Mr. King is -- is not sufficient, or he -- you still are concerned that he is a flight risk, such that any kind of conditions or anything he offers is not sufficient.

So I -- I am concerned by everything that you've told me.  You have the burden.

And the issue of whether the government acted in bad faith, I don't find the government acted in bad faith concerning what they've -- they told the magistrate judge.

They have given me a sufficient explanation.

And I -- I presume, Mr. Rafferty, you don't think that in this filing by the government that they have made false statements?

MR. RAFFERTY:  No, Your Honor.  I have been very clear with Mr. Butland that I don't believe it was done on purpose. I think there -- you know, I was a prosecutor for a long time. I understand these -- these kinds of cases are fast moving, and that he misstated where evidence was found.  I just think it was significant enough to the magistrate court that it was cited to in the -- as a basis for detaining Mr. King.

And I would just note, Your Honor, it is the government's burden.  It is their burden to prove today by a preponderance of the evidence.  Mr. King has been in custody for 60-plus days.  Today I've come to the court offering passports for his children, all kinds of conditions that he's willing to agree to.

I'm willing to put up, literally, millions of dollars of assets that I'm willing to give the government.  And I've expressed to the government that I'm willing to continue to cooperate with them to get whatever assets they think Mr. King has, to put them in the government's hands.

And so I think it's unfair for Mr. King to now, you know, give the government a third bite at the apple to continue to detain him, when the government hasn't met its burden.

THE COURT: All right. I'm telling you I'm inclined to release him. I'm not -- I am concerned. If the government can overcome my concerns within 48 hours, I may change my mind, but I want the government also to consider all the conditions of release, all conditions.

And I think he -- he needs to -- there need to be a monitoring, a -- so that if, in fact, he tries to remove the monitor that -- that the Pretrial Services will be aware of it.

I think that this potential funds that might be available, and that would be enough for me to consider maintaining his -- his detention. I mentioned that when I started. Any funds he has of that magnitude that he could use to flee this country, or at least flee the prosecution, has me concerned. So -- and the government hasn't been able to give me good enough reason, but you haven't either, in terms of telling me with -- by substantial evidence that he does not have access to those funds. So that is what I'm going to do.

So 48 hours from now, Robert, that would be Thursday.

COURTROOM DEPUTY: Yes, Your Honor, Thursday, the 29th.

THE COURT: By 1:30 then I need -- hopefully, I'm hoping that the government is going to find a way that he can be released, and the government will be satisfied that there is insubstantial evidence that he could flee.

I've asked you to determine -- and most important is

this, you know, $7 million. I'm also -- you also need to determine if that -- that note that -- that references Maltese and Swiss, in whose handwriting is that note? Because even if he didn't access it, if it's in his handwriting, then that's relevant.

MR. WILLIAMS: Your Honor, may I --

MR. RAFFERTY: If I could have a moment to speak with counsel for just a second?

THE COURT: Yes.

(Off-the-record discussion was held between counsel.)

MR. WILLIAMS: Your Honor, if I may, may I review with you the different list of items you wanted the government to brief for you for this hearing so I can ensure I have a full understanding?

We have the first three items, which I believe are all related. The first was the full accounting of the $6.7 million, and a full accounting of the items in Exhibit 2. And then --

THE COURT: When I say accounting, are any of those accessible?

MR. WILLIAMS: Yes. And the third item was a basic -- a description of what funds and items of property the government believes is now accessible to -- to the defendant.

Item number four, we discussed the note, who wrote it, do we have -- is there a handwriting expert or other testimony

that I can offer, evidence the government can provide as to the authorship of the note, which is also reflected in Exhibit 3.

Number five, we discussed the airplane.  We discussed does this individual --

THE COURT:  Yeah.  And it sounds like if the person who owns the airplane is -- is cooperating, I don't know if it's a target or a subject or just a witness, I am persuaded if that's true, that the defendant -- the defendant, if he's released, doesn't have access to it.

MR. WILLIAMS:  Yes, I will discuss that with my colleagues, Your Honor.

And then, finally, you would like the government to discuss with Mr. Rafferty all conditions of release that could possibly be imposed for this defendant that could lead the government to agree that those conditions would be sufficient.

THE COURT:  Yeah.  And you're reminded by the Court that the Pretrial Services thinks there are conditions.

MR. WILLIAMS:  Yes, Your Honor, in two reports they do.

THE COURT:  And the other issue was the business, and is it not operating, does he have any access to the business, if someone else is operating it.  I don't need to know the fair market value, but if anything there is accessible to him, that would be of a concern to me.

So I think that's -- you have covered everything I've

asked for.

MR. WILLIAMS:  I believe so, Your Honor.  I believe I understand.

THE COURT:  All right.  So, let's see, 48 hours, let's say, Robert, by 10:00 o'clock on --

COURTROOM DEPUTY:  On Thursday, Your Honor?

THE COURT:  Yes.  So something in writing.  Perhaps you will agree.  You need to talk to Pretrial Services.

I learned a lot about these electronic monitoring devices.

And if you can work it out, that's terrific; if you can't, then it may be necessary to have another hearing.

MR. WILLIAMS:  All right.  So by 10:00 o'clock on the 29th you would like -- if we have an agreement on conditions, you would like that with the Court in writing by 10:00 o'clock; is that correct?

THE COURT:  Yes, that is correct, which will then moot this motion.

MR. WILLIAMS:  We will then argue at 1:30 p.m. if we do not have an understanding.

THE COURT:  No, 1:30 is out.  I decided I want it earlier.

MR. WILLIAMS:  Oh, I'm sorry.  I'm sorry, Your Honor.  My apologies.

THE COURT:  No, I misstated.  Anyway, 10:30.

MR. WILLIAMS:  I'm glad I'm clarifying.  So, either way, the hearing is now reset for 10:00 a.m. on the 29th?

THE COURT:  No.

MR. WILLIAMS:  I'm sorry.

THE COURT:  I want the documentation by 10:00 a.m., and if you have made -- if you have agreed, we don't need a hearing.  So if the -- if the document indicates to me there is an agreement, all the conditions are set forth in that agreement, then I'll just sign it.

MR. WILLIAMS:  And if we are unable to agree, Your Honor?

THE COURT:  If you're not able to agree, then I will issue an opinion.

MR. WILLIAMS:  All right.

THE COURT:  And -- and if you want me to take account of any evidence that I've asked for, then you can provide that to me by 10:00 o'clock, 10:30.

MR. WILLIAMS:  Okay.  Now I understand, Your Honor.  So if we do have an agreement, the agreement should be due to you by 10:00 a.m. on the 29th; if we do not have an agreement, the government should get to you in a written form answers to these items that you have delineated, and at that time then you will render opinion based upon those written answers.

THE COURT:  And also Mr. Rafferty can submit anything to me by 10:00 o'clock.

MR. WILLIAMS:  All right.  I believe I have --

THE COURT:  If you haven't agreed.

MR. WILLIAMS:  Thank you for that clarification, Your Honor.

THE COURT:  One of the things that would be helpful too, if Pretrial Services has indicated conditions of release, and you need to work with Pretrial Services as to those conditions, both -- both of you.

MR. WILLIAMS:  Yes, Your Honor.

MR. RAFFERTY:  Yes, Your Honor.

THE COURT:  All right.  This matter is adjourned.

(Proceedings concluded at 2:49 p.m.)

*          *          *

C E R T I F I C A T E


I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 13th day of September, 2024.



/s/ Christine M. Coaly_____
Christine M. Coaly, RMR, CRR

UNITED STATES DISTRICT COURT