UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,    )
                             )    No.  2:24-cr-01040-ROS
          Plaintiff,         )
                             )
          vs.                )         Phoenix, Arizona
                             )         September 3, 2024
Jeffrey King,                )         10:05 a.m.
                             )
          Defendant.         )
_____)


BEFORE:  THE HONORABLE ROSLYN O. SILVER, SENIOR JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


(Status Conference re: Detention)


Official Court Reporter:
Scott M. Coniam, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription


UNITED STATES DISTRICT COURT

A P P E A R A N C E S

For the Plaintiff:
    U.S. Attorney's Office
    By:  Mr. Matthew Williams, Esq.
    40 North Central Avenue, Suite 1800
    Phoenix, AZ 85004.

    U.S. Department of Justice
    By:  Ms. Rebecca Yuan, Esq
    1400 New York Avenue NW
    Washington, D.C. 20005

For the Defendant:
    Rafferty Law LLC
    By:  Mr. Brian T. Rafferty, Esq.
    1575 Johnson Rd., NE
    Atlanta, GA 30306

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

(Proceedings convened at 10:05 a.m.)

THE COURTROOM DEPUTY:  This is case number CR 2024-1040, United States of America vs. Jeffrey King.

This is the time set for a status conference on the issue of detention.

Would the parties please announce, for the record.

MS. YUAN:  Good morning, Your Honor.  Rebecca Yuan and Matthew Williams on behalf of the United States.

THE COURT:  Thank you.

MR. RAFFERTY:  Good morning, Your Honor.  Brian Rafferty on behalf of Mr. King.

THE COURT:  All right.  Thank you for filing what I needed -- at least I think -- by both counsel in making an effort to resolve this matter.

So let me go through seriatim the government's filing which is titled:  Supplemental Submission in Support.

Okay.  Let's go one by one.

Page 2.  So item -- line 8 -- no, these are the items available to Mr. King.

So line 16, from June '23 to February '24, there was an account received over 613 million.  And it was emptied March '24.

Where is that money, Mr. Rafferty?

MR. RAFFERTY:  Your Honor, Mr. King was not the only

signatory on that account and does not have information about where $613 million went.

THE COURT: Okay. That's important. He has to have information even though he's not a signatory on that account -- he's not the only signatory.

MR. RAFFERTY: Correct.

THE COURT: And if he's not the only signatory, then that means he at least had access to that account or the funds are still there.

Let's go through the rest of this.

So in terms of earned income of $400,000, government says that's a misrepresentation.

Then we go down. And as of December 2023, he diverted 17 million from APX Mobile and King Medical and King Ventures.

Then he received, through his King Medical Consultant account, $4 million.

So then December 29th, $2.7 million from Ms. Gehrke to Apex and that was on January -- in January.

And then about four point -- or 406 million (sic) check from her Viking account. And I'm not sure where this was transferred on February 10.

MS. YUAN: All of those three transfers were to Mr. King's account ending in 8875, Your Honor.

THE COURT: Okay. And which account is that?

MS. YUAN: That account is in the name of King Medical

Consultant LLC and the defendant is the sole signatory on that account.

THE COURT:  So the total of all the funds in the last paragraph, starting on page 2, line 23, page 3 through 4, you say is 7 million; correct?

MS. YUAN:  Yes, Your Honor.  Approximately 7 million.

THE COURT:  Is that unaccounted for?  The government hasn't seized those funds?

MS. YUAN:  In terms of the funds that the government has not seized, the government -- that the government has been able to trace, the government lists that on pages 4 and 5.

THE COURT:  Right.  I've seen those, but I can't put it all together.

MS. YUAN:  Yeah.

THE COURT:  So let's go there.  So what you're saying is whatever else is listed on page 3 and then the first paragraph of page 4, $5,300,000.

And then -- so this is interesting.  Bank records -- page 3.  Mr. King opened accounts November '23.  He was the sole signature on the account and he received $5.3 million from APX.  I don't know if that is the total that is set forth before that.  And so that was December '23.

So the next line, 15, and the "invoice is concerning", shows that King made more than 13 times the amount represented to pretrial services in a single deposit.  And that was six

months prior to his arrest.  So that account the government has seized, right, Ms. Yuan?

MS. YUAN:  The account JKing Ventures --

THE COURT:  Well, the one -- look at line 15 through 17, you say -- first it shows that King made 13 times the amount he represented to pretrial services.  Okay.  Hold on.  Six months prior to his arrest.  Tell me what you mean there.

MS. YUAN:  The purpose of this section, Your Honor, that we're reading is to demonstrate the lack of candor that the defendant had with respect to $400,000 that he purports to --

THE COURT:  400,000 -- oh, he -- he told pretrial services all he had available was 400,000.

MS. YUAN:  He told pretrial services that his annual income over the past year has been $400,000.

THE COURT:  So what you're saying is that these filings or these 13 -- line 16, that 13 times the amount he represented in a single deposit over six months prior to his arrest; right?

MS. YUAN:  Correct, Your Honor.

THE COURT:  And so -- but he said my income is only $400,000.

MS. YUAN:  Correct.  And when we look at the past three paragraphs that Your Honor has been reading, it adds up to over $24 million since June of last year.

THE COURT:  I'm sorry.  I thought it was December of last year?

MS. YUAN:  Including the $17 million on page 2, Your Honor.  That 17 million was from June to December 2023.  And then the additional 7 million was just December, January, and February.

THE COURT:  Of this year?

MS. YUAN:  December of last year, January and February of this year, yes, Your Honor.

THE COURT:  Okay.  So that was '23, last year?  Because this year is '24.

MS. YUAN:  Yes, Your Honor.

THE COURT:  So when you say last year, so that was about 18 months earlier?

MS. YUAN:  The defendant was arrested in June of 2024.  And he reported to pretrial services that in the past year, he received an annual income of $400,000.

THE COURT:  Well, that's -- annual income doesn't necessarily mean what you have here because I understand that he was saying -- and I understand that to be the same -- his annual income was $400,000 from the business, but why is this income?

MS. YUAN:  This is income because this is how he was paid.  He was paid through LLCs, the LLC -- King Medical Consultant LLC and he was paid to his JKing Ventures, Inc.

Those were not businesses that had operating expenses.  That was money that he received and he used for his personal expenses.

THE COURT:  Okay.  So you know it's been used for personal expenses and that's why you think -- or you claim that it's income?

MS. YUAN:  Right.  We have his personal accounts and we did not see any type of salary of $400,000 in those accounts.

THE COURT:  Okay.  So the total of this amount -- and it's over 18 months -- ending December 2023 is how much?

MS. YUAN:  The total from June of 2023 through February 2024, so eight months, that adds up to approximately $24 million --

THE COURT:  Okay.

MS. YUAN:  -- Your Honor.

THE COURT:  And was this -- these sums, did they go to only his account?

MS. YUAN:  That's correct.

THE COURT:  His one account?

MS. YUAN:  To two accounts, Your Honor.

THE COURT:  Okay.

MS. YUAN:  Yes.

THE COURT:  And he was the sole owner of that account?

MS. YUAN:  Of those two accounts, yes, Your Honor.

THE COURT:  So he was the only one that could deposit and withdraw?

MS. YUAN:  He was the only one that could withdraw as the controller.  Others could deposit into his account but he --

THE COURT:  But he can only -- he was only able to withdraw.

Were you able to tell how much he withdrew in terms of how you got to what remains, the about 24 million?

MS. YUAN:  Yes, Your Honor.  As we lay out in our --

THE COURT:  Okay.

MS. YUAN:  -- brief, he --

THE COURT:  All right.  I'll get to you.  I saw that amount.

So he did purchase life insurance, but that's been canceled; right?

MS. YUAN:  That has been seized by the government, yes, Your Honor.

THE COURT:  So then is that a reduction of the 24 million?

MS. YUAN:  Yes, Your Honor.

THE COURT:  Before you reach 24 million?

MS. YUAN:  The 8 million that the government seized was part of that 24 million that he received.

THE COURT:  So you need to reduce that because he

doesn't have access to that 8 million.

MS. YUAN:  Correct, Your Honor.  In considering what he has access to, it's reduced by the 8 million.

THE COURT:  So we're down to now 16 million.

MS. YUAN:  Yes, Your Honor.

THE COURT:  We're talking about access.

MS. YUAN:  Yes, Your Honor.

THE COURT:  I know, Ms. Yuan, you understand.

MS. YUAN:  Yes.

THE COURT:  Okay.  Page 4.

And so these accounts were not the type of accounts where a bank might be suspicious?  Did you ever get that impression?  Money coming in, money going out.  And I'm not suggesting that the bank should have been, maybe yes; maybe no.  But there was no evidence prior to that that the bank contacted Mr. King or anyone that was involved in this alleged fraudulent scheme?

MS. YUAN:  The evidence I'm aware of, Your Honor, is that in approximately February of 2024, JP Morgan Chase raised concerns with the -- several accounts of the defendant and several accounts at JP Morgan Chase have been closed as a result of the financial institution's concerns.

THE COURT:  Okay.  The concern was made to Mr. King or was it made to the government or somebody else?

MS. YUAN:  I do not have that information in terms

of --

THE COURT: That's all right.

MS. YUAN: -- whether it was made to Mr. King, yeah.

THE COURT: That's all right.

So he opened between January '23 and May '24, 30 personal and business and investment accounts; right?

MS. YUAN: Over 30 of those accounts, yes, Your Honor.

THE COURT: And then he used cashier's checks to transfer large amounts of money between the accounts and you have a record of that?

