GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>v.<br>Jeffrey King,<br>Defendant. | CR-24-01040-PHX-ROS<br>**UNITED STATES' SECOND RESPONSE TO JEFFREY KING'S SUPPLEMENT TO MOTION TO REVOKE PRETRIAL DETENTION ORDER** |

Defendant Jeffrey King's ("KING") supplemental filing in support of his Motion to Revoke the Pretrial Detention Order [ECF No. 96] and oral arguments made before this Court seeking revocation of KING's detention [ECF Nos. 81, 86] do not mitigate the serious risk of flight posed by KING, and therefore should not persuade this Court to

modify KING's custodial status. For the reasons discussed below and detailed in the government's detention motion [ECF No. 18], its proffers at KING's detention hearings [ECF Nos. 31, 81, 86], its opposition to KING's motion to revoke the pretrial detention order [ECF No. 64], and its supplemental submission in support of KING's pretrial detention order [ECF No. 83], the Court should deny KING's motion [ECF No. 59] to revoke the pretrial detention order and order KING detained pending trial.[1]

## I. KING's Offer to Relinquish Custody of Government-Identified Assets Does Not Sufficiently Mitigate KING's Risk of Flight to Warrant Release.

The government has emphasized KING's access to substantial financial assets as a significant factor supporting his pretrial detention. In response to the government's concern, KING has offered to relinquish custody of the assets identified by the government pending the outcome of the criminal case. [ECF No. 96 at 3].

As explained below, the government has seized and intends to continue seizing valuable assets that KING owns and controls. KING's offer to relinquish any assets that the government has identified and not yet seized is insufficient to obviate his risk of flight,

---

[1] The government respectfully requests that the Court consider this Second Response and not its Initial Response [ECF No. 104] filed on September 30, 2024, which is now under seal. The Responses are substantially similar with the following differences: (1) the Second Response includes updated information regarding assets seized pursuant to seizure warrants authorized on October 8, 2024; (2) the Second Response reflects the fact that KING's co-defendant is scheduled to plead guilty; and (3) the Initial Response includes a schematic that is not included in the Second Response. KING claims attorney-client privilege over the schematic included in the government's now sealed Initial Response that is not included herein. The government had no reason to believe that the schematic over which KING now asserts privilege was potentially subject to attorney-client privilege when the government included the schematic in its Initial Response, and KING does not dispute this representation. Upon review of the schematic and supplemental evidence identified by KING's counsel, the Filter Team determined that although the sealed schematic may be privileged, the Crime Fraud Exception may apply. The government believes that the Court can resolve the detention issue without considering the challenged schematic and therefore does not seek to delay consideration of the detention issue to resolve the question of privilege at this time. Accordingly, the government respectfully requests that the Court consider this Second Response and not its Initial Response [ECF No. 104], which contains the challenged schematic.

as KING's proposal does not address: (i) his access to assets jointly controlled with his wife and co-defendant, Alexandra Gehrke ("Gehrke"); (ii) his potential access to assets controlled by his associates; (iii) his potential control of assets the government has not identified; or (iv) the other reasons supporting KING's pretrial detention that are independent of his financial resources, such as his motivation to avoid a de facto life sentence if convicted, the strength of the evidence against him, and his dishonesty with the Court and Pretrial Services.

**A. The Government Has Seized and Expects to Seize Substantial Assets Owned and Controlled By KING.**

On June 17, 2024, U.S. Magistrate John Z. Boyle authorized warrants to seize several assets solely or jointly owned and controlled by KING that were traceable to fraudulent proceeds, including: an $8,000,000 life insurance policy held individually by KING; $512,857 in an account jointly held by KING and Gehrke; a 2023 Mercedes-Benz GLE that KING purchased for approximately $90,000; and approximately $524,745 worth of gold bars, gold coins, and jewelry purchased by KING and Gehrke. The government successfully seized the life insurance policy, $512,857.18 from the jointly held account,[2] the 2023 Mercedes-Benz GLE, and approximately $382,499 worth of gold bars, gold coins, and jewelry.

Approximately two months later, on August 22, 2024, U.S. Magistrate Alison S. Bachus authorized warrants to seize, among other assets, $4,586,508.51 held by KING in two investment accounts that was traceable to fraudulent proceeds. The government successfully seized the full amount of those funds.

