UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **United States of America,** | ) |
| | ) No. 2:24-cr-01040-ROS |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) Phoenix, Arizona |
| **Alexandra Gehrke,** | ) October 24, 2024 |
| | ) 3:31 p.m. |
| Defendant. | ) |
| | ) |

**BEFORE:   THE HONORABLE DEBORAH M. FINE, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**PLEA HEARING**

**APPEARANCES:**
For the Government:
    U.S. DEPARTMENT OF JUSTICE
    Public Integrity Division
    By:  **Shane R. Butland, Esq.**
    1400 New York Ave. NW, 12th Fl.
    Washington, D.C. 20005

For the Defendant:
    LOWTHER WALKER, LLC
    By:  **Joshua S. Lowther, Esq.**
    101 Marietta St. NW, Suite 3650
    Atlanta, GA 30303

Transcriptionist:
**Andrea K. Bluedorn**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

### P R O C E E D I N G S

(Proceedings commenced at 3:31 p.m.)

THE COURT:  Case number CR-24-1041-01, United States of America versus Alexandra Gehrke.  Before the Court for a change of plea hearing.

MR. BUTLAND:  Good afternoon, Your Honor.  Shane Butland with the Department of Justices Fraud Section on behalf of the United States.

THE COURT:  Good afternoon, Mr. Butland.

MR. LOWTHER:  Good afternoon, Your Honor.  Joshua Lowther for Ms. Gehrke.  Ms. Gehrke is present at the lectern with me.

THE COURT:  And good afternoon to you both.  Ms. Gehrke, you'll be placed under oath.

COURTROOM DEPUTY:  Ma'am, if you would please raise your right hand to the best of your ability.

Do you solemnly swear or affirm that the statements you are about to give this court shall be the truth, the whole truth, and nothing but the truth?

THE DEFENDANT:  Yes, I do.

COURTROOM DEPUTY:  Thank you.  You may put your hand down.

THE COURT:  You're under oath.  If you say untruthful things, you can be charged with serious crimes, perjury, false

statement.  If at any time you cannot hear or do not understand something said or asked, tell me.  If you answer, I'll assume you heard and understood.  And if at any time you want to take a break and speak with your attorney privately, let me know. We'll break for that.

Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Please state your true and full name.

THE DEFENDANT:  Alexandra Marie Tauken Gehrke.

THE COURT:  Okay.  So your middle name is Marie?

THE DEFENDANT:  And Tauken.  I have two middle names.

THE COURT:  Can you spell them, please.

THE DEFENDANT:  Yeah, M-A-R-I-E.  New word, Tauken, T-A-U-K-E-N.

THE COURT:  Thank you.  Is English your best language?

THE DEFENDANT:  Yes, it is.

THE COURT:  You have the right to have this change of plea hearing in front of a higher level judge than what I am. You have the right to have this hearing in front of a United States District Judge who's appointed for life, like Judge Silver, who presides in your case.  I'm not a district judge. I'm a lower level magistrate judge appointed by the district judges for some years.

I have here a consent.  It appears to be signed by the attorneys and by you.  It says everyone agrees to have this

change of plea hearing in front of a lower level magistrate judge instead of a higher level district judge.  Is that what you want to do?

THE DEFENDANT:  Yes, it is.

THE COURT:  And did you sign the consent?

THE DEFENDANT:  I did.

THE COURT:  And I assume Mr. Lowther has his laptop open and is -- and is showing you the documents as we go.  Is that correct?

MR. LOWTHER:  That's correct, Your Honor.

THE DEFENDANT:  That is correct.

THE COURT:  Excellent.  Thank you.  I find the parties have knowingly, voluntarily, intelligently consented to proceed before a magistrate judge for the change of plea hearing.

There is an indictment against you and another defendant.  Did your attorney go over with you the charges, the allegations in the indictment?

THE DEFENDANT:  Yes, he did.

THE COURT:  Did he go over with you the evidence the Government disclosed, your rights, your possible defenses, and answer all of your questions?

THE DEFENDANT:  Yes, he did.

THE COURT:  Do you understand the charges, the allegations in the indictment?

THE DEFENDANT:  I do.

THE COURT:  Are you satisfied with your attorneys services?

THE DEFENDANT:  I am.

THE COURT:  You seem very able to proceed today.  I have some questions I ask everyone at a change of plea hearing.  Are you thinking clearly and physically well today?

