TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>v.<br>Jeffrey King,<br>Defendant. | CR-24-01040-PHX-ROS<br>**UNITED STATES' MEMORANDUM IN AID OF SENTENCING** |

The United States submits this Memorandum in Aid of Sentencing pertaining to defendant Jeffrey King ("King"). King conspired with his wife and co-defendant, Alexandra Gehrke, a/k/a "Lexie" Gehrke ("Gehrke"), and others to execute a $1 billion health care fraud scheme—the largest in Arizona's history—that deprived the Medicare program of hundreds of millions of dollars that otherwise would have been used to fund

needed medical care for the elderly and disabled.

The Department of Probation ("Probation") recommends a variance of 96 months from the guidelines sentence of 240 months' imprisonment, resulting in a sentence of 144 months. *See* Pre-Sentence Investigation Report ("PSR"), Section II. This recommendation—which would be the equivalent of a 40% reduction in King's sentence—relies too heavily on factors already accounted for in the guidelines and does not appropriately balance the 3553(a) factors.

The government does, however, recommend a lesser variance of 24 months based on King's relative culpability compared to Gehrke's.

Probation also determined that King has the ability to pay a fine. While the government agrees that King has such an ability, the government asks that any funds available to pay a fine be applied to King's significant restitution and/or forfeiture amounts.

## I. PROCEDURAL BACKGROUND

On June 18, 2024, a federal grand jury returned a 10-count indictment charging King and Gehrke with conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States and to pay and receive kickbacks (18 U.S.C. § 371), solicitation and receipt of kickbacks (42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2), and transactional money laundering (18 U.S.C. §§ 1957 and 2). [ECF No. 6].

On January 31, 2025, King pleaded guilty to Count 1 of the Indictment, conspiracy to commit health care fraud and wire fraud. [ECF No. 138].

## II. KING'S OFFENSE CONDUCT

King managed and supervised one of the most financially impactful health care fraud schemes in American history. The staggering loss amount—over $1.1 billion in intended loss and over $605 million in actual loss—has little precedent of which the government is aware, and his scheme resulted in the first prosecution in the country involving fraudulent Medicare claims for amniotic wound allografts.

Though Gehrke orchestrated the conspiracy, King assumed various roles during his involvement in it, each with greater responsibility than the last—from serving as a sales representative, to authoring a Sales Representative Manual that he and Gehrke used to train the sales representatives, to controlling the corporate bank account through which hundreds of millions of dollars of fraudulently-obtained Medicare reimbursements flowed, King was crucial to the conspiracy's success and scale.

King and Gehrke's scheme involved a calculated multi-step process:

- Gehrke, through her company Apex Medical LLC ("Apex"), contracted with medically untrained salespeople, including King, to locate Medicare patients with wounds of any size or severity.
- As one of Apex's sales representatives, King ordered allografts for the patients he identified and referred those patients to Apex Mobile Medical LLC ("Apex Mobile")—a company also owned by Gehrke—for grafting. Apex Medical was enrolled with Medicare and contracted with nurse practitioners to apply the allografts ordered by the salespeople.
- King later assumed a leadership role with Apex. In that capacity, he authored the Sales Representative Manual ("the Manual"), which was distributed to the sales representatives and provided instructions on how to identify Medicare beneficiaries, onboard health care facilities, and order allografts. He also co-led trainings for the sales representatives.
- King and Gehrke directed and financially incentivized the medically untrained salespeople to order as large and as many allografts as possible to be placed on the patients' wounds.
- Gehrke installed King as the co-owner of Apex Mobile's successor, APX Mobile Medical LLC ("APX"), and instructed Apex's salespeople to refer identified patients to APX. APX, like Apex Mobile, was enrolled with Medicare

and contracted with nurse practitioners to apply the allografts ordered by the salespeople.

- King and Gehrke directed APX's nurse practitioners to suspend their own medical judgment and apply whatever allografts were ordered, regardless of whether they were medically necessary.
- King and Gehrke received illegal kickbacks from the wholesale distributor of the allografts ("Company 1") based on the number of allografts that Apex Mobile and APX ordered and billed to Medicare.