MS. YUAN: Of some of it we have a record, yes.

THE COURT: Okay. So obviously cashier's checks are cash, so what your sense -- are you telling me that you cannot account for all those cashier's checks being deposited in another one of his accounts that he has access to?

MS. YUAN: At this point, with respect to specifically the cashier's checks, I believe we have been able to piece together the tracing of where all of those have been deposited, so I don't believe that the government is aware specifically of a cashier's check that the defendant withdrew that is not accounted for.

THE COURT: So with respect to all of those transfers, they were then placed in another account and there's no evidence that he independently from those transfers for himself personally could have those funds available to him?

MS. YUAN:  Specifically on the cashier's checks, no, Your Honor, but other transfers, yes.

THE COURT:  So there was $300,000 that was seized by the government from his home and vault; right?

MS. YUAN:  More than $350,000 in cash, Your Honor.

THE COURT:  And the government has that?

MS. YUAN:  Yes, Your Honor.

THE COURT:  That's not available?

MS. YUAN:  Correct.

THE COURT:  Okay.  Now, this is where you brought me to earlier which is most important because it was just before he was indicted.  So that's May 31st, about.  So these are the balances as of May 31st?

MS. YUAN:  With the exception of three -- of four accounts that I have those footnotes and there's a couple different dates but for the most part, yes, Your Honor.

THE COURT:  Okay.  And so that is about 4 million on line --

MS. YUAN:  Correct, Your Honor.

THE COURT:  Okay.  So I'm wondering why the government has not seized or frozen any of these funds.  Is there a reason?

MS. YUAN:  The way that the defendant moved the money, Your Honor, made it very difficult for the government to trace, so the government has been working on tracing these funds to

satisfy a seizure warrant.  At this point the government has been unable to secure a seizure warrant for these funds but the government continues its financial investigation.

THE COURT:  Okay.  But those funds are not available to Mr. King?

MS. YUAN:  They are, Your Honor.  They are as --

THE COURT:  What I'm asking -- if after this indictment you're aware that there are 4.2 million, about, funds, why do you think they're available?

MS. YUAN:  Your Honor, our records indicate that as of May 31st that is what he had in these ten accounts that he's the sole signatory of and so unless he has spent the money since then or dissipated the money, it is available to him in those accounts.

THE COURT:  Okay.  I'm confused though.  If you know those funds are potentially available to him, how can he withdraw them?  Haven't you notified the bank or -- I mean, if he walks out of here, he can go to the bank and get $4 million in cash?

MS. YUAN:  In order for the government to freeze those funds, the government needs to have a seizure warrant.

THE COURT:  I understand.  So -- but you know those funds are there.

MS. YUAN:  We do.  Well, we knew that they were there as of our last records, which are from May 31st, 2024.

THE COURT:  So knowing exactly how much fund -- exactly the number of funds that are there in that account, if he tried to remove them, wouldn't you be aware and that may be enough for you to get a search warrant to seize it?

MS. YUAN:  The only way for us to be aware, Your Honor, is if we were to issue a subpoena or process to the bank to receive that additional documentation.

THE COURT:  Why can't you do that?

MS. YUAN:  We can, Your Honor.

THE COURT:  Okay.  So then you would know through the bank if he tried to remove any of those funds.

MS. YUAN:  If we issue that process and receive a response.  Our information about any transfers that he makes would not be instantaneous.  It would take a matter of weeks to receive that response from banks typically.

THE COURT:  I'm confused.  I'm confused because usually -- particularly where the bank is -- or some of the institutions have been made aware that Mr. King has been indicted and that you do not want him to run away with $4 million, that the United States government would do everything if he's released to make sure that you are notified.

Now, I may be wrong, but my understanding with my experience is if a bank receives a subpoena for information -- an expedited subpoena from a judge that notice must be given to the United States government that these funds cannot be removed

by the defendant or he cannot empty that account, that you would know.

MS. YUAN:  So the only legal process that would allow the government to tell a bank that would be a seizure warrant.

The government can request documents from a bank, but the government -- without a seizure warrant signed by a magistrate judge, the government cannot seize or freeze --

THE COURT:  No, I know you can't seize.

MS. YUAN:  Yeah.

THE COURT:  But you can get notice.  And then you could issue -- or you could ask for -- from the bank instead of a seizure, you could -- you can tell me I'm wrong.  You could essentially go to the bank and say this is a warrant and you have probable cause; right?

MS. YUAN:  Once we get a seizure warrant then, yes, Your Honor.  But we --

THE COURT:  I'm confused.  Mr. King has been indicted and some of these banks are aware -- I think all of them -- and so you don't have a seizure warrant yet.  And I understand what that is.  But if he were released and you received any information that he tried to withdraw any of those funds, you can certainly make sure that the bank lets you know and then you would be prepared to show a judge probable cause in order to get a search warrant; right?

MS. YUAN:  I believe, Your Honor, that the government

could informally request that the bank notify us.  I do not believe that the bank would have any legal obligation to notify the government absent a seizure warrant.

THE COURT:  If you got a court order?

MS. YUAN:  Exactly, Your Honor.

THE COURT:  And so, for example, from a judge?

MS. YUAN:  Correct, Your Honor.

THE COURT:  Okay.  As long as the judge thought it was appropriate because the defendant has been released; right?

MS. YUAN:  I believe that would be a possibility.

THE COURT:  So this particular judge could give you that, right, and you would take it to the bank and you would say if any of these funds are attempted to be withdrawn by the defendant, we want to know, and you then would already have provided a document to me, most likely, or a magistrate judge, for a search warrant and seizure, right, only as evidence?

MS. YUAN:  Yes, Your Honor.  And the challenge with the seizure warrant at this point is --

THE COURT:  Not seizure.

MS. YUAN:  Okay.

THE COURT:  We're talking about -- we're talking about a search and seizure; right?

So you wouldn't, essentially, see it, it would be evidence.  So I'm trying to figure out -- and if you could tell me there's no way that he could -- or many ways where he could

get that money and the bank would give it to him and he could flee then, that's what I need to know.

And you've given me a lot of information, Ms. Yuan, and I'm very pleased as comparison -- in comparison to what I received previously.

Okay.  So the last portion of this on line 8 you say: King has direct control of and access to over 4.1 million in liquid funds.

That's serious.  Where is that?

MS. YUAN:  That is summarizing those ten accounts above that we were just discussing, Your Honor.  And that money is as of May 31st, 2024.

THE COURT:  And so what you're saying is you have not been able to issue documentation to seal it -- seize it?

MS. YUAN:  Correct, Your Honor.

THE COURT:  So they have not been seized yet?

MS. YUAN:  Correct, Your Honor.

THE COURT:  So remind me what it takes to seize those funds.

MS. YUAN:  Yes, Your Honor.  It's probable cause that the funds are proceeds of a crime, which we have, Your Honor.

The second part is that it -- we need to have it traced, actually, that the funds were traced.  And the way that the defendant here moved the funds from account to account, withdrawing it, depositing it, our forensic accountants have

not been able to put together sufficient tracing --

THE COURT:  Okay.

MS. YUAN:  -- to satisfy that.

THE COURT:  How long is it going to take to do that so that -- this is a significant issue.  If you can establish that he has access to those funds and you cannot get a seizure of them or a seizure order from the court, that's serious.

So as I take it today, he has -- as far as you're concerned, because you haven't seized it yet, he has access to that?

MS. YUAN:  Yes, Your Honor.

THE COURT:  He could walk out of here and get those 4 million.

MS. YUAN:  That's the government's understanding, Your Honor.

THE COURT:  So the next -- we're in the next paragraph, tracing King's withdrawals.

So he withdrew about 6.6 million from bank accounts about one month before the indictment; right?

MS. YUAN:  About two months before, yes, Your Honor.

THE COURT:  Two months before.

All right.  So -- and you have no idea where those funds are?  Is this what you're showing me that you can -- so he made the following withdrawals and this was after April 22nd?

MS. YUAN:  This was on April 26, 2024, Your Honor.

THE COURT:  Okay.  On that day, he withdrew all these funds?

MS. YUAN:  Yes, Your Honor.

THE COURT:  Okay.  And that you've been able to establish?

MS. YUAN:  And that you can see in lines 20 through 22, those cashier's checks, we were able to piece together that they were deposited into those Charles Schwab accounts.

THE COURT:  And so they were deposited in the Schwab account.  And current balances of about 3.3 million.  Of that, 1.3 has been frozen; right?

MS. YUAN:  Your Honor, it's 3.3 plus 1.3.  So the government just recently, as of last week, executed a seizure warrant and --

THE COURT:  Okay.  Those are not available to him; right?

MS. YUAN:  The 4.6, Your Honor, correct.

THE COURT:  Okay.  Then -- and so of the 6.6 million, he withdrew -- this is another 1.9 million and that has not been seized and is likely available.  That's most important to me.  Why is that likely available?

MS. YUAN:  Yes, Your Honor.  The government hasn't seized it.  There was a $1.3 million payout in this Charles Schwab account.  It's on May 24th, 2024.

THE COURT:  Okay.

MS. YUAN:  The bank has not provided any additional information about that payout.  We are unable to know whether it went to Mr. King in cash, in a cashier's check to somebody else.  We don't know.

MR. RAFFERTY:  Your Honor, I can --

THE COURT:  No.  Hold on for a second.

MR. RAFFERTY:  I'm sorry, Your Honor.

THE COURT:  I know you're anxious.  You're sitting on the edge of your seat.

MR. RAFFERTY:  I have information about that specific transaction.