Additionally, on October 8, 2024, U.S. Magistrate Judge John Z. Boyle authorized additional seizure warrants for balances of 3 bank accounts held by KING, 2 investment accounts held by KING, a $1,260,215 investment made by KING, and 11 accounts held by Gehrke. The total amount of money subject to those seizure warrants was approximately

[2] Approximately $400,000 had been withdrawn from the account prior to the government's seizure.

$12,677,165. The government successfully seized 1 of the bank accounts held by KING (the other 2 had been closed prior to the execution of the warrants), KING's 3 investment accounts, KING's $1,260,215 investment, and 8 of the accounts held by Gehrke (the other 3 had been closed prior to the execution of the warrants). The total amount of money seized pursuant to those warrants was approximately $11,717,241. Of that amount, approximately $5,078,843 belonged to KING.[3]

To date, the government has seized approximately $18,650,738 of assets solely or jointly owned by KING. The government anticipates applying for a seizure warrant for recording equipment belonging to KING that is worth approximately $400,000. KING has agreed to relinquish this equipment to the Government.

**B. KING Continues to Have Access to Substantial Assets.**

Despite the government's seizures of KING's known assets that are traceable to his fraud proceeds—and KING's professed willingness to relinquish those that the government is aware of but has not yet seized—he still has access to millions of dollars owned and controlled by his wife (Gehrke), he has potential access to significant assets owned by his associates, and likely has other assets unknown to the government.

**i. Gehrke's Assets.**

As the government noted in its Supplemental Submission in Support of KING's Pretrial Detention Order [ECF No. 83], the government seized a folder from a safe deposit box accessible by Gehrke and KING labeled "Lexie's Finances: in case of emergency defined as . . . incarcerated or death or incapacitated for > 6 months ex: coma. For Jeff King only." Inside the folder were account details for 27 accounts at financial institutions. *See* ECF No. 83 at 9.

The Government has seized the funds in 15 of those accounts. Funds in the remaining 12 accounts that the Government had not seized total over $28 million. The Government is working to determine whether the balances of those accounts can be traced

[3] These seizure warrants were executed after the government filed its Initial Response to KING's Supplement to Motion to Revoke Pretrial Detention Order [ECF No. 104].

to fraudulent proceeds; however, that money is currently held in accounts controlled by Gehrke and could be made available to KING if he were released.

This Court can reasonably conclude that Gehrke would allow KING to have access to her substantial unseized funds as they were engaged in 2022 and married in February 2024. It is expected that one spouse—particularly one who is indicted and in custody—would permit her co-defendant husband to access her unseized assets to evade prosecution. That Gehrke is scheduled to plead guilty on October 24, 2024, does not change the calculus: her expected acceptance of responsibility does not obviate KING's risk of flight.

**ii. KING's Associates' Assets.**

Bank records reflect that at least 12 "sales representatives" received over $1 million between April 2023 through March 2024 as a result of KING and Gehrke's scheme. *See* ECF No. 83 at 10. Four of those individuals received over $5 million each. *Id*. KING's mother-in-law received more than $2.5 million. *Id*. Several attended KING's February 2024 wedding, and one even attended one of KING's court appearances, demonstrating their close personal bonds with KING. *Id*.

The motivations of these sales representatives to facilitate KING's flight from prosecution are the same as Gehrke's: loyalty and self-interest. They are loyal to KING because of the riches that KING's scheme brought them; and they have a strong self-interest in subsidizing the disappearance of a potential key witnesses against them for their own criminality in the scheme.

**iii. Assets Not Identified by KING.**

KING has offered to relinquish control only of assets the government identified and located. KING has not provided Pretrial, the Court, or the Government with a complete or accurate accounting of his assets, and there is reason to believe that KING has access to funds unknown or unidentified by the government.