THE DEFENDANT:  Yes, I am.

THE COURT:  In the last two days, have you had alcohol, drugs, or medicine even given to you by the facility?

THE DEFENDANT:  I have had medication.

THE COURT:  And can you give me a general idea of what kind of medication.

THE DEFENDANT:  Yeah.  I take clonidine for sleep in the evening.

THE COURT:  Does the medication or the condition for which you take the medication in any way affect your ability to understand or participate today?

THE DEFENDANT:  No, not at all.

THE COURT:  Is anyone forcing, threatening, pressuring you, trying to get you to plead guilty to anything?

THE DEFENDANT:  No.

THE COURT:  Mr. Lowther, any competency concerns?

MR. LOWTHER:  None, Your Honor.

THE COURT:  So, Ms. Gehrke, I have here a plea agreement that appears to be signed by you on page 17.  I'm

holding it up, and I'm betting Mr. Lowther has it in front of you. It's dated October 17th, 2024. Is that your signature?

THE DEFENDANT: Yes, it is.

THE COURT: And, counsel, Mr. Butland, is that the right plea agreement?

MR. BUTLAND: It is.

THE COURT: And, Mr. Lowther, is that the right plea agreement?

MR. LOWTHER: Yes, Your Honor.

THE COURT: Thank you. And, Ms. Gehrke, before you signed the plea agreement, did you read the plea agreement?

THE DEFENDANT: I did.

THE COURT: Did your attorney explain each part of the plea agreement to you answering all of your questions about it?

THE DEFENDANT: Yes.

THE COURT: Do you understand the plea agreement?

THE DEFENDANT: I do.

THE COURT: I am going to summarize some parts of it to make sure, and I'll start with if you choose to go forward with the plea agreement, then the plea agreement calls for you to plead guilty to Count 1 of the indictment charging you with a violation of the United States Criminal Code conspiracy to commit health care fraud and wire fraud, a Class C Felony offense.

Is that your understanding?

THE DEFENDANT:  It is.

THE COURT:  The maximum penalties on your plea agreement.  I'll summarize.  If probation were to be imposed, the maximum is five years, the minimum is one year.  The maximum imprisonment is 20 years.  The maximum supervised release following prison is three years.

The maximum fine is $250,000 or twice the pecuniary gain or loss incurred by another.  The Court has to order you to make restitution to any victim and pay a $100 dollar special assessment.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  Supervised release that I referred to a few moments ago is time after prison where there are rules to follow.  If you break any rule, you could be sentenced to more prison, more supervision.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  In deciding what's the right sentence, the judge has to consider all the sentencing factors.  One of those factors is the recommendation of the United States Sentencing Guidelines.  Did your attorney go over with you how the guidelines work, how Federal sentencing works?

THE DEFENDANT:  Yes.

THE COURT:  So you know at sentencing the district

judge will determine your Sentencing Guideline Range by determining the offense level for the crime, reflecting how serious the crime is.  The larger the number, the more serious, and by determining your Criminal History Category based on points the guidelines give for past convictions.  Where those two numbers meet on the guidelines chart, you get to the guidelines recommended sentencing range.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  And the many things your attorney probably went over with you and explained and talked about with you, one of the things he probably did is give you his opinion about the sentencing guidelines.  It important that you understand that reasonable minds can differ about such legal matters. Information at sentencing can be different than what the attorneys have now.  If the sentencing judge's opinions, orders are different than your attorney's opinions, different than the prosecuting opinions regarding the sentencing guidelines, you will not be allowed to withdraw your guilty plea or withdraw from the plea agreement.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  Now, your agreements regarding sentencing in your plea agreement include recommendations and there are stipulations.  Recommendations are suggestions just like it

means in plain English, something the district judge has to consider but does not have to follow.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  Stipulations are different such as your restitution stipulation, your assets and financial responsibilities stipulation, those are binding on the parties. They're binding on you, and they're binding on the sentencing judge if the sentencing judge accepts your guilty plea and plea agreement.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  The recommendations in section 4a start on page 3 of your plea agreement.  I'll summarize.  First, there's a recommendation that your base offense level is 7 pursuant to guideline 2B1.1A1.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  There is a recommendation that a reasonable estimate of your intended loss exceeds $550 million resulting in an increase of 30 levels pursuant to guideline 2B1.1B1P.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  There is a recommendation that you're