**A. King Began as an Apex Sales Representative.**

From approximately December 2022 through May 2023, King was among the medically untrained "sales representatives" who contracted with Apex to identify Medicare beneficiaries to whom Company 1's allografts could be applied. King assessed those patients' wounds, ordered allografts for the patients, and referred the patients to Apex Mobile to be grafted by its nurse practitioner contractors. In this role, King was paid almost $472,000 in illegal kickbacks based on the sizes and quantities of allografts he ordered and arranged to be ordered for the patients.

**B. King Trained Apex's Sales Representatives.**

In approximately May 2023—six months after King first joined the conspiracy—King's role changed from being an Apex sales representative to training and managing them. It was during this time that King wrote the Manual, which discussed how to "prospect leads" ("Ideal leads will be in facilities that services patients 65 years of age and older . . ."), identify new patients (the Manual directed sales representatives to regularly conduct "skin sweeps" for "[a]nyone with a wound that could benefit from healing faster"), and order allografts. King distributed the Manual to the Apex sales representatives.

King also teamed up with Gehrke and others to present at sales representative trainings conducted on July 10, September 11, and November 15, 2023. Gehrke video-recorded each of these trainings.

During the July 10 training, Gehrke expressly instructed the sales representatives to commit health care fraud, directing them to order allografts only in sizes 4x6 cm or larger even if the patient's wound was "the size of [her] little fingernail," knowing that Medicare paid by the square centimeter for the allografts. King offered his support of this policy pronouncement by adding that providers should "fold the graft in half" if it was significantly larger than the wound, and that any providers who had questions should call him directly. King also advised the sales representatives to "stick to the same graft size" when ordering grafts, not accounting for the actual needs of the patient.

During the training on November 10, 2023, Gehrke detailed Apex sales representatives' illegal payment structure, telling the sales representatives that due to Medicare's recent reduction in the reimbursement rate for the allografts Apex used, sales representatives could earn a maximum of $115,500 per patient over a 10-week course of treatment—about $6,000 less than the prior maximum—which was based on commissions of $38.50 per square centimeter. Later in the meeting, King tacitly acknowledged the egregiousness of Apex's allograft ordering when he informed the sales representatives that they had "sucked the tissue banks dry" of the 4x8 cm allografts and were therefore required to use smaller sizes.

Rather than challenging Gehrke's obviously illegal directives, King lent his support, even telling the sales representatives at the July 10 meeting that Gehrke's "brilliance" was the reason why Apex was the "largest [allograft] distributor in the nation."

### C. King Directed APX's Nurse Practitioners to Only Apply Allografts.

Gehrke, through Apex Mobile, and King, through APX, contracted with nurse practitioners to apply Company 1's allografts to the Medicare beneficiaries identified

and referred by Apex's sales representatives, and paid the nurse practitioners between $500 and $1,000 each time they applied allografts to a patient.

King made clear to APX's nurse practitioners that their job was not to exercise independent medical judgment, coordinate a treatment plan in conjunction with the patients' treating physicians, or even review the patients' medical records, but merely to apply whatever allografts were ordered by the sales representatives to whatever wounds they deemed worthy of these extraordinarily expensive products. On occasion, King even overruled the judgment of the nurse practitioners, instructing them to apply the grafts ordered by the non-medically trained sales representative despite the providers' protestations that the grafts were not appropriate or medically necessary.

### D. King Controlled APX's Finances and Unlawfully Enriched Himself with Fraudulent Proceeds.

Beginning in May 2023, King wore two hats: he assisted with the training of Apex's sales representative and handled APX's finances as its co-owner and managing partner. In that capacity, he opened a bank account on behalf of APX for the purpose of receiving reimbursements from Medicare and other health care insurers for the false and fraudulent allograft claims APX submitted. Although King was one of two signatories on the account, he alone was responsible for the distribution of those Medicare proceeds. He transferred over $24 million to the account's co-signatory (who was APX's co-owner and purported Medical Director), millions of dollars to APX staff and contracting nurse practitioners, and over $23 million to himself, which he used to purchase a $6 million mansion with Gehrke, a $90,000 car, an $8 million life insurance annuity, and hundreds of thousands of dollars' worth of gold and silver.

Between May and December 2023—the timeframe that King managed APX's finances—APX billed Medicare over $731 million for allografts that it purchased from Company 1, and Medicare paid over $543 million based on those false and fraudulent claims.