THE COURT:  Okay.  What is it?

MR. RAFFERTY:  As I mentioned at the last hearing, there was a construction project that was scheduled to begin in around here.  He was building out a studio and there was approximately one point something million dollars in an account held by an attorney whose name is, I think, Kenneth Murray. He's a local lawyer here.  That lawyer still has all that money.  And so when we're talking about the 1.3, I think a majority of that is in Mr. Murray's account.  Some of that money was used apparently to purchase some of the things that are needed to do this build-out of a studio, but I've already expressed to the government at the last hearing and in my pleadings that I would be prepared to have Mr. Murray give that

money to the government.

THE COURT: Okay. But it was 1.9. And so 1.3 -- so that still leaves 600,000. Am I -- you said that 1.3 or the entire 1.9 is in the account of the attorney?

MR. RAFFERTY: My understanding, Your Honor, is it's the 1.3. With respect --

THE COURT: What I'm saying is where's the rest?

MR. RAFFERTY: There --

THE COURT: As of the 26th of April, counsel says 1.9 has not been seized and is likely available. Now you're saying at least 1.3 of that is in the hands of an attorney?

MR. RAFFERTY: Along with -- it's -- it was 1.3 originally. I think some of the money was used by the contracting company to purchase equipment so, you know, 1.3 -- whatever it is, 1 million plus whatever equipment.

THE COURT: So you -- 1.3, 1.9 is -- if you subtract that, that's still 600,000.

MR. RAFFERTY: Yes, Your Honor. And my understanding is Mr. King had to pay taxes and so I think there's going to be a payment to the IRS that are reflected in those accounts.

THE COURT: So you're going to tell me that the $600,000 can be accounted for?

MR. RAFFERTY: That is my understanding, Your Honor.

And with respect to the other accounts that are listed in the government's brief beginning on page 4 into page 5, the

4.1 million, you know, I've already discussed with the government, you know, a willingness to -- because the concern I think of the court has been since last -- at the last hearing and this hearing is Mr. King's access to these accounts.  And what I've expressed to the government is I'm prepared to relinquish access to these accounts that are specifically listed in here to the government.

THE COURT:  In other words, you're not going to contest the seizure?

MR. RAFFERTY:  I am --

THE COURT:  You're not going to contest the seizure?

MR. RAFFERTY:  I am not, Your Honor.  I mean, obviously the government still has a burden that they would have to prove at the end of this case by a preponderance of the evidence to actually keep these funds, but what I have suggested to the government is I am going to skip the step that requires them to first grab it and I'm prepared to just give it to them if that is going to secure my client's release.

THE COURT:  So when you say give it to them, is it -- you're not relinquishing potential ownership.  You're just saying the government can have it?

MR. RAFFERTY:  That is correct, Your Honor.

THE COURT:  Okay.

MR. RAFFERTY:  And that goes for some of the other assets that were listed at the last hearing on government

Exhibit 3 which we talked about, including the Captive Insurance account.  I think there was 2.58 million on that document that I've also indicated a willingness to turn over the funds in that Captive Insurance account to the government, along with the deed, which I believe the government has, for the commercial property on that same document that's listed at a value of $2 million, so in excess of -- Mr. King is prepared to relinquish control to the government.

THE COURT:  Okay.  Let me take you through it.  We're on page 4.

MR. RAFFERTY:  Page 4, yes.

THE COURT:  And there's bank accounts that had these balances and I'm not going to read it.

We go to page 5 and Ms. Yuan says these balances total about 4 million and the government has not seized or frozen these funds.

MR. RAFFERTY:  Yes, Your Honor.

THE COURT:  Okay.  So the government says unless the money was spent in the two weeks ending May 30th, the funds -- or dissipated them, he has direct control of the 4.1 million. What happened -- where is the 4.1 million that the government does -- it's on page 5, lines 5 through 9.

MR. RAFFERTY:  Your Honor, with respect, beginning on page 4, I think the 2,080,000 in the Charles Schwab account, that was originally listed on government Exhibit 3 and was the

Chase investment account.  It is on that same exhibit.  I believe Chase closed that investment account because of the government investigation.  That's why a lot of this money was moved.

THE COURT:  Okay.  Let me focus you on what the government has said.  Look at page 5, line 5.  And so the total balance is at 4.1 million, about 4.2, and the government says we haven't seized or frozen any of these funds, so that's her understanding as how much was there previously and may well be there now.  And the government can't tell if these were spent in the two weeks between May 30th and June 17th or dissipated the funds.

So if they -- can you explain how -- whether or not the 4.1 million still exists and is accessible to your client?

MR. RAFFERTY:  If I can have a moment, Your Honor.

(Pause.)

MR. RAFFERTY:  Your Honor, with respect to those funds, my understanding is that the only thing that may not still be there which was returned to the company is this American Express savings account.  That was part of Mr. King winding down his work.  That was returned.

THE COURT:  Well, what company?

MR. RAFFERTY:  APX Mobile, Your Honor.

THE COURT:  Okay.  That company is part of this indictment?

MR. RAFFERTY: Yes.

THE COURT: Where are those funds?

MR. RAFFERTY: My understanding is they were returned to Nadia Khan, who is another individual who's associated -- was the accountant. The money was --

THE COURT: Okay. Has she been indicted?

MR. RAFFERTY: She's not been indicted, Your Honor.

THE COURT: So you have no idea where those funds are, whether or not your client can contact her and obtain those funds?

MR. RAFFERTY: Your Honor, I don't --

THE COURT: I'm saying what you are telling me -- and you talked to your client and he has a Fifth Amendment privilege so I'm not going to take it as if he's told you.

MR. RAFFERTY: Uh-huh.

THE COURT: But your understanding is what was the remainder of the 4.1 million was distributed to Apex under the care, custody, and control of someone he knows?

MR. RAFFERTY: Nadia Kahn is not employed by APX, Your Honor. She's just an accountant.

THE COURT: Well, but they were distributed to her --

MR. RAFFERTY: The funds were --

THE COURT: -- and she worked for the company; right?

MR. RAFFERTY: She did the accounting work. She has her own company.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  Where is that money?

MR. RAFFERTY:  As far as I know, Your Honor, it was returned to her.  We don't know what happened to that money.

With respect to the rest of the money that's on this document, as I said, as far as we know --

THE COURT:  Let's stop.  We're not going anywhere else.

There is a concern I have here.  If the accountant had those funds and it was through Apex, then the defendant has access.  She worked for him.  So that's my concern.  That's something that only you and your client can resolve.

So those funds are not accessible to your client through the accountant?

MR. RAFFERTY:  Your Honor, I understand that and that's only one of these entries here.

THE COURT:  That's one that you need to look into.

MR. RAFFERTY:  Okay.  The rest of this money, as I said, Your Honor --

THE COURT:  Okay.  We're going there now.

So the rest we start at line 11.  So the government has traced withdrawals, about 6.6 million, as two months before he was indicted, April.  And then he withdrew that 6.6.  And there's a list of the withdrawals.

Then the government on the next page says, line 3, about 2 million has not been seized and is available, including

the 1.3 million out of the May 24th Schwab account.

Tell me about that.

MR. RAFFERTY:  That is the funds, Your Honor, that I mentioned earlier that is in the possession of an attorney by the name of Kenneth Murray.

THE COURT:  Okay.  So that's in possession -- whatever the amount is, because we -- as I said, doing the math, a part of that was used for construction.  Has -- the construction is no longer occurring?

MR. RAFFERTY:  We canceled the project, Your Honor.  They had only bought the equipment necessary to do the project.  The attorney contacted me and I canceled that and he has the remaining funds in his trust account.

THE COURT:  Okay.  So you are going to have to explain to me -- it's 1.3 and we started with 1.9.  Where is the 600,000?

MR. RAFFERTY:  That was the payments that were made to the IRS, Your Honor, that's my understanding.  So that's where all that money went.  He does not have access to that money.

THE COURT:  Well, you earlier said it was 1.3 that the attorney had access -- was provided to him for this building project.  That leaves 600,000.

MR. RAFFERTY:  Yeah.  The 1.3 was for the project and there was approximately 600,000 paid to the IRS.  The total of those two numbers is 1.9, which is the figure that's on this

document.

THE COURT:  Okay.  So now I know.

Is that correct, the IRS was paid 600,000?

MS. YUAN:  No, Your Honor.

THE COURT:  Okay.  You say that affirmatively, the money was not paid.

MS. YUAN:  337,000 of that 600,000, roughly, that we've been talking about is still sitting in the Charles Schwab account.  We see that on page 4 of the government's brief.

So with respect to the remaining approximately 300,000, I do not know right now, Your Honor, if there is a payment to the IRS in the bank records.  I'd have to check that.

THE COURT:  But at least -- you're saying there's $300,000 available in the Schwab account?

MS. YUAN:  Yes, Your Honor.  We see that on page 4.

THE COURT:  Is that correct, Mr. Rafferty?

MR. RAFFERTY:  I have no reason to dispute the government, Your Honor.  If their records show there's 337,000 in that account, then I don't dispute that.  As I mentioned, the government has all of these accounts listed.  They believe they all contain, as I understand it, proceeds of the unlawful activity.  They're just working through a financial analysis to actually seize them all.  I'm prepared to --

THE COURT:  What's your -- what you are telling me and

telling the government is that you're going to provide verifiable information that your lawyer -- your client, after he's released, will not have any access to those funds.

MR. RAFFERTY:  I'm prepared to surrender access and control to all of the accounts that the government has identified that they believe contain funds from the alleged fraud.  I'm prepared to relinquish control to all of those accounts to the government.