For example, law enforcement seized a handwritten note from KING and Gehrke's residence indicating that KING gave $159,000 in cash to an individual to purchase guitars and other instruments for a "new store":


[redacted] is recieving
$154,000 in cash from Jeff King of
SMC Inventories LLC to purchase Guitars
and instruments for inventory of new store
in process of opening.
Jeff King
5-1-24
5-1-24

As another example, law enforcement recovered a schematic from a notebook within KING's office that appears to be in KING's handwriting showing that KING contemplated organizational and asset structures with an "offshore" component[4]:




And law enforcement seized yet another note from KING's home office that appears to be in KING's handwriting reminding him to "Move 2m to bit" as an entry on a task list:

---

[4] KING advised the government through counsel that he is not asserting privilege over this schematic at this time and has no objection to the Government including this schematic in this Second Response. KING's counsel noted that he may reconsider this position if he identifies evidence that would support the privilege assertion.




The government believes that this note means that KING intended to purchase $2 million in Bitcoin, which is a type of virtual currency.

Accordingly, KING's own handwritten notes indicate that KING gave significant funds to individuals to purchase music equipment on his behalf, devised plans to move money offshore, and wrote himself a reminder to transfer $2 million to virtual currency. Though the government has identified a substantial amount of KING's assets, these notes provide reason to believe that the government may never identify all of them.

## II. KING Should Be Detained for Reasons Independent of His Access to Money.

Even if the government were able to seize all of the assets accumulated by KING, Gehrke, and their associates as a result of their fraud, there are reasons independent of his access to money that favor detention, including the severity of the sentence he faces (and strength of the evidence against him) and his dishonesty with Pretrial Services, the latter which demonstrates his unwillingness to comply with this Court's directives.

### A. KING Faces a Life Sentence if Convicted.

KING is charged with orchestrating one of the largest health care fraud schemes ever charged in the United States. The success of the scheme depended on KING and Gehrke's deceit: the deceit of Medicare through the submission of thousands of false and fraudulent claims, and the deceit of dying hospice patients, who were led to believe they were receiving medically necessary wound care treatment at no cost to them. The Indictment alleges an intended loss amount exceeding $900 million and an actual loss

amount exceeding $600 million.

Based on the base offense level, staggering loss amount, and applicable sentencing enhancements, the government has calculated an estimated guidelines range of life imprisonment—and statutory maximum of 75 years' imprisonment—if KING is convicted.

And the weight of the evidence strongly suggests that conviction is likely. The evidence includes, among other things, audio and video recordings of KING and Gehrke instructing sales representatives to commit health care fraud; cooperating nurse practitioners who are expected to testify that KING, who has no medical training, pressured them to apply allografts to patients' wounds despite their protestations; testimony of a former sales representative who was trained by KING to order excessively large allografts to treat wounds of any kind and any severity; and medical records reflecting the application of exorbitantly large and expensive allografts to wounds that had already healed.

Spending the rest of one's life in prison is arguably the strongest incentive to flee imaginable—particularly when the strength of the evidence suggests that such an outcome is not only possible, but likely.

**B. Pretrial Services' Recommendation Was Based Upon KING's Lies, Misrepresentations, and Omissions.**

Because KING lied, misrepresented, and omitted material information to Pretrial Services concerning his earnings, net worth, and travel history, his reliance on Pretrial Services' recommendation for release—which was largely based upon KING's self-reported information—is unpersuasive.

On June 20, 2024, Pretrial Services filed a Bail Report for KING. [ECF No. 11]. The Bail Report noted that the information contained therein was based, in part, upon statements made by KING during an in-person interview conducted earlier that day. *See id*. at 1. Among those statements provided by KING and relied upon by Pretrial Services were the following:

- KING earned $400,000 as a Medical Consultant from June 2023 through June 2024.

- KING had a net worth of approximately $2,427,000, which included:
    - Cash: $10,000
    - Savings: $100,000
    - Stocks/Bonds: $2,100,000
    - 2023 Mercedes GLE: $60,000
- KING's last international travel was in February/March 2024 to Nassau, Bahamas for leisure.

Based on the information provided by KING, Pretrial Services recommended KING's release with several conditions, the most onerous of which was the restriction on travel outside of Arizona unless authorized by the Court. *Id*. at 5.