pleading guilty to a Federal health care offense involving a loss to a government healthcare program exceeding $20 million resulting in an increase of four levels to your guideline offense level pursuant to guideline 2B1.1B7.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  There's a recommendation regarding abusive trust.  That you abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense resulting in an increase of two levels pursuant to guideline 3B1.3.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  There is a recommendation regarding sophisticated means, that the offense involved sophisticated means and that you intentionally engaged in or caused the conduct constituting sophisticated means resulting in an increase of two levels pursuant to guideline 2B1.1B10.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  There is a recommendation regarding aggravating role, that you were an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive resulting in an -- in an increase of four levels pursuant to guideline 3B1.1A.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  There's a recommendation regarding acceptance of responsibility.  If you accept responsibility, the prosecution will recommend that your guidelines offense level be reduced by two or three levels.

Is that your understanding?

THE DEFENDANT:  Yes, it is.

THE COURT:  On page 4, the restitution section starts in section B.  There is a stipulation that you'll pay full restitution regarding -- regardless of the resulting loss amount but not more than $614,990,420.01 to all victims directly or approximately harmed by your relevant conduct which includes dismissed and uncharged conduct.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  And there's a list of restitution to certain Federal -- to certain -- I'm -- not Federal but certain healthcare benefit programs.  They may be Federal, they may not be.  That are identified on pages 4 and 5 of your plea agreement.

Is that your understanding?

THE DEFENDANT:  Yes, it is.

THE COURT:  You're agreeing on page 5, section C to waive any ownership -- owner -- excuse me -- ownership interest

you may have in the $87,641,543.44 currently suspended by the Centers for Medicare and Medicaid Services, CMS.

Is that your understanding?

THE DEFENDANT:  Yes, it is.

THE COURT:  And that suspended amount constitutes payments suspended by CMS based on certain false and fraudulent claims made by APX Mobile Medical, LLC to Medicare -- Medicare.

Is that correct?

THE DEFENDANT:  Yes.  Correct.

THE COURT:  In (d) beginning on page 5, there is a stipulation directed to assets and financial responsibility that includes your agreement to give full information to the prosecution and the probation office regarding your finances. You're agreeing that they can get that information from other sources, and you're agreeing to participate in the inmate financial responsibility program.

Is that your understanding?

THE DEFENDANT:  It is.

THE COURT:  On page 6, section 5, there is an agreement to dismiss or not to prosecute that the United States Attorney's Office for the District of Arizona is agreeing at sentencing to dismiss as to you and to you only, Counts 2, 3, 4, 6, and 8, 9, 10 of the indictment.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that the plea agreement does not in any manner restrict the actions of the United States in any other district or bind any other United States Attorney's Office or division of the United States Department of Justice?

THE DEFENDANT:  I do.

THE COURT:  Now, other bad things happen besides the sentence by your pleading guilty by your being convicted. There are legal practical consequences that are not part of the sentence that are usually outside of the sentencing judges control.

And these collateral consequences for a United States citizen include your loss of your right to vote.  You lose your right to run for some public offices.  Depending on the conviction, you may lose your right to use, possess firearms, ammunition.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  I have to give everyone this example.  It appears you're a United States citizen, but for people who are not United States citizens, there can be immigration consequences.  For example, removal, exclusion, denial of admission, deportation, denial of citizenship in the United States.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  And it appears in your plea agreement there is an agreed upon -- I don't know whether you technically call it a collateral consequence but it appears to -- to me to be in section 3 on pages 2 and 3.  You're -- you're acknowledging your understanding that as a result of your guilty plea, you will be excluded as a provider from Medicare, Medicaid, and all Federal health care programs, and you're also agreeing to complete and execute all necessary documents provided by any department or agency of the Federal Government, including but not limited to, the United States Department of Health and Human Services to effectuate the exclusion within 60 days of your receiving the documents, and the exclusion will not affect your right to apply for and receive benefits as a beneficiary under any Federal health care program including Medicare and Medicaid.

Is that your understanding?

THE DEFENDANT:  Yes.

THE COURT:  Did your attorney go over with you your circumstances, likely collateral consequences for you in more detail, and answer all of your questions?

THE DEFENDANT:  Yes.