## III. SENTENCING GUIDELINES

Probation calculated King's offense level as follows:

- King's conduct qualifies for a base offense level of 7, U.S.S.G. § 2B1.1(a)(1);
- 30 levels are added based on a loss of more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P);
- 2 levels are added because the offense involved ten or more victims, U.S.S.G. § 2B1.1(b)(2)(A)(i);
- 4 levels are added because King was convicted of a health care offense involving a loss of more than $20 million to a government health care program, U.S.S.G. § 2B1.1(b)(7);
- 2 levels are added because King used sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C);
- 3 levels are added based on King's role as a manager or supervisor (but not an organizer or leader) of a criminal activity that involved five or more participants or was otherwise extensive, U.S.S.G. § 3B1.1(b);
- 2 levels are added because King willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice, U.S.S.G. § 3C1.1;
- 2 levels are deducted based on King's acceptance of responsibility, U.S.S.G. § 3E1.1(a); and
- 1 level is deducted based on King's timely notification of his intention to plead guilty, U.S.S.G. § 3E1.1(b).

PSR ¶¶ 56–63. The resulting offense level is 47; however, due to the applicability of Chapter 5, Part A (cmt. n.2) of the guidelines, the offense level is treated as 43. *Id*. at ¶ 64. Combined with a criminal history category I, Probation calculated King's guidelines range to be life imprisonment. *Id*. ¶ 114. But because the statutorily

authorized sentence of 20 years is less than the applicable guideline range, the guideline term of imprisonment is 240 months under U.S.S.G. § 5G1.1(a). *Id*.

The government does not dispute Probation's determination that the offense conduct supports each of the guidelines applied; however, the government does not seek the application of the 2-level adjustment for obstruction of justice or the 2-level increase for ten or more victims, as the government did not recommend those enhancements in King's plea agreement (*see* ECF No. 139) and it would be unfair to now advocate for a higher guidelines level than what the parties agreed upon. Nonetheless, subtracting 4 levels makes no practical difference, as King's resulting offense level of 43 would be the same as it is now (due to the application of Chapter 5, Part A (cmt. n.2)) and the guidelines would remain 240 months under U.S.S.G. § 5G1.1(a).

King lodged various objections to the PSR, only one of which—his objection to the obstruction of justice enhancement—affects the Guidelines calculation. As noted above, the government is not seeking the application of that enhancement.

## IV. SENTENCING FACTORS

The factors set forth in 18 U.S.C. § 3553(a) support the government's 24-month recommended variance.

### A. The Nature and Circumstances of the Offense and History and Characteristics of the Defendant.

18 U.S.C. § 3553(a)(1) directs the court to consider the nature and circumstances of the offense and the history and characteristics of the defendant when determining the sentence to be imposed. Here, the Court is tasked with considering that King had a leadership role in one of the most financially consequential health care fraud schemes in history, and that King suffered from significant childhood and teenage trauma more than 25 years prior. The government submits that its sentencing recommendation appropriately accounts for both.

**1. The Egregious Nature and Circumstances of King's Offense.**

As detailed above, King fraudulently enriched himself by bilking a federal health care program funded by American taxpayers that is relied upon by tens of millions of elderly and disabled Americans for valuable health care benefits of hundreds of millions of dollars. And he did so by taking advantage of elderly Medicare beneficiaries.

When evidence of this conduct was presented to a grand jury, it returned an indictment charging King with seven felony counts that carried a combined statutory maximum of 75 years' imprisonment; and yet, the severity of that cumulative statutory maximum sentence is exceeded by the guidelines range of life imprisonment for the single count to which he pleaded guilty. Notably, life imprisonment was the guideline range *after* King's offense level of 47 was treated as a level 43 due to the applicability of a rule—U.S.S.G. Chapter 5, Part A (cmt. n.2)—not any mitigating circumstance. That King's offense level exceeded those on the Sentencing Table underscores the severity of his conduct.

**2. King's History and Characteristics.**

The PSR notes that King reported experiencing significant trauma, abuse, and unstable living conditions during childhood, adolescence, and as an 18-year-old enlistee in the Army. *See* PSR ¶¶ 74-80.

The government sympathizes with the immense challenges and adversity that King faced as a child and young man while also recognizing that despite this difficult history, King went on to earn several associates degrees for music, including in music business, audio production, and disc jockeying, and attended the Audio Engineering Institute in San Antonio, Texas. PSR ¶ 102.