THE COURT:  So let me ask you, Ms. Yuan, you know how much money on the funds that are in these accounts that you believe that the defendant may have access to; correct?

MS. YUAN:  Of what we've been able to account for, yes.  But the government believes that there is money that we haven't been able to account for.  And so specifically what Mr. Rafferty just said was that he would make available the money that the government has identified.  He has not provided an accounting.  He's not been truthful with pretrial services in terms of accounts that the government has not been able to identify.

THE COURT:  So how much of the funds that you -- that you're aware of -- and there's quite a bit in many accounts -- that you think that defendant still has access to?

MS. YUAN:  So I think a helpful way to look at it is probably where Your Honor was going next on page 6 and 7.  This is government Exhibit 2 which is a spreadsheet of the

defendant's assets.

My understanding from Mr. Rafferty is that this was prepared as part of a prenuptial agreement between the defendant and his codefendant in approximately February this year.  And so that spreadsheet --

THE COURT:  So the prenuptial agreement is that -- it's clear that his wife is not -- doesn't have access to those funds?

MS. YUAN:  That's my understanding.  That this spreadsheet --

THE COURT:  Mr. King is the only one who has access to those funds because it was part of the agreement that she would not have access; right?

MS. YUAN:  Part of the agreement that she would not have ownership going into the prenuptial agreement.

THE COURT:  And that amount is?

MS. YUAN:  So when you look at page 6, what the government did in response to Your Honor's questions last week is we took that spreadsheet, government Exhibit 2, and we divided it into what the government has seized and what the government has not seized.  And so page 6 of the government's submission is what we have seized.

And then you turn to page 7 and this is an accounting, again, from that prenuptial spreadsheet, of what the government has not seized.

THE COURT:  And you're aware that all these accounts exist?

MS. YUAN:  We are not, Your Honor.  We are aware of what accounts --

THE COURT:  Okay.  Hold on for a second.

You have listed a number of accounts.  So how did you learn that these accounts exist or are you saying they don't exist?

MS. YUAN:  What we're saying is as of February of this year, this is an accounting of what the defendant put together as his assets and so --

THE COURT:  So he put it together for the government after he was indicted?

MS. YUAN:  My understanding from Mr. Rafferty is it was put together in preparation of his prenuptial agreement with his now wife and codefendant.

THE COURT:  And so you're saying that these funds that he disclosed to his wife are his funds according to the prenuptial agreement?

MS. YUAN:  Yes, Your Honor.

THE COURT:  And assuming that all those funds existed, is that -- and you saw that in some document; right?

MS. YUAN:  We have been able to trace some of these accounts --

THE COURT:  No.  What I'm saying is you saw the

prenuptial document?

MS. YUAN:  We saw that spreadsheet, Your Honor.

THE COURT:  Yes.

And so these are listed there in part of the prenuptial agreement and he signed it?

MS. YUAN:  I do not have that information, Your Honor.

THE COURT:  Okay.  So at least that -- when he -- he was married in, I believe, January?

MS. YUAN:  February, Your Honor.

THE COURT:  Okay.  All right.

MS. YUAN:  And so --

THE COURT:  Have you made efforts to seize these accounts or --

MS. YUAN:  So where I was going with that, Your Honor, is this is an accounting of his assets as of February of this year.

Yes, Your Honor, the government has made efforts to trace and track all of this money.  He moved a significant amount of money to a significant number of accounts in the past five months.  And so my understanding is a lot of these accounts have been closed, the money has been moved.  But if Your Honor's question is, you know, what is his available net worth, the assets available to him specifically, I think this is the best accounting.  It would be the $15.9 million that he at least set forth in his prenuptial agreement, you know, five

months ago, that was what he had ownership over separate from his wife.

THE COURT: Okay. That makes sense.

But how do you know as of today he still has access to 15 -- about 16 million?

MR. RAFFERTY: He -- he does not have access to this anymore, Your Honor, because much of this has already been seized.

THE COURT: Okay. I'm asking the government. That's what you think and I'm not surprised.

So why do you believe he doesn't have access to the 16 million?

MS. YUAN: Well, first of all, everything on page 7 the government has not seized. Right. We took apart what we have seized. That's on page 6.

THE COURT: Right. But do you -- do you know that those assets exist and those various -- and that some of them are in bank accounts, aren't they?

MS. YUAN: Most of the money in bank accounts has been subsequently moved. Like I said, he moved a significant amount of money. So what is in bank accounts that we can account for, we've set forth previously in our submission.

THE COURT: Okay. So, for example, you haven't seized the BMW and the Yamaha and you haven't seized CDs and -- in other words, you haven't found any of these?

MS. YUAN:  Correct, Your Honor.  We haven't seized any of these.

THE COURT:  And you don't know whether or not they exist?

MS. YUAN:  A lot of the funds I do know that were in the JP Morgan Chase accounts were transferred to other accounts, so we've accounted for some of those.

THE COURT:  Which ones have you as of now not been able to account for?

So in other words, you're still looking for them and that there's reason to believe that because they existed at the time of the prenuptial, that the defendant may have access to them, which ones?

MS. YUAN:  Yeah.  I can say, Your Honor, everything -- everything except for the JP Morgan Chase accounts the government has not seized and does not have access to.

THE COURT:  So where is that in this?

MS. YUAN:  That would be lines 1, 2, 3, and 4.

And then there's a series of CDs and checking business and checking personal.

And then around line 14 we pick up with cryptocurrency.  So cryptocurrency and below, the government has not seized or accounted for.

THE COURT:  In other words, you couldn't find, for example, the jewelry?

MS. YUAN:  We seized some jewelry but not the jewelry listed here.

THE COURT:  Okay.  So you don't know if they exist or not anymore?

MS. YUAN:  Correct.

THE COURT:  Okay.  But at least as of the prenuptial agreement, arguably that -- because they're listed here, they existed at least then?

MS. YUAN:  Correct, Your Honor.  And one thing I will add just as an update.  So this is the $15.9 million, the total we see on page 7.  And we do know that some of that money that was sitting in Chase accounts was transferred to Charles Schwab.  And the government just last week did seize that $4.6 million that we discussed.

THE COURT:  Okay.  So -- but there is still some -- so, for example, is it the investment accounts that were transferred?

MS. YUAN:  The checking and the business accounts that were transferred, Your Honor.

THE COURT:  Okay.  So that's line 8 through 14?

MS. YUAN:  Yes, Your Honor.  About 13.

THE COURT:  About 13.

And so you don't know where the cryptocurrency, Digital Assets Coinbase is?

MS. YUAN:  We have seized some cryptocurrency

ledgers -- I'm sorry -- we have seized some cryptocurrency ledgers that -- we are working to seize the actual funds, the actual cryptocurrency.  We have not seized the actual cryptocurrency.

THE COURT:  Is it about $12,000?

MS. YUAN:  We do not have how much it is at this point, Your Honor.

THE COURT:  And equipment, you don't have that seized?

MS. YUAN:  No, Your Honor.

THE COURT:  You have any reason to believe it still exists?

MS. YUAN:  I do not know one way or the other, Your Honor.

THE COURT:  And Captive Insurance, it's about 2.5, 2.6 million.

MS. YUAN:  Mr. Rafferty has expressed to the government that the defendant has that money and would be willing to put that in an account for the government.

MR. RAFFERTY:  The defendant doesn't have it, Your Honor.  It's actually in the hands of the insurance company.  It's a complicated situation but counsel is correct that we are prepared to provide that money to the government.

THE COURT:  Okay.  And then we have various investments and do you have access to the investments?

MS. YUAN:  No, Your Honor.

THE COURT:  And so you don't -- it's Morgan Chase, movie investment.  So you don't know if he has access to that?

MS. YUAN:  I don't, Your Honor.

THE COURT:  Okay.  Is that -- Mr. Rafferty.

MR. RAFFERTY:  Your Honor, the investments that you're speaking of the -- it says 2.3 -- 2.038,316, line 17, that fund and that account was closed at the direction of Chase, along with the other accounts that Mr. King had that are listed on this document.  The 2,038,000 was then placed in the Charles Schwab account which can be found on page 4, line 17.  The balance is now $2,080,401.

THE COURT:  So is it clear you're going to be able to show that this amount that's $2,038,000 was deposited so there's -- for example, is it clear that it was exactly $2,038,000 that was deposited in the Schwab account?

MR. RAFFERTY:  Your Honor, I'm pretty certain it was close to that number because the account was closed at the direction of Chase.  Typically what will happen -- or what happens in investigations like this is a grand jury subpoena is received by the bank.  The bank becomes suspicious and ultimately, just like any one of us has the ability to close an account for any reason or no reason at all, Chase has the right to close accounts and they closed all of the accounts that Mr. King had.

If you look at the balance, $2,038,000, this is as of

February.  If you go up --

THE COURT:  And that's in the Schwab account?

MR. RAFFERTY:  That's now in the Schwab account.

THE COURT:  You're able to show that that's -- that precise amount was deposited in Schwab?

MR. RAFFERTY:  That is my understanding, Your Honor.

And if you look at the balance in the Schwab account right now or --

THE COURT:  Where is it on here?

MR. RAFFERTY:  I'm on page 4, line 17, you see that the amount of money which, again, this account had just been opened, the government has indicated that.  If you look as of May 31st, 2024, there's $2,080,000 in an investment account at Charles Schwab.  I think it's fair to infer that, you know, with some interest or maybe some gains, that is what that amount is.  And as I mentioned earlier, Mr. King is prepared to relinquish control of all of that money.