Pretrial Services filed addenda to this report on August 26, 2024 [ECF No. 80] and August 30, 2024 [ECF No. 85]. Other than confirming KING's lack of criminal history with an updated inquiry, the first addendum did not change or modify any information from the original report. The second August 30, 2024, addendum also did not change any of the information in the original report, but it included two additional recommended conditions to be imposed upon KING if released: prohibiting travel outside the United States without Court approval and requiring KING to verify all bank accounts and credit card accounts with Pretrial Services.

The Pretrial Services reports are necessarily dependent upon the accuracy of the information provided by the defendants. Pretrial Services does not—and often cannot, due to time limitations, resources, and other factors—conduct its own investigations into defendants' foreign travel, finances, or employment history. It therefore must rely upon the honesty and accuracy of defendants' responses to assess and predict their danger to the community, their risk of flight, and the likelihood that they will abide by any conditions of release and Court directives.

Here, the information KING provided, and which Pretrial Services relied upon when making their recommendation for his release, was verifiably inaccurate, untruthful, and incomplete.

### i. KING Lied About His Prior Year Earnings.

KING told Pretrial Services that he made $400,000 the previous year as a Medical Consultant. This was a lie.

As the government noted in its supplemental submission in support of KING's detention order, between June and December 2023, KING diverted over $17 million in illegal kickbacks from APX Mobile Medical LLC to himself. [ECF No. 83 at 2]. He also received the following transfers from Gehrke through three of her entities, Jexie Enterprises Inc., Apex Medical LLC, and Viking Medical Marketing LLC:

- December 29, 2023: $4,000,000
- January 15, 2024: $2,723,713
- February 10, 2024: $463,405

*Id*. at 2-3. This is more than $24 million in earnings KING received in the year prior to his arrest—a far cry from the $400,000 salary he reported to Pretrial Services.

Regrettably, KING didn't restrict his $400,000 annual income lies to Pretrial Services; he persisted by making the same misrepresentation to the Court through counsel. On August 29, 2024, more than two months after his initial interview with Pretrial Services, KING represented to the Court through counsel as follows regarding his purported $400,000 annual income:

> Regarding King's annual income listed in the pretrial services report of $400,000, the source of that income was King's compensation he received for working with the health care entities listed in the Indictment and not through his employment at the music studio. *See* ECF No. 11 at 2. The health care entities listed in the Indictment that paid King his annual compensation are no longer operational, and King is no longer earning any income from any of these entities. Thus, in response to the Court's inquiry about how King's annual income of $400,000 could be used to fund King's potential flight, King respectfully submits it should have no bearing on the issue because King is no longer working for those entities, is not earning any money from them, and will not be earning any income from them in the future. Thus, King's listed annual salary of $400,000 is no longer accurate and could not be used to fund King's potential flight.

[ECF No. 82 at 3]. KING had an opportunity to correct his false report to Pretrial Services by clarifying that he actually received millions of dollars more than a "$400,000 annual income," but KING instead chose to persist in his lie to the Court.

At KING's detention hearing on September 3, 2024, the Court specifically addressed KING's lack of candor on this point, stating to counsel: "I am not convinced that your client [KING] was so frightened by the pretrial services officer that he did not understand that he had to tell the truth . . . I took that as true last week that the—he was only receiving every year only $400,000. That's nonsense. I don't want to hear a crazy argument like that." [ECF No. 86 at 70–71].

**ii. KING Lied About His Net Worth.**

KING didn't just lie to Pretrial Services about his yearly earnings—he grossly understated his total net worth. KING self-reported that he had approximately $10,000 in cash, $100,000 in savings, $2,100,000 in stocks and bonds, and a $60,000 2023 Mercedes Benz GLE. *See* Pretrial Services Report (June 20, 2024) at 3. Not one of these representations was accurate.

*$10,000 Cash:* Law enforcement seized over 26 times that amount ($267,150) from safe deposit boxes leased and accessible to KING and seized an additional $100,000 cash—10 times KING's reported amount—from KING's primary residence.