THE COURT:  Now, you have a very extensive forfeiture section in your plea agreement.  It begins on page 7 and it ends I believe on page 10.  It goes through page 10.  And it

includes your giving up any right, title, and interest in a sum of money equal to approximately $279,912,916, which is stated in your plea agreement represents the proceeds that you obtained directly or indirectly, possessed, owned, and exercised dominion or control over and you're giving up your interest in the assets identified in Exhibit 1 to the plea agreement which is a list of what appears to be 116 items ranging from property, real property, to vehicles to life insurance policies to handbags and cash.

Is that your understanding?

THE DEFENDANT:  It is.

THE COURT:  Did your attorney go over all of those forfeiture provisions in that exhibit with you such that you understand all of it?

THE DEFENDANT:  Yes.

THE COURT:  And you don't have to plead guilty to anything.  You've entered not guilty pleas.  There's a jury trial set.  You can keep your not guilty pleas, your denial to the forfeiture allegations, and go to the jury trial where you'll be presumed innocent until and unless the Government proves you guilty beyond a reasonable doubt on each element of each offense to each and all of 12 jurors.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  At trial, you would have the assistance of

your attorney; retained attorney of your choosing, if you could afford such, but if you could not afford such, you're entitled for the Court to appoint an attorney to represent you free of charge to you at the Court's expense.

Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  If you kept your not guilty pleas and went to the jury trial, you'd have the right to confront, cross examine, compel attendance of witnesses, you could present evidence in your own defense, testify if you wanted to, but no one could force you to.  If you were silent at trial, your silence could not be used against you by the judge or jury.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  If you go forward with your plea agreement, you give up all of those rights.  You won't have any trial rights anymore because there won't be a trial as to you if you go forward with the plea agreement.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  If you went to trial and you were found guilty, you could appeal and collaterally attack any convictions, any sentences, and you could complain to judges about all the mistakes in your case and ask for those mistakes to be fixed so I think of these as your complaining rights.

Do you understand?

THE DEFENDANT:  I do.

THE COURT:  Under section 7 of your plea agreement on pages 6 and 7, if you go forward with your plea agreement, you give up almost all of your complaining rights.  Under the plea agreement, you only keep complaining rights for ineffective assistance of counsel, prosecutorial misconduct.  You keep your right to file a compassionate release motion under Federal Law, appeal the denial of any such motion, but those are the only complaining rights you keep if you go forward with the plea agreement.

Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Now, the elements of the offense in Count 1 of the indictment are in your plea agreement on page -- pages 11 and 12 in section 10.  Did you review those carefully with your attorney such that you understand the elements?

THE DEFENDANT:  Yes.

THE COURT:  Do you still want to plead guilty with your plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  Before I ask you about what happened, do you have any questions for me in open court or for your attorney privately?

THE DEFENDANT:  No.

THE COURT:  Have you understood everything we've gone over?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Butland, is there anything that you'd like me to review before the factual basis?

MR. BUTLAND:  No.  Thank you, Your Honor.

THE COURT:  Thank you.  Why don't we do the factual basis this way that Mr. Butland will read a paragraph and then I'll ask Ms. Gehrke if everything Mr. Butland has said is true. My voice is getting tired from being on the bench all day and so that will give it a rest and allow me to listen carefully. So does that work from your perspective, Mr. Lowther?

MR. LOWTHER:  Yes.

THE COURT:  Mr. Butland, you may proceed.

MR. BUTLAND:  Thank you, Your Honor.

Beginning in or around June 2022 and continuing through in or around May of 2024, within the District of Arizona and elsewhere, the defendant knowingly and willfully agreed to conspire with Jeffrey King, Company 1, and others, in violation of Title 18 United States Code Section 1349 to commit wire fraud in violation of Title 18 United States Code Section 1343, and health care fraud in violation of Title 18 United States Code Section 1347.

Specifically, the defendant, individually and through entities she owned, operated, and controlled, conspired with

King and others to unlawfully enrich herself and others by submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and the commercial insurers listed in the footnotes in this plea agreement for amniotic wound allografts ordered and purchased from Company 1 that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks.  The defendant, King, and their co-conspirators diverted proceeds of the fraud for their own personal use and benefit and to further the fraud.

THE COURT:  And, Ms. Gehrke, are all of those things true?

THE DEFENDANT:  Yes.

THE COURT:  And you understand when the defendant is referred to, that's a reference to you?

THE DEFENDANT:  I do.

THE COURT:  And do you know what Company 1 refers to?

THE DEFENDANT:  I do.

THE COURT:  Thank you.  Mr. Butland, you may proceed.