King overcame obstacles that few could endure. And yet, after going to school, forming a production studio, and growing the business through extra income earned as a DJ (PSR ¶ 105), he abandoned his passion, likely motivated by the pursuit of quick

riches and his loyalty to Gehrke. While the 3553(a) factors direct the Court to consider King's history and characteristics, the government submits that undue weight should not be placed on traumatic events that pre-dated King's involvement in the conspiracy by over 25 years and lack any substantiated correlation to his criminal conduct.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence.

In addition to considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct, among other purposes of sentencing. 18 U.S.C. § 3553(a)(2)(A)-(C). Each of these considerations justifies the significant sentence recommended by the government.

#### 1. Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

The severity of King's conduct is unprecedented, well documented, and factually undisputed. The staggering $1.1 billion in intended loss was one of the largest health care fraud cases ever prosecuted at the time of King's indictment. The company that he co-owned and operated billed Medicare, on average, over $1 million per Medicare beneficiary for allografts that were not medically necessary and procured through kickbacks and bribes. At every stage of his escalating involvement in the scheme, King chose to continue his criminal conduct rather than return to his law-abiding life in the music business. Whatever the reason—whether to amass millions of dollars, maintain his relationship with Gehrke, a combination of both, or something else entirely—King was aware of the unlawfulness of his conduct but persisted anyway. The sentence imposed should reflect the magnitude of the offense and the consequences of such flagrant disregard of the law.

**2. General Deterrence of Medicare Fraud.**

King's punishment should take into account not only the scope and seriousness of his criminal conduct, but also the need for general deterrence of future criminals from stealing from Medicare. The Ninth Circuit has noted that "[f]raud crimes . . . typically are calculated, and, as a result, are particularly amenable to general deterrence." *United States v. Thompson*, 130 F.4th 1158, 1167 (9th Cir. 2025) (citing the court's recognition in *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) of "the increased importance of general deterrence in white collar crime cases"). Sentencing King to a lengthy term of imprisonment will send a clear message that Medicare fraud is a serious offense and violating criminal fraud laws has serious consequences.

**3. Specific Deterrence of Wound Allograft Fraud.**

King's punishment should reflect the need to deter similar offenders. The extraordinary expense of amniotic wound allografts combined with the number of Medicare beneficiaries with wounds, the illegal financial incentives offered by allograft distributors, and the willingness of medical facilities to outsource their patients' wound care create fertile ground for fraudsters to make immense profits by taking advantage of the trust-based nature of the Medicare system. King and his co-conspirators stole over $586 million from Medicare in less than two years by billing for allografts applied to fewer than 500 Medicare beneficiaries concentrated almost entirely in one state. There are similar wound allograft schemes operating around the country, including ones across state lines, that have collectively siphoned an extraordinary amount of taxpayer dollars from Medicare and other federal health care programs.

King's sentence should send a clear message to everyone involved in wound allograft fraud that seeking riches by defrauding Medicare instead of providing legitimate medical services does not pay.

**4. Individual Deterrence for King.**

The sentence recommended by the government will provide sufficient individual deterrence for King. According to Probation, King has "expressed deep remorse and shame for his conduct," and the government agrees with Probation that King's offense conduct "seem[s] to be an outlier to his normal law-abiding nature." PSR, Section II. But a significant sentence is nevertheless warranted to send the message that there are consequences to committing Medicare fraud on such a historic scale and persisting in such unlawful conduct.

**C. The Need to Avoid Unwarranted Sentencing Disparities Supports a 24-Month Downard Variance.**

The Guidelines intended to establish sentencing uniformity whereby similarly situated defendants received similar sentences. *United States v. Banuelos-Rodriguez*, 215 F.3d 969, 974 (9th Cir. 2000) ("In drafting the Guidelines, the [Sentencing] Commission 'sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.'" (citing U.S.S.G. Ch. 1, Pt. A, Intro, p.s. 3, at 2)); *Rita v. United States*, 551 U.S. 338, 349 (2007). In determining the particular sentence to be imposed, courts are required to consider the need to avoid unwarranted sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6).