THE COURT:  That's right.  We're just doing a -- I'm doing a mathematical calculation here.

So on page 7, the -- we have two investment accounts, so -- we actually have three investment accounts.  So we're -- it's about 4 million -- almost $5 million.  You see there was all that -- all those investment accounts where they -- was that closed and transferred?

MR. RAFFERTY:  Line 16, the investment that's

described as Captive Insurance Scottsdale Assurance Group, that fund -- those are the funds that counsel previously mentioned I've already offered to give to the government.  It is sort of sitting out there.  It is kind of an investment account.  It's an insurance project of some kind that was recommended to Mr. King by his accountant whose name is Nolan Moore.

THE COURT:  So that account is -- you are ready to relinquish any ownership in that account so he cannot access it?

MR. RAFFERTY:  Yes, Your Honor.

THE COURT:  Okay.  So then the next one is about 2 million and that's Morgan Chase.

MR. RAFFERTY:  And that's the account, Your Honor, that I mentioned earlier.  My understanding is that that account was closed.  Those funds were then transferred to Charles Schwab on page 4, line 17, the account ending in 8799, and Mr. King is prepared to relinquish any control over that account as well.

THE COURT:  Do you have any reason to believe that is not accurate, Ms. Yuan?

MS. YUAN:  Your Honor, it's difficult to tell because on the spreadsheet there's no account number listed.  And so if you see it, he has the account numbers on all of the accounts above --

THE COURT:  So when you say -- I'm sorry to interrupt,

but when you say account numbers, are we talking about JP Morgan Chase?

MS. YUAN:  Yeah.  If Your Honor looks at lines, like, 7 through 14, he lists the last four digits of the account number but --

THE COURT:  So if he gave you or provided to the government the account number and -- is there any way to trace whether or not all of that has been deposited into the Schwab account?

MS. YUAN:  Then we would be able to know, yeah, that -- the fear, the uncertainty is he may have an Investment Portfolio JP Morgan Chase account out there that had those $2 million that we didn't know about.

THE COURT:  I'm clear.

You understand, Mr. Rafferty?

MR. RAFFERTY:  I am, Your Honor.  The only reason why there's no account number here is because JP Morgan Chase and Chase are separate.  JP Morgan Chase is described on what was in earlier hearings marked as government Exhibit 2 is an investment portfolio.  And so my understanding is that all the accounts at Chase that Mr. King had control over were closed in or around April of 2024.

THE COURT:  That's fine.

The government raises a good point.  She doesn't know whether or not -- what this account number is and if it's been

closed -- say, for example, it was closed and your client says all those funds were deposited in the Schwab account, you should be able to trace that; right?

MR. RAFFERTY:  Yes.  And the government has the records for account ending in 8799 at Charles Schwab and so the government, which bears the burden here --

THE COURT:  No, no.  The JP Morgan Chase account, do you have -- there's no account number there.  That's what she's concerned about.  Because what you're saying is that the approximately 2 million in the Chase account was transferred to the Schwab account; right?

MR. RAFFERTY:  That is correct, Your Honor.

THE COURT:  Okay.  She wants to confirm through Chase and she would need the account number.  And, for example, if it was withdrawn or it was transferred to Schwab, it should be clear.

MR. RAFFERTY:  Your Honor, I agree with you.  And I think the government has the records so you could find that information --

THE COURT:  Well, how about you give it to the government.

MR. RAFFERTY:  Well, I guess what I'm saying to you, Your Honor, is the government already has the records.  So the government in their own filing says we have records of all of these different accounts and so that would include the Charles

Schwab account ending in 8799 that was opened.  When you make a transfer --

THE COURT:  No, I -- no.  What we're talking about is the Chase account.  It seems the government doesn't have the account number for Chase.

MR. RAFFERTY:  I understand that, Your Honor, but the account number for Chase would also appear in the Charles Schwab account because the funds, as I understand it, are transferred --

THE COURT:  Oh.  Okay.

MR. RAFFERTY:  -- from Chase and so when you do a transfer --

THE COURT:  Yeah.

MR. RAFFERTY:  -- there's an account number there.

THE COURT:  Okay.  So it has been a transfer.  He didn't pull it out and then -- by cash and then deposit it?

MR. RAFFERTY:  That's my understanding, Your Honor.

THE COURT:  So, Ms. Yuan, what Mr. Rafferty is saying makes sense to me.

MS. YUAN:  Yes, Your Honor.  And I'm pulling up -- we do have the Charles Schwab 8799 account and I am pulling it up to be able to confirm Mr. Rafferty's representations.

THE COURT:  Okay.  So then Last Meals Project, movie investment, it's 500,000, what happened to that?

MR. RAFFERTY:  Your Honor, that money is in the

possession of Nolan Moore, who is Mr. King's accountant.  This was some sort of investment project that he suggested Mr. King engage in.  I could -- I mean, like everything else, Your Honor, if Mr. Moore has $500,000 for some movie investment, I'm prepared to relinquish custody and control of that to the government as well.

THE COURT:  And what you are saying is that was something that was created through his accountant?

MR. RAFFERTY:  That's correct.  He has --

THE COURT:  And that's the same accountant that we talked about before?

MR. RAFFERTY:  Correct.

So Mr. Moore works at a company called AASI.  Many of the things that were done here, the financial activity, the investments were done under the advice and counsel of Mr. Moore, who is some sort of financial advisor.  For example, the Captive Insurance investment that's listed at line 16 on page 7, that was another investment that was done at the direction of Mr. Moore and his colleagues at AASI.

THE COURT:  Okay.  So what you're saying is you're going to provide the government enough information so they can assess and determine that this -- whatever it is, this investment is not in the care, custody, and control of your client?

MR. RAFFERTY:  Yes, Your Honor.

THE COURT:  Okay.  Any reason, Ms. Yuan, to disagree with that?

MS. YUAN:  No, Your Honor.  We don't have any information about that money.

THE COURT:  So the rest of it is jewelry.  You have that in your possession; right?

MS. YUAN:  I'm sorry.  I thought you were asking the defendant, Your Honor.

No.  Everything listed on page 7 the government does not have in its possession.  So the jewelry on page 7 is not in the government's possession.

THE COURT:  And, Mr. Rafferty, where is that?

MR. RAFFERTY:  Your Honor, my understanding is it could be at his house, if it's there.  I'm happy to give them the thousand dollar watch if that's what they want.  I'm happy to give the government, you know, any of the assets that they're concerned about.

THE COURT:  Okay.  So obviously the government has done a search -- complete search of his house.  You didn't find these items in his home; right?

MS. YUAN:  That's correct, Your Honor.

THE COURT:  Okay.

MR. RAFFERTY:  Your Honor, I was at his house.  I'm pretty sure I saw a TAG Heuer watch.  I also found a firearm that was just left there.

THE COURT:  You mean after --

MR. RAFFERTY:  Yes, last week -- or two weeks ago I found a TAG Heuer watch sitting there.  I found a firearm, an open safe.

THE COURT:  Do you have any reason to believe that isn't true?  Why wouldn't the government seize it?

MS. YUAN:  I don't know, Your Honor.

THE COURT:  Okay.  So let's get that taken care of.

And the real property we've talked about.  He's obviously not going to sell it.

MR. RAFFERTY:  He's not going to sell it, Your Honor. I believe the deed was taken when the financial paperwork from the house was taken.  And I've offered to give -- if it's -- whatever it is, I'm happy to give the government the deed so nothing can happen to it.  If they want to put a lis pendens on it, they can do that.

THE COURT:  Okay.  And then we have a number of listings involving Ms. Gehrke's assets.  So I can't -- is that on page 9?

You have said you have seized some of this but the remainder -- I guess her first name is Lexie?

MS. YUAN:  Yes, Your Honor.

THE COURT:  So you have access and you -- these funds are not available to him on page 9 through line 11?

MS. YUAN:  That's correct, Your Honor.

THE COURT:  And the funds at line 12 through 19 may be available to him?

MS. YUAN:  Are we on page 9, Your Honor?

THE COURT:  Yes.

MS. YUAN:  Okay.  If I may just explain what this chart is, Your Honor.

The government located what has been attached as government Exhibit 6 which was a green folder in the Mountain Vault box.  And it says on the folder cover:  Lexie's finances. In case of emergency defined as incarcerated or death or incapacitated for greater than six months for Jeff King only.

So we found a similar binder that said for Ms. Gehrke's mother only.  And so this is -- which we see in the folder is a summary of all of Ms. Gehrke's accounts that she was leaving for Jeff King only in the event of her incarceration.  Obviously that's very concerning to the government because the defendant -- Ms. Gehrke is now incarcerated and so she left this folder leaving these assets for her husband, the defendant, in case of her incarceration.

So what we did for Your Honor, appreciating these concerns, is we looked through this folder.  Each account that Ms. Gehrke listed, put it in this chart for Your Honor on page 8 through 9, and then put in orange those -- the accounts that the government has seized.

And so what we see -- the accounts in this green

folder for Jeff King that the government has not seized adds up to $34.8 million.  So this staggering amount of money --

THE COURT:  Okay.  Yeah.  I'm -- I'm surprised that these funds that have not -- that may be available to Mr. King are not in the care, custody, and control of the government is -- she has been released.

MS. YUAN:  She is detained, Your Honor.

THE COURT:  I thought you said she was -- okay.

MS. YUAN:  I'm sorry.  She's incarcerated and she is detained.

THE COURT:  She is incarcerated.  Okay.