*$2,100,000 Stocks/Bonds*: Bank records show that on May 31, 2024—less than 3 weeks prior to KING's arrest—KING had the following balances in his investment accounts:

- $3,320,969.25 in Charles Schwab account x3965 (JKing Ventures Inc.)
- $2,080,401 in Charles Schwab account x8799 (Jeff King)
- $1,265,539.26 in Charles Schwab account x9244 (King Medical Consultant LLC)
- $337,041 in Charles Schwab account x2902 (JKing Holdings LLC)
- $148,641 in Charles Schwab account x7287 (Jeff King)
- $96,000 in Charles Schwab account x8345 (The Other Consulting Firm LLC)

None of these accounts were depleted prior to KING's arrest; to the contrary, each of the balances actually increased in June 2024 due to the accrual of interest. Therefore, KING owned and controlled approximately $7.2 million in stocks at the time he falsely represented to Pretrial Services that he had less than a third of that amount.

*$60,000 2023 Mercedez Benz*: Records reflect that KING purchased a 2023 Mercedes Benz GLE on August 7, 2023, for $90,031.51. KING was fully aware of the purchase price, as he bought the vehicle himself and signed the check. On average, vehicles depreciate approximately 20% in the first year of ownership. *See* www.carfax.com/blog/car-depreciation. But KING represented that his Mercedes Benz lost 33% of its value in approximately 10 months. Though this misrepresentation to Pretrial Services is less egregious than those concerning his yearly earnings and net worth, it is another example in which KING intentionally undervalued and underreported his assets to give a distorted and sanitized perception of his financial position.

#### iii. KING Lied About His Foreign Travel.

In addition to KING's lies to Pretrial Services about his finances, KING also lied about his foreign travel. KING reported that his last international travel was to Nassau, Bahamas "sometime in February/March 2024" for leisure, *see id.* at 2. In fact, law enforcement databases reflect that he and Gehrke reentered the United States from Mexico via the Lukeville, Arizona border crossing on or about March 31, 2024.

### III. KING's Proposed Conditions Do Not Obviate His Risk of Flight.

KING suggests that home detention with a GPS monitor and relinquishing the passports of his children are conditions sufficient to reasonably assure his return to Court. [ECF No. 96 at 4].

Preliminarily, if GPS monitoring and home detention were conditions sufficient to assure the return of all defendants who pose a risk of flight, risk of flight would never be a basis for detention. But of course, the success of GPS monitoring and home detention is largely dependent upon the compliance by the individual subject to those conditions. There is nothing that can stop a non-compliant defendant from leaving his house in violation of

his home confinement, cutting off his GPS location device, and walking across the border into Mexico, where he would be largely beyond the reach of U.S. law enforcement. Figuring out which defendants are good candidates for conditional release is necessarily an inexact science that requires courts to make determinations based on a relatively limited amount of information available.

In this case, the available information does not support KING's release; to the contrary, it counsels against it:

- The charges are extremely serious and involve deceiving federal health care programs and vulnerable victims.
- KING faces an effective life sentence if convicted of the crimes charged.
- KING was not a minimal participant in the scheme; rather, he—along with his wife—was one of its orchestrators.
- KING profited immensely from the scheme and sprinkled his eye-popping wealth among numerous bank accounts at various financial institutions in addition to purchasing a vast array of assets, including cryptocurrency, real estate, luxury vehicles, precious metals, expensive jewelry, life insurance policies, and brokerage accounts.
- KING and Gehrke possessed burner phones and a Criminal Law Handbook when arrested, and a search of his house and safe deposit boxes revealed fraudulent proceeds and handwritten notes reflecting his wife's expectation of an imminent indictment.
- And once he was arrested and interviewed by an arm of the court, KING misrepresented his income, his net worth, his assets, and his foreign travel.

KING has demonstrated that he is willing to lie when it suits him, even when those lies are made to federal agencies and the Court itself. Accordingly, detention is appropriate, as there is no condition or combination of conditions that will reasonably assure KING's return to court.

## CONCLUSION

As detailed above and proffered by the government at KING's detention hearings and various motions in support of detention, there is substantial evidence that KING poses a significant risk of flight and that there is no condition or combination of conditions that can reasonably assure his return to court. Accordingly, pursuant to 18 U.S.C. § 3142, the Government urges the Court to detain KING pending trial and deny his motion to revoke the detention order.

Respectfully submitted,

,

GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
District of Arizona

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By: */s/ Shane Butland*
SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

Dated: October 24, 2024