MR. BUTLAND:  Medicare, TRICARE, and CHAMPVA are health care benefit programs as defined in Title 18 United States Code Section 24(b) and Federal health care programs as defined in Title 42 United States Code Section 1320a-7b(f).  The commercial insurers are health care benefit programs as defined in Title 18 United States Code Section 24(b).

THE COURT:  And, Ms. Gehrke, are all those things true?

THE DEFENDANT:  Yes.

THE COURT:  And were they true for the time frame beginning in or around June 2022 and continuing through in or around May 2024?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Butland.

MR. BUTLAND:  The defendant co-owned, controlled, and operated Apex Mobile Medical, LLC and Apex Medical, LLC -- the latter of which I'll refer to as Apex -- and served as Apex's Chief Executive Officer.  The defendant also solely owned, controlled, and operated Viking Medical Consultants, LLC, which did business as Viking Medical Marketing, LLC, which I'll refer to as Viking.  King co-owned, controlled, and operated APX Mobile Medical, LLC, which I'll refer to as APX.

THE COURT:  Ms. Gehrke, are all those things true?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Butland.

MR. BUTLAND:  Company 1, a limited liability company formed in Texas was a wholesale distributor of allografts.  Medicare reimbursed claims for the allografts distributed by Company 1 at an extremely high rate, exceeding $1,000 per square centimeter for certain allografts.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Butland.

MR. BUTLAND:  Apex Mobile Medical and APX were enrolled Medicare providers and submitted claims to Medicare for payment including claims for the furnishing of allografts purchased from Company 1.

THE COURT:  Ms. Gehrke, are those things true?

THE DEFENDANT:  Yes, they are.

THE COURT:  Mr. Butland.

MR. BUTLAND:  Apex and Viking arranged for and recommended the ordering and purchasing of allografts sold by Company 1.  Apex and Viking also referred patients to Apex Mobile Medical and APX, among other Medicare enrolled providers, for the furnishing of allografts purchased from Company 1.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Butland.

MR. BUTLAND:  In or around September of 2022 and November of 2022, the defendant falsely certified to Medicare as Apex Mobile Medical's authorized official that she would comply with all of Medicare laws, regulations, and program instructions, and that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  The defendant and King, through Apex and Viking, arranged for and recommended the ordering and purchasing of allografts sold by Company 1 and referred patients to Apex Mobile Medical and APX for the furnishing of allografts purchased from Company 1.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  The defendant, through Apex and Viking, contracted with medically untrained sales representatives to arrange for and recommend the ordering and purchasing of allografts sold by Company 1, and to refer patients to enrolled Medicare providers including Apex Mobile Medical and APX for the furnishing of allografts purchased from Company 1.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  The defendant paid the sales representatives illegal kickbacks based on the size and quantity of Company 1's allografts that were applied to patients and billed to Medicare.  Between April 2023 and March 2024, the defendant paid approximately 12 sales representatives illegal kickbacks totaling over $1 million each and paid approximately four of those sales representatives kickbacks totaling over $5 million each.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  The defendant and King instructed the sales representatives to locate facilities with elderly populations such as nursing homes, assisted living facilities, and hospice facilities and identified patients with any wound at any stage to which Company 1's allografts could be applied.

The defendant told the sales representatives to specifically target hospice facilities because those facilities were, quote, "where the most money was at with the defendants company," end quote.  The defendant directed the sales representatives to order Company 1's allografts only in sizes four-by-six centimeters or larger despite the availability of smaller sizes of allografts even if the patient's wound was, quote, "the size of the defendant's little finger -- little fingernail," end quote.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  The defendant, through Apex Mobile Medical, and King, through APX, purchased allografts from Company 1 that were ordered and recommended to be ordered by Apex and Viking's medically untrained sales representatives. The defendant, through Apex Mobile Medical, and King, through APX, solicited and received illegal kickbacks and rebates from Company 1 in violation of Title 42 United States Code Section

1320a-7b(b)(1).

The defendant, King, Company 1, and others, concealed and disguised these illegal kickbacks and rebates by, among other ways, causing sham invoices to be issued by Company 1 that reflected the full non rebated price of the allografts and opening a so-called joint venture bank account to conceal the transfer of the illegal kickbacks from Company 1 to APX.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  Neither the defendant or King reported or remitted Company 1's rebates to Medicare as required by Federal Law and Medicare's rules and regulations.  Instead, the defendant and King unlawfully retained the rebated amounts for their own use and benefit and to further the fraud.