While King's offense conduct is undeniably serious, King's role in the offense was less significant than Gehrke's. The evidence establishes that the scheme was orchestrated by Gehrke—it was she who had connections with the wholesale allograft distributor due to her prior experience in medical device sales; she who enrolled Apex Mobile with Medicare and falsely certified that the claims submitted would comply with federal law; she who was responsible for hiring, promoting, and occasionally firing the various individuals involved with the scheme; she who received over $279 million in illegal kickbacks and diverted over $110 million—over four times what

King profited—to her own personal accounts; and she who effectively controlled the day-to-day operations of each of the entities involved in the scheme.

Although Gehrke and King have the same adjusted offense level of 43 due to the applicability of § 5G1.1(a) (as both of their guidelines ranges exceeding the statutory maximum), the disparity in adjustments reflected in their PSRs and plea agreements accurately reflect the disparity in their relative culpability—only Gehrke's PSR and plea agreement included a 2-level abuse of trust enhancement under § 3B1.3 based on her false certifications to Medicare [ECF Nos. 118, 128], and she received a 4-level adjustment for being an organizer/leader of the criminal activity under § 3B1.1(a), rather than the 3-level adjustment that King received for the lesser role of manager/supervisor. *Id.*; ECF Nos. 139, 141.

Of the ten defendants charged in this conspiracy,[1] only Gehrke is more culpable than King; as such, the government's 24-month recommended downward variance—when viewed in conjunction with the government's sentencing recommendation for Gehrke—appropriately balances King's culpability in relation to Gehrke's as well as his other co-conspirators'.

**D. King Should be Ordered to Pay Restitution to His Victims.**

King did not commit a victimless crime, and restitution to the victims is mandatory. The victims of King's offense are Medicare, TRICARE, and commercial insurers. Consistent with the recommendation of Probation, King should be ordered to pay $605,690,110, which is the actual loss for his offense, jointly and severally with his co-conspirators.

---

[1] *See U.S. v. Carlos Ching* (Case No. 24-CR-01075); *U.S. v. Bethany Jameson* (Case No. 24-CR-01068); *U.S. v. Daylon Bennett* (Case No. 25-CR-00090); *U.S. v. Ira Denny* (Case No. 25-CR-00944); *U.S. v. Gina Palacios* (Case No. 25-CR-00947); *U.S. v. Tyler Kontos, Joel Max Kupetz, and Jorge Kinds* (Case No. 25-CR-00915). Several have pleaded guilty while others await trial, but none have yet been sentenced.

## V. THE 3553(a) FACTORS DO NOT SUPPORT THE VARIANCE RECOMMENDED BY PROBATION

Probation recommends a variance of 96 months based on King's lack of criminal history, the non-violent nature of the offense, his expressed remorse, and his "tumultuous upbringing." [ECF No. 141 at 34-36]. This Court should reject Probation's recommendation. First, King's statutory maximum effectively reduces his sentencing exposure by over 50% when compared with the guideline range for his total offense level; second, the non-violent nature of the offense, lack of criminal history, and remorse are accounted for in the guidelines, common among health care fraud defendants, and/or overcome by the extraordinary nature of King's scheme; and third, though King's upbringing should be taken into consideration by the Court, a reduction of the magnitude recommended by Probation suggests a correlation with his criminal behavior that is unsupported by the evidence.

As noted above, Probation recognized the serious nature of King's offense by calculating his total guidelines level as 47. PSR ¶¶ 56-63. The level was reduced to 43 based on U.S.S.G. Chapter 5, Part A (cmt. n.2). *Id*. This significant adjustment was not afforded to King because he earned it, but because he committed a fraud so egregious that the offense level exceeded those listed on the Sentencing Table.

But despite acknowledging the staggering losses involved in the conspiracy, Probation nevertheless finds that that the non-violent nature of the offense favors a downward variance. PSR, Section II, p. 35. This assessment should be rejected.

While violent crimes are generally understood to be more "serious" than white-collar offenses—whether due to the intimate nature of the crimes, as the perpetrator's nearness to the victim is necessary for their commission, or because the resulting physical and psychological harm is often more direct and readily quantifiable—the national consequences of Medicare fraud make it uniquely damaging. According to the most recent statistics, over 68 million elderly and disabled Americans are covered by Medicare. *See* https://data.cms.gov. The affordability and availability of care for

those beneficiaries is dependent on the existence of the Medicare trust fund, which is projected to be insolvent in 2036. *See* https://budget.house.gov/press-release/social-security-and-medicare-continue-on-path-to-insolvency-trustees-confirm.