MS. YUAN:  Yes.

THE COURT:  So -- but you're -- you obviously are aware of these accounts.

MS. YUAN:  We are, Your Honor.

THE COURT:  And why do you think that Mr. King can have access to these accounts?

MS. YUAN:  Because of what it says on the front in Ms. Gehrke's handwriting of this green folder, for Jeff King only in the case of her incarceration.

THE COURT:  But you have already identified these accounts and have you made an effort to ensure that they are not distributed?

MS. YUAN:  We are making those efforts.  You can see we made the efforts on one, two, three, four, five, six, seven,

eight, nine of the accounts that we have seized.

Again, our forensic accountants are working to establish that appropriate sufficient tracing for seizure warrants for the remaining accounts --

THE COURT:  Okay.  Those -- that's quite a bit and it's less than 34,000 but I'm sure Mr. Rafferty is going to say that your client is not -- does not have access to any of this.

MR. RAFFERTY:  He doesn't, Your Honor.  And I'll say this, you know, the government did disclose a similar packet of information for Ms. Joan Gehrke.  And the important distinction I would draw between those two packets is the packet for Joan Gehrke included a power of attorney that would allow Ms. Joan Gehrke to actually engage in financial transactions with all of these accounts.

THE COURT:  And Ms. Jones (sic) is the mother?

MR. RAFFERTY:  Is Ms. Gehrke's mother.

There is no power of attorney for Mr. King.  As I've laid out in the --

THE COURT:  So -- but what's the status of Ms. Jones for this case?

MS. YUAN:  She has not been indicted, Your Honor. She's not been charged.

THE COURT:  Is she a witness --

MS. YUAN:  In terms of the justice --

THE COURT:  -- for the government?

MS. YUAN: -- her status, Your Honor?

THE COURT: Yeah. I'm wondering, other than what we know that everybody has problems with mother-in-laws, what makes you think that Mr. King is going to be able to access these accounts --

MS. YUAN: Several things, Your Honor.

THE COURT: -- once he's released?

MS. YUAN: Several things, Your Honor. One is his wife said that he was leaving -- that she was leaving these accounts in the case of her incarceration.

THE COURT: Let me stop you. Sorry to interrupt.

Mr. Rafferty says that only the mother-in-law has access.

MS. YUAN: Well, what he said is the mother-in-law has power of attorney and so the mother-in-law can move funds for Ms. Gehrke while she's incarcerated.

THE COURT: To Mr. King?

MS. YUAN: To anybody.

THE COURT: Well, but --

MS. YUAN: And, yes, of course to Mr. King.

THE COURT: Okay. Okay. So -- and you're working on those accounts to -- in order to seize them, is that it?

MS. YUAN: We are, Your Honor.

THE COURT: So if -- so you haven't given notice to these institutions, banks and Charles Schwab and Wells Fargo,

that they're subject to investigation?

MS. YUAN:  I don't know that there's a mechanism to give that type of notice, Your Honor.  We, of course, have issued subpoenas for records, for the documents.

THE COURT:  Okay.  So if it's a subpoena, then they can't violate the subpoena, otherwise they would be in front of the court for violating a court order; correct?

MS. YUAN:  The subpoena only requests documents from them.  The subpoena does not order them to do anything going forward.

THE COURT:  You mean it doesn't preclude them from transferring the money to Ms. Jones, who would then transfer the money -- well, I can issue that order; right?

MS. YUAN:  I have not seen that happen before, Your Honor, where a judge issues that type of order, but I have no reason to think that Your Honor couldn't.

THE COURT:  Well, if I issued it in conjunction with his release and the banks or the institutions violated it, correct, that would be a violation of a court order.  And do you think somehow I can't do that in order -- in connection with releasing the defendant?

MS. YUAN:  I would say, Your Honor, that this codefendant, Ms. Gehrke, would likely have -- would likely need an opportunity to respond to that before Your Honor issues it absent a probable cause affidavit from the government because

this is money that is not in the direct control of this defendant.

THE COURT:  So what you're saying is he has access only if she provides access through her mother-in-law -- through her mother?

MS. YUAN:  If she transfers the money through her mother-in-law or, yeah, anyone else that she directs to transfer the money on her behalf.

THE COURT:  That's an issue.

Mr. Rafferty, how do we resolve that?

MR. RAFFERTY:  Your Honor, you know, I do think the court can issue an order that would prohibit anyone from engaging in transactions with this account.

If Ms. Gehrke wants to later complain, she certainly would have the right to move and ask that that be vacated, but there's nothing that would prevent the court at this stage for Mr. King to issue an order that prohibited anyone from engaging in transactions in these accounts.

THE COURT:  Okay.  And Ms. Jones does not own the funds.  The only thing -- only ownership that she has is that she can remove the funds and give it to Mr. King?

MR. RAFFERTY:  She has an executed power of attorney that the government has provided to me that would indicate she has the ability to engage in financial transactions on behalf of her daughter.

THE COURT:  So essentially power of attorney, that means she can remove the funds?

MS. YUAN:  And, Your Honor -- yes.  And, Your Honor, Ms. Gehrke could call anybody, give them her password for her online banking, call a friend, and have the money transferred that way.  You don't need a power of attorney to transfer money with online banking these days.

THE COURT:  Ms. Jones, is she willing to provide an affidavit under penalty of perjury that she will not obtain access to these funds, do you know?

MR. RAFFERTY:  Your Honor, I believe Ms. Joan Gehrke is in the courtroom.

THE COURT:  So you can tell me.

MR. RAFFERTY:  Ms. Gehrke.

THE COURT:  No, I don't want to hear from her.

MR. RAFFERTY:  Yes.  I mean, I don't represent her, Your Honor.

But, you know, as I said, I think a court order that prohibited anyone, which would extend to Ms. Gehrke, from engaging in any financial transactions with these accounts that is served upon the bank would prevent anyone from engaging in transactions.

THE COURT:  Well, my only concern is -- I definitely can do that with respect to Ms. Gehrke because she's a defendant in this case.

But with respect to Ms. Jones, that doesn't mean that she can't withdraw them so -- and I -- the government has -- has issued a subpoena regarding these funds; right?

MS. YUAN:  The government has issued grand jury subpoenas for bank records to show the statements and the transfers of these -- well, I believe of some of these accounts.  I would have to check to see if we've done them for all of the accounts.

THE COURT:  When is the return due?

MS. YUAN:  We typically --

THE COURT:  It's usually ten days, two weeks.

MS. YUAN:  We typically request two weeks on a return for grand jury subpoena; sometimes it's quicker.

THE COURT:  So when was it issued?

MS. YUAN:  For which account, Your Honor?

THE COURT:  Well, all of the accounts.  When did these subpoenas issue and how far -- are we at the point where I could issue an order that the funds cannot be distributed by anyone?

MS. YUAN:  One moment, Your Honor.

(Pause.)

MS. YUAN:  I can represent to Your Honor that the government has issued over approximately 250 grand jury subpoenas to banks alone in the course of this investigation over the past year.

THE COURT:  When are they to return?

These particular ones, you are telling me that these are not -- I guess you're saying that you have not received responses --

MS. YUAN:  For these specific --

THE COURT:  -- for the banks for the -- yes.

MS. YUAN:  For these specific accounts, I do not know right now, Your Honor.  I would have to look at the records and get that information back to you, which I could do very quickly.

THE COURT:  And if they are the -- the papers indicate that the funds are still there, what will the government do?

MS. YUAN:  The government, again, is working on getting seizure warrants for those accounts, Your Honor.

THE COURT:  And if I issued an order to the banks that they cannot distribute those funds because a -- there is pending a seizure application, you don't think that would be valid?  You don't think the banks would follow my order?

MS. YUAN:  I just -- I have not seen it done before, Your Honor, so I do not know if Your Honor would need to rely on a probable cause affidavit in order to do that.

And, again, we have probable --

THE COURT:  You can't give me a probable cause?

MS. YUAN:  That's exactly what we're working on.

THE COURT:  Okay.

MS. YUAN:  The probable cause with respect to the tracing, Your Honor.

THE COURT:  Okay.  So with respect to these funds, if they are funds, page 8 and 9, it seems to me in terms of documentation and in order for the government to be able to ensure that these funds are not distributed to the defendant, you still have to complete the process so that -- as I understand it, you've issued the subpoenas.  You don't yet know if they responded.

MS. YUAN:  I think --

THE COURT:  And then if they responded, then you're in the process of issuing or preparing a seizure warrant; correct?

MS. YUAN:  Yes, Your Honor.

THE COURT:  And you haven't done that yet?

MS. YUAN:  We have not established enough probable cause with respect to the tracing for a seizure warrant for these accounts.  But that is something our forensic accountants are working on, Your Honor.

THE COURT:  Okay.  So I may be missing something, but it seems to me -- and I appreciate that an accountant has to do this, but you have documentation that you showed me that Ms. Gehrke intended to provide these funds to Mr. King and that if she was indicted or she was unavailable, that her mother could access these funds and remove them.

MS. YUAN:  Yes, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT: Okay. So right now you've gotten a subpoena and you're attempting to determine whether or not this list is, in fact, accurate and the funds are there?

MS. YUAN: Yes, Your Honor.

THE COURT: Correct?

MS. YUAN: Yes, Your Honor.

THE COURT: And then you don't know if you've gotten that information back yet?

MS. YUAN: I do not know right now, Your Honor.

THE COURT: Okay. But if you get it back, then you are going to initiate seizure warrants?

MS. YUAN: Yes, Your Honor.