From in and around April 2023 to in and around May of 2024, King received, through APX, over $90 million in illegal kickbacks in the form of rebates from Company 1 in exchange for the purchasing and ordering of Company 1's allografts that were billed to Medicare.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes, they are.

MR. BUTLAND:  The defendant and King, through Apex Mobile Medical and APX, contracted with nurse practitioners to apply the allografts ordered and purchased from Company 1 to patients identified and referred by the defendant, King, and

Apex and Viking's sales representatives.  The defendant and King directed the nurse practitioners to apply all allografts that the sales representatives ordered even if the quantity and sizes were medically unreasonable and unnecessary.

This resulted in the application of allografts to infected wounds, wounds that had already healed, wounds that were not responding to the allografts, and wounds that would not heal because of the terminally ill patients comorbidities. It also resulted in the application of allografts that grossly exceeded the size of the wound.  Some patients died within days or on the same day of the allograft application.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  From in and around June 2022 through in and around May 2024, the defendant received, individually and through Apex Mobile Medical, Apex, and Viking, approximately $279,912,916 in illegal kickbacks from Company 1 in exchange for the purchasing, ordering, and arranging for and recommending the purchasing and ordering of its allograft s that were billed to Medicare.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

MR. BUTLAND:  From in and around November 2022 through in and around May 2024, the defendant, King, and others, through Apex Mobile Medical and APX, submitted approximately

$1,212,005,778 in false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and commercial insurers for furnishing and applying Company 1's allografts.

THE COURT:  Medicare, TRICARE, CHAMPVA, and commercial insurers hit approximately $614,990,420.01 based on those claims.  These payments constitute proceeds of a conspiracy to commit health care fraud and wire fraud and or deposited into the accounts and used to purchase the assets identified in Exhibit 1.

THE COURT:  Ms. Gehrke, are all those statements true?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Butland, does the Government avow that should the matter have proceeded to trial, the Government can prove those things beyond a reasonable doubt?

MR. BUTLAND:  Yes, Your Honor.

THE COURT:  Mr. Lowther, are you satisfied with the factual basis?

MR. LOWTHER:  I am, Your Honor.

THE COURT:  Ms. Gehrke, how do you plead to Count 1 of the indictment charging you with a violation of Title 18 United States Code Section 1349 conspiracy to commit health care fraud and wire fraud a Class C Felony offense.

Do you plead guilty or do you plead not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  I find you're fully competent and capable of entering an informed plea.  You're aware of the nature of

the charge, the consequences of your guilty plea. Your guilty plea is knowing, voluntary, intelligent. It's supported by facts that match up with the elements of the offense. I'm recommending that the district judge accept your guilty plea.

As to you and to you only, I'm cancelling all of the dates set in the case. I'm ordering a presentence investigation and report prepared as to you, and I'm setting your sentencing for the date and time given to my staff from Senior District Judge Silver's staff, February 11th, 2025. February 11th, 2025 at 1:30 p.m. That's before Senior District Judge Silver in courtroom 604 of this building.

Counsel, if either party intends to call a speaker other than the defendant or for any reason you believe that this sentencing may take longer than what's usually a lotted, communicate with Judge Silver's courtroom deputy as soon as possible. I'm supposed to say not later than three business days before but I think it's obvious that counsel need to be in touch with Judge Silver's courtroom deputy as soon as possible about the a lotted time for the sentencing so proper time can be set aside. I'm not sure if you've already done that in any kind of pretrial conference or communications with Judge Silver's courtroom deputy in anticipation of this change of plea hearing but please do so after the change of plea hearing to confirm.

I wish you well, Ms. Gehrke. Do you have any

questions for me?

THE DEFENDANT:  No questions.

THE COURT:  Anything further from the Government?

MR. BUTLAND:  No, Your Honor.  Thank you.

THE COURT:  From the defense?

MR. LOWTHER:  No, Your Honor.

THE COURT:  Thank you, everyone.  We're adjourned on these proceedings.  I'll be staying on the bench.  Thank you.

(Proceedings conclude at 4:05 p.m.)

---oOo---

**C E R T I F I C A T E**

I, ANDREA K. BLUEDORN, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 25th day of October, 2024.

/s/ Andrea K. Bluedorn
Andrea K. Bluedorn

UNITED STATES DISTRICT COURT