Fraudsters, like King, accelerate the looming demise of the Medicare program by stealing finite resources that are intended to be used to provide legitimate and medically necessary services to the populations that need them most. In just 18 months, Medicare paid over $590 million to King and his co-conspirators based on the false and fraudulent claims that they caused to be submitted.

While the government certainly recognizes the harmfulness of violent crime, it would be a mistake to ignore the destructiveness of King's conduct and grant him a variance because he victimized a health care program rather than an individual.

Additionally, King's remorse is not only an emotion to be expected of defendants who are facing lengthy terms of imprisonment after being caught, but his plea agreement and guidelines calculation included a 3-level adjustment for acceptance of responsibility. [ECF Nos. 139, 141]. Neither the 3553(a) factors nor the guidelines contemplate an additional sentencing benefit to defendants who express feelings of shame during post-sentencing interviews.

And lastly, the government acknowledges King's abusive and traumatic experiences and reiterates that they should be considered by the Court as required under § 3553(a)(1); however, it should not serve as a basis for the 40% variance recommended by Probation. Probation's claim that King's upbringing may have influenced his continued involvement in the conspiracy as the way to "keep his relationship with Gehrke intact" is speculative, unfounded, and fails to explain why participation in a criminal conspiracy was required to maintain his relationship with her. In short, there is no evidence that the horrors King experienced between 1982 and 1996 influenced his behavior between 2022 and 2024 or otherwise mitigate his guilt.

## VI. KING'S UNSEIZED FUNDS SHOULD BE APPLIED TO RESTITUTION AND/OR FORFEITURE

While this Court has the discretion to impose a fine as part of King's sentencing based on his current assets, the government asks that King instead be ordered to apply any available funds to his restitution obligations.

A defendant who has been found guilty of an offense "*may* be sentenced to pay a fine." 18 U.S.C. § 3571(a) (emphasis added). "In determining *whether* to impose a fine," several factors are to be considered, including the defendant's financial resources and amount of restitution ordered. 18 U.S.C. § 3572(a)(4) (emphasis added). "If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine . . . only to the extent that such fine . . . will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b). The guidelines state that a fine "shall" be imposed "in all cases" except where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a). Similar to the governing statute, factors to be considered under the guidelines are the defendant's ability to pay and any restitution she is obligated to make; however, these considerations are only relevant as to the amount of the fine, rather than whether a fine should be imposed. U.S.S.G. § 5E1.2(d)(2), (4). But the guidelines advise that "[t]he administration of the fine . . . may be dispensed with entirely upon a court determination of a present and future inability to pay any fine." *Id*. § 5E1.2 at comment (n. 3).

Here, Probation determined that King has a net worth of almost $16 million based on bank account balances that the government had not recovered. PSR ¶ 109. Those assets and corresponding values were derived from a spreadsheet recovered from King's home office, which the government listed in an August 2024 filing relating to King's detention. *See* ECF No. 83 at 7. The government seized that spreadsheet from a folder within King's home office upon the execution of a search warrant at King and Gehrke's residence shortly after their arrests. *Id*.

Of the assets listed in the PSR, the government seized the Captive Insurance Scottsdale Assurance Group Inc. account balance of $2,580,517. *See* PSR ¶ 109. The balances of the unseized accounts total approximately $13,387,999. *Id*.

King's plea agreement reflects an agreement to pay $605,690,110 in restitution to the federal and commercial insurers victimized by his offense conduct. [ECF No. 139 at 4-5]. This amount dramatically exceeds the value of his assets. Even assuming King will obtain gainful employment upon release from incarceration, the difference of over $590 million between his present assets and the restitution amount he agreed to pay is so vast as to be unbridgeable with any realistically expected future earnings. Accordingly, this Court should waive the imposition of a fine under § 5E1.2 and 18 U.S.C. § 3572(b) and order that King's present assets be applied to his restitution obligation.

## VII. CONCLUSION

Based on the considerations set forth above, the Court should adopt the 24-month variance requested by the government and order King to pay $605,690,110 in restitution, jointly and severally with his co-conspirators.

Respectfully submitted,

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
District of Arizona

LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By: */s/ Shane Butland*
SHANE BUTLAND
Trial Attorney

Criminal Division, Fraud Section
U.S. Department of Justice

Dated: October 1, 2025

CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

*s/ Shane Butland*
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section

.