THE COURT: And why would you issue seizure warrants? What would you set forth?

MS. YUAN: We would set forth probable cause.

THE COURT: Okay. And if you have probable cause, then what do you do to get seizure?

MS. YUAN: We submit a probable cause affidavit to --

THE COURT: The court.

MS. YUAN: -- the court.

THE COURT: Okay. Then you will do that on an expedited basis.

MS. YUAN: Yes, Your Honor.

THE COURT: And for every other, let's say, funds or property where you need a seizure warrant, expedite it, get it

to me.  If it's properly -- if it's a proper request for seizure, I will grant it.

MS. YUAN:  Yes, Your Honor.

And just to clarify, because our normal process is to submit that to the duty magistrate judge going forward, would you like us to submit to Your Honor?

THE COURT:  I think I can act as a magistrate.

MS. YUAN:  Yes, Your Honor.  Understood.

THE COURT:  Okay.  So then we're on page 10.  And this you're concerned about the associates and whether or not -- what they were paid and the amount of potentially $1 million is now accessible to Mr. King?

MS. YUAN:  Yes, Your Honor.

THE COURT:  And so 12 sales representatives -- do you have any idea who they are and where they are?

MS. YUAN:  I have all of their names, Your Honor.  The government has attempted to interview some of them, yes, Your Honor.

THE COURT:  Okay.  And you're sure that they were, in fact, paid $1 million -- or given $1 million, $5 million, $2.5 million?

MS. YUAN:  Yes, Your Honor.  That has all been traced.

THE COURT:  Mr. Rafferty.

MR. RAFFERTY:  As I mentioned at the last hearing, many of the individuals that the government's talking about

have, in fact, been interviewed and are now cooperating.  We talked about the individual with the initials J-T who --

THE COURT:  They are cooperating?

MR. RAFFERTY:  Yes.  Yes.  Ms. J-T is a cooperator now.  She received some of these moneys.  And she's cooperating with the government.  And so is the other individual I mentioned, a Dalin Bennett.  He's also cooperating.  Has been interviewed.  And so the likelihood that these cooperators are going to -- who don't even really know Mr. King -- when they're interviewed and they're asked about Mr. King, they didn't even know what he did in some instances.  So the likelihood that strangers would give him money to help him flee is just -- it just isn't sufficient, Your Honor, to prove by any standard that Mr. King is a risk of flight.  Just the fact that other people were paid money has no bearing in -- on behalf of Mr. King on the question of whether or not he would flee.  He would not.

THE COURT:  Okay.  Let me respond as I think the government will probably tell me.

The fact that Mr. King would basically give to a number of sales associates, 12, the amount of 1 million, 2.5 million, $5 million, and whether or not it can be traced by the government, indicates to me that they at least had a close relationship with him.

MR. RAFFERTY:  Your Honor, the payments were not made

by Mr. King.  They were made by Lexie Gehrke.

The one example they have in here --

THE COURT:  Okay.  But those funds, even though they were paid by her, how do we -- first of all, the government has indicated and has documentation that Ms. Gehrke would provide these funds to your client even if they -- she did so through her mother or through individuals.

MR. RAFFERTY:  The payments that are being referred to, Your Honor, on page 10, these are payments that were made by Lexie Gehrke.  They were not --

THE COURT:  No.  My point is -- what I'm saying -- and I know you understand -- is that Ms. Gehrke set up funds to give to her husband if she was -- became unavailable, say, for example, she was indicted.  So why would she not tell these individuals to give the funds to him and I think that's what Ms. Yuan is telling me.

MR. RAFFERTY:  Your Honor, I -- respectfully, I think that's speculative.  There's no reason to believe that Ms. King is -- Ms. Gehrke is talking to any of these folks or that any of these folks would ever give money to Mr. King, especially when many of the people that we're talking about are actually cooperating with the government.

THE COURT:  Are they all cooperating?  We have 12.

MR. RAFFERTY:  I don't know the list of 12, Your Honor, but I've seen multiple interviews of sales folks in

the discovery that I've been provided so far.

THE COURT:  Is there any reason to believe, Ms. Yuan, that these individuals will not cooperate with the government and would provide these funds that they received, assuming that they're still in their possession, to the defendant?

MS. YUAN:  Yes, Your Honor, there is significant reason to believe that.  Of the 12 individuals -- I'm looking at the list right now -- the government has only -- only, I believe, two or three of them have agreed to be interviewed by the government and none of them is cooperating with the government in the sense that none of them signed a cooperation agreement with the government.

THE COURT:  So two or three.  That's either nine or ten.  And of those nine or ten, do you know the amount of funds that were distributed to them?

MS. YUAN:  I do, Your Honor.

THE COURT:  Okay.  And you know the names of those individuals?

MS. YUAN:  Yes, Your Honor.

THE COURT:  Okay.  So only two or three have talked to the government, whether or not they cooperated; right?

MS. YUAN:  Yes, Your Honor.

THE COURT:  And you have every reason to believe that they're not going to transfer those funds after talking to the government; correct?

MS. YUAN:  We have --

THE COURT:  Can you ensure that those funds will not be distributed to Mr. King?

MS. YUAN:  None of the individuals have agreed to do anything with those funds.  None of those individuals have represented to the government that they will agree or promise, much less sign an agreement to do anything with the funds.

THE COURT:  Okay.  So we have a problem here, Mr. Rafferty.

MR. RAFFERTY:  Your Honor, Mr. King has no control over any of these people.  We don't even know who all these people are.  And there isn't any evidence that suggests that any of them would pay.  It is the government's burden to prove by a preponderance of the evidence that Mr. King is, first, a risk of flight and, second, that there are no conditions or combination of conditions that would ensure his future appearance in court.

THE COURT:  So this is at this point speculative.  You have a list of 13 individuals?

MS. YUAN:  Yes, Your Honor.

THE COURT:  You have a list of how much funds were distributed to them through Ms. Gehrke?

MS. YUAN:  Yes, Your Honor.

THE COURT:  And were they provided to them as compensation for what they've done for Apex or all of the

companies that are owned by the defendant?

MS. YUAN:  Yes, Your Honor.  They're illegal kickbacks paid to them as commission payments.

THE COURT:  So you have no reason to believe those funds still exist?

MS. YUAN:  Some of them, I believe, are in accounts controlled by some of these sales representatives.  Many of the sales representatives made large purchases with the money that they received.  Several bought homes and luxury vehicles with them.

THE COURT:  So they're not available in terms of cash or actual funds?

MS. YUAN:  I mean, the top sales representative made $17.9 million.  And I believe -- I would have to confirm with the records -- that he does have a significant amount of liquid assets, I think what Your Honor is getting at, available to him.

THE COURT:  So are these individuals close to Mr. King because they were working for him as opposed to just Ms. Gehrke?

MS. YUAN:  So the information that we have, Your Honor -- again, we've only spoken to two of them -- is that several of them were at Mr. King and Ms. Gehrke's wedding in February of this year.  It wasn't a large wedding list.  So they were close enough to both of them to be at the wedding.

Mr. King -- if Your Honor will recall, he and another individual controlled the account that received all of the fraudulent money from Medicare. And so even though that money was transferred to Ms. Gehrke and then to the sales representatives, Mr. King is the one, along with Ms. Gehrke, that made them millionaires.

I'm now recalling that we have several -- we have email documents showing that Mr. King gave trainings to some of these sales representatives in --

THE COURT: Okay. The question is how long ago, too? I mean, if it was yesterday, that's different, or a month ago, but you have no idea at this point whether or not those funds still exist?

MS. YUAN: The funds that the sales representatives have, Your Honor, all of the payments were made between summer of last year and, you know, approximately April of this year.

And, again, I would have to check our accounting to see what funds are still available in the account.

THE COURT: And of the two or three that you've spoken to, is there any reason to believe that they -- well, first of all, how much -- how much was distributed to them and was there any reason for you to believe that those funds would be transferred?

MS. YUAN: So I've just confirmed by looking at my records. I do believe, Your Honor, that the government has

64

only interviewed two of the individuals.  One individual is J-T and she received approximately $4.1 million.

And one moment, Your Honor.

The other individual is the one that received $17.9 million.

Again, they're both represented.  And through their counsel, they have not given any assurances that they would not transfer these funds and so they're not cooperating with the government.  They don't have an agreement with the government in that sense, Your Honor.

THE COURT:  So they're just subjects and not targets?

I mean, I -- you know, I don't want you to tell me about each and every one of them.  They may be witnesses.  They may be subjects.  They may be targets.

MS. YUAN:  Neither of them are witnesses, Your Honor.

THE COURT:  Okay.  So you haven't answered the other. Is it -- I don't need to know who they are, but I just need to know whether there's any basis for me to believe that they're not going to transfer those funds?

And if I had a potential indictment hanging over my head, I would be careful not to transfer those funds.  That's pretty logical.

MS. YUAN:  I mean, you know, Ms. Gehrke had an indictment hanging over her head and she transferred millions -- tens of millions of dollars of funds, Your Honor,

and so I don't know that that is a sufficient --

THE COURT: So what I'm saying, though, is it gratuitous? It was just a gift? Or are they -- they're not witnesses? They never will be witnesses?

MS. YUAN: The money paid to these two individuals, Your Honor, were illegal kickbacks. The government's position --

THE COURT: A kickback means potentially, you know, responsibility.

MS. YUAN: Exactly, Your Honor.

THE COURT: Potential criminal responsibility.

MS. YUAN: Yes, Your Honor.

THE COURT: And so are all these 12 individuals aware of this indictment, as far as you know?

MS. YUAN: I have no reason to think that any of them would be unaware of this indictment.

THE COURT: Okay. So the only thing we have is the funds were given by Ms. Gehrke, not anyone else, not Mr. King, or did he authorize the distribution of these funds for kickbacks?

So this is very vague in terms of whether or not they're poised to provide the funds to Mr. Gehrke (sic) so he can disappear. So this is not enough for me to -- and that's where we are. Other than Mr. Rafferty has to provide the government information that -- what we already talked about

that may be loose funds or money that Mr. King could use to escape.  I don't see much here at all.

MS. YUAN:  I appreciate that, Your Honor.

And just to add, you know, the reason we included this for Your Honor's consideration is envisioning the scenario where Your Honor does release him, for example, on house arrest with an ankle monitor and he puts up the approximately $10 million in funds that he says that he has access to because the government found that money, so now we're in a scenario where would the defendant have access to other means to flee?

THE COURT:  And I get that, but how close is this?

If you could establish for me that they were relatives, they were best friends, that -- but there's not much of a connection here.

And I understand that Ms. Gehrke may have provided them the kickbacks on behalf of Mr. King, but because they -- they were married, they own this business.  So it's too loose for me to consider this as a possibility.

If I have all the other restrictions that I am asking for and have to have, this portion is really -- it's not frivolous, but it's not substantial enough.

MS. YUAN:  I think the greater concern, then, Your Honor, is what we just previously talked about is Ms. Gehrke's assets.

THE COURT:  Yeah.  The greater concern matters is

something that Mr. Rafferty is going to provide information to you as we have talked here today so that you are satisfied and I am satisfied, because it's my decision, that those funds will not be available to Mr. King for him to escape.

MS. YUAN:  But I think the challenge, Your Honor, is what we set forth on page 8 and 9, is that it's not going to account for the assets available to Ms. Gehrke that could be transferred to her husband.

THE COURT:  Well, I thought that those funds are -- although they are in her name, she doesn't have access to them.

MS. YUAN:  She could easily call from the detention center, call a friend to give her online user name and password and authorize a transfer.  It's that simple, Your Honor.

THE COURT:  Well, once again, can you -- she's a defendant in this case.

MS. YUAN:  Yes, Your Honor.

THE COURT:  So what do you need from me?  Are you seizing those funds?

MS. YUAN:  We --

THE COURT:  Are you making an effort to seize those funds?

MS. YUAN:  We are making a significant effort --

THE COURT:  Okay.

MS. YUAN:  -- to trace those funds.

THE COURT:  I am sure you are.  So get that to me.

MS. YUAN:  Yes, Your Honor.

THE COURT:  All right.  And so, you know, you don't have to go to a magistrate judge.

MS. YUAN:  Yes, Your Honor.  Understood.

THE COURT:  Okay.  So what else are you concerned about, other than what we talked about as I'm here, in order to ensure that these funds are not used by Mr. King so that he can escape?

And I will tell you, Ms. Yuan, you've done a great job.  So I don't know if I have seen anything as this complicated in order to provide reason for this court to keep Mr. King incarcerated, but it seems to me we've been through everything.

And if there's anything else that needs to be accomplished to establish for the government reason to believe once I sign orders that there are no lingering funds out there and we know because, allegedly, this is a fraud where there was a lot of money floating around and a lot of money available to both defendants, you're going to have concern.

I will tell you, Mr. Rafferty, that once all of this is presented to me, if your client is -- persuades me, if he complies with all of the requirements of pretrial services, he will under oath agree to everything that he must do.  And then I'm sure you will tell him that if he violates not only the requirements that have been set by the court and pretrial

services, he indeed will be subject to a crime of perjury.  You understand?

MR. RAFFERTY:  Yes, Your Honor.

THE COURT:  All right.  What else?

What else -- I'm not concerned about the airplane, so let's just take that off the table.

Okay.  I think we have -- we have covered everything.

MS. YUAN:  If I may add something just to Your Honor's last point about the defendant being under oath and promising.

The concern the government has is even if these funds are set aside and he promises under oath to abide by Your Honor's orders, we have to ask the question of can he be trusted to comply with those orders?

THE COURT:  Well, of course.  But I -- you know, I don't trust anybody who's been indicted because there's probable cause to believe that he committed a crime.  And so I don't -- I have no reason to trust him at this point.  But if I feel that there's a substantial basis for me to be confident that he will not flee, then I will allow him to be released under all these conditions.  And if the government wants some kind of report to the government, defense attorney, and the court on an expedited basis over, you know, a short period of time, then that's another thing that will ensure me and you.

So it's my decision, as you know.  I have taken everything into account.  And I am not prepared today,

obviously, to release Mr. King, but if the items that you have raised to my -- raised to my attention that we have gone through seriatim, if the conditions are met that I have required of Mr. Rafferty and -- then I will certainly consider releasing him with substantial conditions.

MS. YUAN:  Yes, Your Honor.

And just one final note on that.  Another reason that Your Honor shouldn't trust the defendant, in addition to the charges in the indictment that are charges of deceit, of fraud, is looking at his history since indictment.  His lies to pretrial services.  And he continued to misrepresent through counsel, as recently as last week, that he only made $400,000 last year.  So he's not being forthcoming even through counsel.

THE COURT:  And I agree with you.

MS. YUAN:  Thank you, Your Honor.

THE COURT:  So, Mr. Rafferty, I am not convinced that your client was so frightened by the pretrial services officer that he did not understand that he had to tell the truth, so that excuse doesn't fly.

MR. RAFFERTY:  Your Honor, I understand what the court is saying, but my understanding of the interview process with pretrial services is, you know, how much money do you make a year --

THE COURT:  Oh, come on.  Come on.  That's silly. Don't make that argument to me.  Don't -- there's a lot of

money floating around here.  I took that as true last week that the -- he was only receiving every year only $400,000.  That's nonsense.  I don't want to hear a crazy argument like that.

MR. RAFFERTY:  I understand.

THE COURT:  So let's get these things resolved.  I have given you and your client a substantial amount of time, because if I had relied on all the information and the findings that the most recent magistrate judge made, I wouldn't have let him out last week.  So I have, mercifully, allowed him and -- to prove to the government and to me that he will not be a flight risk.  All right.  Clear?

MR. RAFFERTY:  Your Honor, to be clear, then, the conditions that you are asking Mr. King to satisfy are to relinquish control over all of these accounts that are listed in here beginning on page 4, to relinquish control over the 2.5 million in the Captive Insurance account, to relinquish control of the money that's held in the trust account for that construction project, to relinquish control over the commercial property located at 7540 East 6th Avenue in Scottsdale that's valued at $2 million?

THE COURT:  Yeah.  I -- I'm sure you've got it and you are going to have a transcript.

But I -- I'm reminded of something.  I know you don't think you can -- certainly the government has a right to believe that and I have said that some of the statements he

made may well be false.  Okay.  So I get that.  But you may be able to save time and not have to go to your accountant if that you can, through the bank and through Mr. King, persuade the bank they cannot distribute these funds to him.  Okay.  If you need a court order -- he's just saying that he will not do anything to obtain these funds.  So if he tells me that, I will issue an order to the bank and tell them essentially that he has consented not to distribute these funds, have anybody else distribute these funds.  So if he has any access to these funds or he has limited access to these funds, then I will issue an order.  Okay?

MS. YUAN:  Perhaps the best way to proceed, Your Honor, is I'll confer with Mr. Rafferty and we'll find the quickest way for those funds to satisfy the government's concern that they're not within his --

THE COURT:  Okay.  And you're really -- you're satisfying me; right?

MS. YUAN:  Yes, Your Honor.  Yes.

THE COURT:  Okay.  So we've talked a lot about what you have to do with your accountant and if you still have to do that, do it on an expedited basis.

And as I said, this is comprehensive from the government.  I congratulate both of you, including you, Mr. Williams.  You may be seated.

But I just happened to think when Mr. Rafferty stood

up is that his client is going to issue whatever papers that Schwab needs, Wells Fargo needs, any papers that they're going to require and I'll sign an order. Okay?

MS. YUAN: Yes, Your Honor.

THE COURT: All right. Anything else from the government?

MS. YUAN: Nothing from the government, Your Honor.

THE COURT: Okay.

MR. RAFFERTY: Your Honor, I had suggested some other conditions, including the surrender of his children's passports.

THE COURT: Yeah. Definitely.

MR. RAFFERTY: So you would like that because I understand from pretrial services --

THE COURT: Yes.

MR. RAFFERTY: -- that requires a separate order from the court.

THE COURT: If I need a separate order then the government will provide it.

MR. RAFFERTY: That would also then include the home confinement and ankle monitoring?

THE COURT: Of course.

MR. RAFFERTY: Yes. Okay. Thank you.

MS. YUAN: To be clear, Your Honor is not issuing a releaser at this point. We'll --

THE COURT:  No.

MS. YUAN:  -- make our submissions to --

THE COURT:  All these things need to be resolved and provide a joint notice to the court that it's been resolved.

MS. YUAN:  Yes, Your Honor.

THE COURT:  Okay.  We're adjourned.

(Proceedings adjourned at 11:50 a.m.)

C E R T I F I C A T E


          I, SCOTT M. CONIAM, do herby certify that I am duly appointed and qualified to act as Official Court Reporter for the United State District Court.

          I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

          DATED this 13th day of September 2024.



          s/Scott M. Coniam_____
               SCOTT M. CONIAM, RDR, CRR


UNITED STATES DISTRICT COURT