**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

United States of America,<br>Plaintiff,<br>vs.<br>Alexandra Marie Tauken Gehrke,<br>Defendant.

No. **2:24-cr-01040-ROS**

Phoenix, Arizona<br>October 7, 2025

**BEFORE: THE HONORABLE ROSLYN O. SILVER, SENIOR JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING**

Official Court Reporter:<br>Christine M. Coaly, RMR, CRR<br>Sandra Day O'Connor U.S. Courthouse, Suite 312<br>401 West Washington Street, Spc 37<br>Phoenix, Arizona 85003-2151<br>(602) 322-7248

Proceedings Reported by Stenographic Court Reporter<br>Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:

U.S. DEPARTMENT OF JUSTICE
Public Integrity Division
By: **Mr. Shane R. Butland, Esq.**
1400 New York Ave., NW, 12th Fl.
Washington, D.C. 20005

U.S. ATTORNEY'S OFFICE
By: **Mr. Matthew Williams, Esq.**
2 Renaissance Square
40 N Central Ave., Ste. 1800
Phoenix, AZ 85004

For the Defendant:

LOWTHER WALKER, LLC
By: **Mr. Joshua S. Lowther, Esq.**
Centennial Tower
101 Marietta St., NW, Ste. 3650
Atlanta, GA 30303

**P R O C E E D I N G S**

COURTROOM DEPUTY: This is case number CR 2024-1040, United States of America versus Alexandra Marie Tauken Gehrke. This is the time set for sentencing.

Would the parties please announce for the record.

MR. BUTLAND: Good afternoon, Your Honor. Shane Butland on behalf of the Department of Justice's fraud section.

MR. WILLIAMS: And Matt Williams, U.S. Attorney's Office, Your Honor.

THE COURT: Thank you.

MR. LOWTHER: Good afternoon, Your Honor. Joshua Lowther for Ms. Gehrke. Ms. Gehrke is present at the lectern with me.

THE COURT: All right. Counsel, we have discussed quite a bit previously in a hearing, which has -- I think has allowed the Court, and all of us, to expedite this to a great extent.

I have one other question, though. I have the green sheets, I'm sure you do, and you know I'm reading everything from them. Is there any difference on the Medicare and the amount that is owed? That hasn't changed, right?

MR. BUTLAND: I'm sorry, Your Honor?

THE COURT: Do you know what I'm talking about?

MR. BUTLAND: I don't have the green sheet that you're referring to.

COURTROOM DEPUTY: The sentencing recommendation --

MR. BUTLAND: Oh.

COURTROOM DEPUTY: -- in the PSR.

THE COURT: Thank you.

MR. BUTLAND: So, Your Honor, there was a discrepancy in the restitution figure. I think that is on paragraph 4 of the PSR.

THE COURT: Well, what I'm looking at is this. This is what I'm going to read when I sentence the defendant.

Mr. Williams, can you help him out?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: I have this if you want to look at it. This may save us time.

Robert, why don't you hand it to them.

COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: I just want to make sure those numbers are correct so that I don't hear from you later that I have to amend the amount that is owing.

MR. BUTLAND: Okay. Yes, Your Honor. So the recommendation here that you have in the green sheet, that is an accurate number. The plea agreement, even though the loss amounts to each of the insurance providers was accurate, there is an error in the total calculation that was off by $45,000. Probation caught that. And that is reflected -- the accurate amount is reflected on the green sheet.

THE COURT: Okay. Thank you.

And with respect to the objections, you agree, and I've talked to the probation officer about it, there will be no fine.

That's an agreed decision, correct, Counsel?

MR. BUTLAND: I would ask -- I believe the defendant does have the ability to pay a fine, as reflected in my submissions, but I would ask that that amount be applied to restitution and/or forfeiture as opposed to a fine.

THE COURT: I don't think I can do that. It's either a fine, which is a penalty, or it's restitution, Counsel.

And what is your position?

MR. LOWTHER: Our position is Ms. Gehrke doesn't have the ability to pay a fine based on what was seized.

THE COURT: And we've asked -- or the probation officer asked for information as to whether or not she could pay the fine. I am -- you know, this has gone back and forth enough and I am not going to order a fine. There will be, of course, substantial restitution.

Now, the other -- one other issue was on the variance. And I have received multiple briefings on this. And let me hear from counsel.

MR. LOWTHER: Your Honor, briefly, based on everything we've already discussed and the pleadings, there has actually been substantial submissions in the case. And I know the

Court's informed. The presentence report is very thorough. So I want to underscore, or just emphasize just a few points in support of that.

Ms. Gehrke is 39 years old. She obviously has an education. She's worked gainfully in the medical industry before her conduct in this case, which as we talked about previously, was, given her age, was relatively short. She's led a law-abiding life, absent the substance abuse conduct, until she was 36. And the duration of this conspiracy was 18 months.

I've discussed her mental health and substance abuse issues in the sentencing submissions. And of course that's no excuse for her having committed the conduct, but, again, we submit, respectfully, that it clouded her judgment. She didn't handle anything the way that she could have. Nonetheless, it increased her penchant for making bad decisions, I guess is the best phrase I could use.

Present in court today is her family, her mother, children. And the Court's aware of the letters that we've submitted on Ms. Gehrke's behalf. Her family supports her. Her family loves her. And that is a good indication to the Court of what support system that she will have when she's eventually released from prison.

Again, she recognizes her conduct was wrong, and she recognizes that it was serious and it had a substantial effect

on the victims. I say victims, because it wasn't just Medicaid, Medicare. There were commercial payers involved to a much lesser extent. But she's remorseful. And there is no chance that she's going to be anything other than a law-abiding citizen when she reenters society. She's going to contribute to her community. And you can judge that for yourself, because she wants to make a statement, she wants to -- before the Court imposes sentence.

So for all of the reasons, again, and all of the pleadings, all of the submissions, and all the arguments already made, we believe that a sentence of 120 months imprisonment is sufficient but not greater than necessary to comply with all the purposes of 18 U.S.C. 3553(a).

THE COURT: And, Counsel, either counsel on that issue, which is the variance.

MR. BUTLAND: Yes, Your Honor. The government does not believe that a variance is warranted in this case based on the 3553(a) factors.

I won't belabor the facts of this case, we've submitted numerous briefs on these points, but starting with the nature of the offense. This is a historically egregious and impactful fraud scheme, one of the largest that's ever been prosecuted by the Department of Justice in the country, resulting in $1.2 billion of billings to Medicare and other federal healthcare programs and private insurers for expensive

allografts that were placed on elderly patients, many of them dying in hospice care. They were not medically necessary. And all of which were procured by kickbacks and bribes, making them ineligible for reimbursement by Medicare.

This defendant personally profited to her personal accounts over a hundred million dollars from that scheme, which she used to live a life of luxury, buying a $6 million mansion, luxury cars, gold and silver coins and bars, and other luxury items.

When you look at her history and characteristics, this defendant had the benefits that many other defendants who stand before you, likely had. She had a conflict-free childhood. She reported to probation that she did not suffer any trauma or abuse growing up. She had supportive parents. She had educational opportunity. She graduated from high school a year early. She did three years of post-secondary education.

And she was financially independent. She reported she was the owner of a property that was netting $7,000 per month prior to engaging in this type of conspiracy.

Defense counsel mentioned her substance abuse and psychiatric history. First of all, as Your Honor knows from the guidelines, substance abuse generally is not regarded as a factor that warrants any kind of variance.

And in terms of her psychiatric history, she reported having extensive psychiatric treatment dating from when she was

14 years old to address these issues. And there is no indication that any of her potential diagnoses contributed to these offenses, rather there is an abundance of evidence that it didn't. All of the things I mentioned --

THE COURT: Counsel, let me remind you there is an expert witness report by -- I'm sure if he had been unqualified, you would have brought it to my attention -- who disagrees with you. And why do you disagree with him?

MR. BUTLAND: Well, I guess, first, Ms. Gehrke herself reported that she had extensive psychiatric therapy starting when she was a teenager. The fact that these conditions were not diagnosed over the course of her treatment, but then were diagnosed after nine hours of interviews and self-assessments that relied on self-reported information, I think is somewhat suspect. This expert didn't spend a whole lot of time with Ms. Gehrke, and yet identified these various conditions that no other psychiatrists who she had seen had identified.

But, secondly, the suggestion that her ADHD or autism spectrum disorder contributed to her criminal conduct is just not borne out by the facts. She, as defense counsel said, led a law-abiding life for, basically, her entire life. These conditions didn't compel her to commit crimes in the past. In fact, she was academically successful. She was smart. She was an entrepreneur. And she was financially independent.

So I think when you look at the actual facts and the

evidence, it's difficult to say, if not impossible, that any of these conditions, you know, somehow compelled her to then orchestrate the largest healthcare fraud in the history of Arizona, and one of the largest in the United States history.

This defendant was savvy. She set up companies. She hired individuals to go out and identify these Medicare patients. None of these individuals who identified the patients had any medical training. She hired nurse practitioners, directed them to slap these grafts on the patients, regardless of whether they're medically necessary. She was receiving kickbacks per allograft that were placed on these dying patients. You know, this is not the conscience of somebody who, you know, is unable to function based on some of her prior psychiatric issues. This is somebody who was calculated and successfully was able to extract over $600 million from Medicare and other insurers in only 18 months.

The last point I'd like to make is in terms of deterrence for the 3553(a) factor. I think there are three different types of deterrence that we need to look at when imposing an appropriate sentence. First is just general deterrence in terms of other Medicare fraudsters. I submitted some examples of cases that were prosecuted elsewhere in the country to try to give Your Honor some guideposts as to what sentence might be appropriate.

This loss amount we're dealing with here eclipses any of those cases. And several of those defendants received 240 months -- a 240-month sentence, which is what the government is recommending here. So I think the sentence should put other potential Medicare fraudsters on notice that this is not a crime that is worth engaging.

Secondly, I think there is the aspect of specific deterrence in order to deter other fraudsters in the allograft space. As I noted in my memorandum, this -- despite this being over a billion dollar fraud, this was confined to the state of Arizona. There are similar schemes operating all over the country of which the government is aware, and it operates in the very similar fashion. So I think that there needs to be deterrence for those individuals too to stop engaging in this type of conduct.

And then, lastly, is the individual deterrence for Ms. Gehrke. Mr. Lowther said that, you know, she's not going to commit anymore crimes after her sentence is over. But when you look at the facts of this case, it took two audits from Medicare, $87 million in payment suspensions, and even after all of that when Ms. Gehrke had actual knowledge that what she was engaging in was fraud, she told probation she was still going to receive ten percent of the money that was brought in to her second marketing company called Viking Medical Marketing through 2025. So this is an individual who, despite all

indications that she was engaging in fraud, nevertheless, persisted and wanted to take the royalties after she exited the company.

So for those reasons, the government does not believe a variance is warranted, and we ask Your Honor to sentence the defendant to 240 months.

THE COURT: Thank you.

Counsel, reply.

MR. LOWTHER: Nothing further, Your Honor.

THE COURT: State your full name.

THE DEFENDANT: Alexandra Marie Tauken Gehrke.

THE COURT: And you pled guilty pursuant to a plea agreement.

THE DEFENDANT: I did.

THE COURT: It is now the judgment of the Court that you are guilty.

There is a presentence report. And you know we've talked about that quite a bit, right?

THE DEFENDANT: Correct.

THE COURT: Did you review the report?

THE DEFENDANT: I did.

THE COURT: Did you talk to your attorney about it?

THE DEFENDANT: I did.

THE COURT: Do you know of anything in the report now that is incorrect, other than what your counsel has brought to

my attention?

THE DEFENDANT: No, not that I'm aware of.

THE COURT: Anything else other than what we've talked about, Counsel?

MR. LOWTHER: No, Your Honor. Nothing else.

THE COURT: Counsel, any other --

MR. BUTLAND: No, Your Honor. Thank you.

THE COURT: All right. With respect to the separate downward adjustment, based upon our discussion under seal earlier, I will grant that reduction as recommended of 24 months.

And with respect to the variance, I will also grant a variance, but my variance will be for 30 months. And I will say that I was particularly interested in the government's position on the report that was filed by the psychiatrist, who was -- certainly is qualified. And the government doesn't say he isn't qualified.

But I do agree that -- and you've been very honest about the motivation. You were interested -- and I saw it a number of times -- in money, money, money. That's never a justification. And that certainly isn't any -- anywhere in the report, that I could tell, having any connection or any cause from Asperger's disease or depression. It is unmitigated greed, and there is no question about that, and that this has been very costly to everyone. And, obviously, for reasons that

counsel -- the government counsel has said, this is a very, very expensive, and not only expensive, but harmful fraud that was perpetrated, not just on the government, but also on individuals.

I have no reason, after my conversations with the government, to believe that you were aware or that you ordered anyone to administer the allografts on patients, the elderly patients, even if it was going to be harmful to them. What I read in the presentence report -- and was waiting for something else from the government that would indicate that somehow you were heartless when it comes to these potential individuals -- what you are and what you were is exactly how you have defined yourself. And congratulations on doing that. You were greedy. You were criminally greedy, to the extent that everyone has suffered, but particularly our Medicare agencies and the citizens of the United States and taxpayers.

I understand that Medicare and Medicaid and the interest on our debt amounts to about 80 percent of our -- of what the government has to pay every year. That's a lot of money. And this doesn't help. People have been complaining about Medicare fraud, Medicaid fraud, and something has to be done about it. And the United States government has done so here.

It's always interesting to me that people argue that their substance abuse should be an excuse for their crime. If

I were to allow a reduction in sentence based upon substance abuse, I think 50 percent of the cases that I sentence almost every week -- over 50 percent, I'd say 70 or 80 percent in federal court, because there is a lot of white-collar crime, I would be reducing sentences every day based upon that. That is no excuse.

You seem to understand that you have a problem, and that I have every reason to believe that you will address it, not only while you're incarcerated, because at least federally there are -- which is a benefit to having been sentenced federally -- there are a number of programs that are available for people with your kind of problem.

All right. So I'm going to have to do some calculations here.

So with 24 and then 30, where are we?

PROBATION OFFICER: 186.

MR. LOWTHER: And, Your Honor, Ms. Gehrke also has a statement when -- the appropriate time.

THE COURT: Yes, I'm going to hear from her.

All right. But, Counsel, are there any other disputes or issues you need to bring to my attention?

MR. LOWTHER: No, Your Honor.

THE COURT: Counsel?

MR. BUTLAND: Just some housekeeping matters after Ms. Gehrke gives her statement.

THE COURT: Okay. So what do you have to say?

THE DEFENDANT: Okay. Um, I stand here before you with a deep regret and a profound sense of responsibility for my actions. I wish I could take back all the damage that I've done, but I know that isn't possible. What I can do is speak honestly and take full responsibility for my actions. I harmed Medicare, TRICARE, other insurance companies, and the American taxpayer. I live with that knowledge every day and it weighs heavily on me.

I would like to also apologize to the victims, the patients, the families, and the healthcare community. I am guilty of what I did. I made choices driven by ambition and the desire to succeed. I crossed lines that I never should have approached. There is no excuse for it. I let down people who trusted me, and I lied to myself about the ethics of what I was doing. I'm deeply ashamed of the pain I caused, not only to those impacted by the fraud, but also my family, former colleagues, and others who believed in me.

I want to apologize to my family, to my husband, to my children, to my mother. I exposed my husband Jeff to incredible legal risks when I asked him to join the medical business, and if my husband had never met me, he wouldn't be in jail.

I harmed my stepchildren, Mya and Dante (phonetic), by providing a poor example, decreasing stability at home, and

depriving them of their father.

Mya and Dante, I'm so sorry your life is less because of me.

I am mortified at the harm and ongoing hardship I've caused my mother. As an only child, my mother relied on me after my father died and I utterly failed.

Mom, I'm so sorry I let you down, and I'm sorry that your life is harder because of me.

Over the past months while I've been incarcerated awaiting sentencing, I have had the opportunity to look introspectively on how I got here. Part of that reflection has included receiving a diagnosis for attention deficit hyperactivity disorder and autism spectrum disorder. I expected the ADHD, but I was surprised by the autism diagnosis. This new diagnosis has helped me to understand lifelong patterns and how I see the world, things I didn't used to have a name for but finally do now. This is not an excuse, however, it gives me an understanding of how I think.

Living with ADHD is like driving a race car with bicycle brakes. When you add in autism, causing difficulty reading people in situations, it makes for a lethal combination. I had no business running a healthcare company, cutting corners, and taking shortcuts. Again, it was like I was going 200 miles an hour.

We were growing so fast. And by the time I realized

that there are so many guidelines I had never considered, I panicked. Then I made the wrong decision. I ultra focused on sales and ignored everything else. When I should have stopped, I stepped on the gas. This was wrong. When I look back, it's hard to believe the enormous amount of damage that I caused in only 18 months. The decisions I made during that time were not just wrong but deeply out of character for the person whom I've always tried to be.

This conviction has already changed my life profoundly. I've had to face myself in ways I've never imagined. Once in jail, I straightened out my priorities. I had the profound epiphany about what truly matters in life. It's not material possessions, or wealth, or the greed that once drove me. It's people, to how astounding and relentless my mother's love is. It's family. It's all of the small things. All of the small things in life really are the big things, and I will never look at the world the same way.

During my time at the BOP, I plan to focus on self-development and my education. A member of my legal team has inspired me to become a paralegal, and I look to her as a mentor. I plan to get my paralegal certificate while incarcerated, and upon my release work as a paralegal for a lawyer. I think this new career path will provide stable employment for me, with direct oversight, and this will ensure I stay on the right path. I look forward to helping people

operate within the law.

I also plan to be the best wife, mother, and daughter that I can be. I intend to live with my husband and my mother in Phoenix.

Now, I know I can't undo what I did, however, I am committed to making amends in every way that I can. I understand the magnitude of this offense and I feel terrible. I feel terrible for the damage that I have caused. I assure you that this was an isolated period of my life, and I will take all of the appropriate steps to ensure that nothing like this will ever happen again. It was out of character for me and I am disgusted and appalled by what I did.

Again, I'm truly sorry for the victims, Medicare, the patients, their families, the American taxpayers, and the healthcare community. I am filled with remorse and riddled with guilt, and that is something I have to carry with me for the rest of my life.

Your Honor, thank you for listening, and I beg of you mercy.

THE COURT: Counsel.

MR. LOWTHER: Nothing else, Your Honor.

THE COURT: Counsel.

MR. BUTLAND: Nothing to that point, Your Honor.

THE COURT: Okay. All right. Well, I will say the reasons now for the variance which I have given you. If it's

not clear, I'll make it clear.

There certainly is evidence of your mental health problems. And I didn't see anything, as I said, from the government that disputed the expertise of the expert, and just that the government says that it doesn't make any sense. I find that it does. I also find that some of it doesn't. But it certainly does make sense that you could have been diagnosed for the first time after a very serious circumstance and activity in your life, so that's part of the reason.

And I, as I have said, if I had thought, as in some other cases, that you had a bad heart, in that you did not -- you were not concerned about those people who were in hospice, I might have felt better -- different about whether or not I would give you any departure.

I've talked to the government about it, as you know, and I don't see that as being the case. Whether you should have known, of course you should have known. It's serious. And the cost to the government and to these individuals, although we don't know exactly if they suffered, but it could have been they could have suffered.

And also your family. I see that you have an enduring family that has cared for you. It all has been provided to me and the government. And they, obviously, they care for you. They think you're a caring person and a loving person. Thus, I am giving you a variance, as I said, of 30 months.

Has your attorney done a good job for you?

THE DEFENDANT: Yes.

THE COURT: Anything else from the government?

MR. BUTLAND: No, Your Honor.

THE COURT: It is the judgment of the Court that the defendant is committed to the Bureau of Prisons for a term of 186 months.

And I recommend that you participate in the Bureau of Prisons Residential Drug Abuse Treatment Program, and any other such programs which are made available to you.

There is a special assessment of a hundred dollars. That's due today. Obviously, you can pay it while you're incarcerated.

And you are to pay restitution of 614,945 -- wait a minute. This is not right. Oh, I'm sorry. $614,945,420.01 to the following victims -- and I will set forth the amounts.

Medicare, 594,189 -- 549,189,182.27 --

PROBATION OFFICER: Your Honor.

THE COURT: I mean, I'm sorry, $594,189,182.27; TRICARE, $9,310,034.21; CHAMPVA, $77,918.16; Anthem Elevance, that's $542,404.07; Bankers Fidelity Life Insurance, $1,192,391.97; Blue Cross and Blue Shield, $1,991,780.88 -- that's Blue Cross and Blue Shield of Arizona; Blue Cross and Blue Shield, now, of Minnesota, $631,972.79; Blue Cross and Blue Shield of Nebraska, $252,156.71; Blue Cross and Blue

Shield of North Dakota, $230,140.95; Blue Cross of California, $177,541.08; CIGNA, $786,378.16; Humana, $1,845,232.48; Moda Health, $1,705,421.02; Mutual of Omaha Health Insurance, $205,998.11; National Association of Letter Carriers, $627,737.53; United Healthcare, $649,983.11; Western and Southern Life Insurance, $529,146.51.

Your restitution obligation is to be paid jointly and severally with the other defendants in this case until full restitution is paid.

You are to pay a total of $615,945,420.01 in criminal monetary penalties, due immediately.

Having assessed that you do not -- that you have the ability to pay, payment of the total criminal penalties is due as follows --

PROBATION OFFICER: Your Honor.

THE COURT: Yes.

PROBATION OFFICER: That amount that you just read off included the suggested fine.

THE COURT: Okay. So then the amount should be what?

PROBATION OFFICER: $614,945,520.01.

THE COURT: Again, 615 -- 600 -- 615,945,520.01 in criminal penalties.

PROBATION OFFICER: 614 million.

THE COURT: 14?

PROBATION OFFICER: 14.

THE COURT: All right. Let's start again.

$614,945,520.01 --

Does that take in the special assessment?

PROBATION OFFICER: Yes, that adds in the $100 special assessment.

THE COURT: Okay -- in criminal penalties, due immediately. And that I have already assessed that you have the ability to pay.

Payment of the total criminal monetary penalties is due as follows:

The balance is due in equal monthly installments of $2,500 over a period of 34 months, to commence 60 days after release from imprisonment.

And while you're incarcerated, the criminal monetary penalty is due at the rate of not less than $25 per quarter, and the payments shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.

Criminal monetary penalties shall be made to the Clerk of Court, with the address that's set forth in the order.

Payments should be credited to various monetary penalties imposed by the Court in the priority established by law.

The Court hereby waives the imposition of interest and penalties on any unpaid balance.

So upon release from imprisonment, you'll be placed on

supervised release for three years, 36 months.

While on supervision, you must comply with the mandatory and standard conditions of supervision. And they are in an order of this Court.

And of course it is important that you not commit another crime, federal, state, or local, during this time of supervision.

And within 72 hours of release from custody from the Bureau of Prisons, you will report to the probation office in the district in which you are released.

There are mandatory conditions. Again, you must not commit a crime, federal, state, or local.

You must not unlawfully possess a controlled substance. The use or possession of even marijuana, even if you have a physician's certification, is not permitted.

You must refrain from any unlawful use of a controlled substance. The use and possession of marijuana is also unlawful even if you have a prescription from a doctor.

Unless ordered by the Court, you must submit to drug testing within 15 days of your release from imprisonment, at least two periodic drug tests thereafter, as determined by the Court through the probation officer.

Counsel, there are standard conditions. Do you want me to read all of them or did you discuss them with your client?

MR. LOWTHER: We waive reading, Your Honor. I've discussed those with Ms. Gehrke and she understands them.

THE COURT: And you agree --

THE DEFENDANT: Yes.

THE COURT: -- you don't need for me to read them?

THE DEFENDANT: Correct.

THE COURT: You understand that you're bound by them, however?

THE DEFENDANT: I do.

THE COURT: The special conditions are as follows:

You must participate as instructed by the probation officer in a program of substance abuse treatment, which may include testing for substance abuse.

If substance abuse -- if substance use treatment includes inpatient treatment and you do not wish for such treatment, the probation officer must seek authorization from the Court. And you must contribute to the cost of that treatment, in as much as you can afford to do so.

You must submit to substance abuse testing. You must not attempt to obstruct that testing. Must contribute to the cost, again, in as much as you can afford it.

You must participate in a mental health treatment program, and participate in outpatient mental health treatment as determined to be necessary by medical and mental health professionals, and follow the treatment by those professionals.

You must take medicine as prescribed by the doctors, unless you object. And if you object, you are to notify the probation officer.

You must not use or possess any alcohol or alcoholic beverages.

You must submit your person, property, house, residence, vehicle, papers, or office to a search conducted by a probation officer. Failure to submit to a search may be grounds for revocation of release.

You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

You must provide the probation officer with access to any requested financial information, and authorize the release of the financial information. And the probation officer may share this information with the U.S. Attorney's Office.

Is there a question?

THE DEFENDANT: No. I'm following along on his computer what you're reading aloud.

THE COURT: You are prohibited from making major purchases over $500, incurring new financial obligations, or entering into any financial contracts without the prior approval of the probation officer.

You must cooperate in the collection of DNA as will be done through the probation officer.

If this judgment imposes a financial penalty, you must

pay the financial penalty in accordance with the schedule of payments. And it's a schedule set forth on the sheet of this judgment which I have read.

You must also notify the Court of any changes of economic circumstances that might affect your ability to pay this financial penalty.

You must make restitution. And that's pursuant to laws that are set forth in this judgment.

You must notify the Court of any material change of your economic circumstances and conditions that might affect your ability to make restitution, fines -- there is no fine -- or special assessment.

You must not communicate or otherwise interact with co-conspirators, and that is Ching and Jameson, without first obtaining permission of the probation officer.

PROBATION OFFICER: Your Honor, at the time that this presentence report was prepared, these two co-defendants were the only ones indicted other than her husband. So we would ask that this condition be all co-conspirators other than her husband.

THE COURT: You agree?

MR. BUTLAND: Yes. Thank you.

THE COURT: Do we have the names of those individuals, any other, that we can place in the judgment?

MR. BUTLAND: Yes. I can name all of them.

Carlos Ching, Bethany Jameson, Daylon Bennett, Ira Denny, Gina Palacios, Tyler Kontos, Joel Max Kupetz, and Jorge Kinds.

THE COURT: Thank you.

So you cannot have any contact with those individuals, any interaction of what -- of any sort without permission from the probation office, and, if necessary, the Court.

And there is a forfeiture obligation. And your interest in the following property shall be forfeited to the United States in a sum of money equal to approximately --

Is that -- there is no zeros after that; is that correct?

PROBATION OFFICER: Correct.

THE COURT: So it's -- after the six, it's zero, zero, correct?

PROBATION OFFICER: Correct.

THE COURT: -- $279,912,916 and no cents. And this represents the proceeds that you obtained directly and indirectly, possessed, owned, and exercised dominion or control over, and all assets identified in Exhibit 1 of the plea agreement.

And, Counsel, there has been no change to that exhibit, correct?

MR. BUTLAND: No, Your Honor. All of the items that we've identified for forfeiture were included in the order that

you issued on October 3rd. It's Document Entry -- Docket Entry 172.

THE COURT: And it is -- it is as I've said, it's the Exhibit 1 of the plea agreement, right? That's what is in my judgment here. I just want to make sure, because we don't want to have to make corrections later.

MR. BUTLAND: There is some --

THE COURT: Can you check that for me, please?

MR. BUTLAND: There were some slight variations. There were some items that were identified in the forfeiture allegations of the indictment that were included in the forfeiture order and were not in the plea agreement, I don't believe.

THE COURT: All right. So -- but what you've said is I signed an order for forfeiture, and that is accurate, right?

MR. BUTLAND: Correct.

THE COURT: Okay. What's the amount?

MR. BUTLAND: The amount that you identified was correct.

THE COURT: It is correct. Okay. And -- but the assets -- and I said the assets -- the assets are also set forth in that order, right?

MR. BUTLAND: Correct, Your Honor.

THE COURT: Okay. So not Exhibit Number 1 of the plea agreement.

Have you understood all of your obligations?

THE DEFENDANT: Yes.

THE COURT: Do you remember when you pled guilty that you waived your right to appeal?

THE DEFENDANT: Yes.

THE COURT: And was that a voluntary decision?

THE DEFENDANT: Yes.

THE COURT: So you were before another judge and you told the judge it was a voluntary decision?

THE DEFENDANT: Correct.

THE COURT: And today it still is a voluntary decision, correct?

THE DEFENDANT: Correct.

THE COURT: I find that you have knowingly and voluntarily waived your right to appeal. That's based upon the answers that you gave the judge when you pled guilty, and the answers you've given me in your conversation with me today.

Anything else?

MR. BUTLAND: Just one item with respect to restitution.

There are other co-conspirators who have been charged -- I named them off for you in the record -- and who will also be jointly and severally liable for restitution.

THE COURT: Yes.

MR. BUTLAND: In order to ensure that the Clerk's

Office apportions the restitution payments appropriately, the parties have proposed additional language to be included in the restitution order.

We spoke to Mr. Lowther about that before the hearing. He's in agreement. And we provided the language to the Court.

THE COURT: Okay. So after paragraph number 12: You must not communicate or otherwise interact with co-conspirators, there will be a 13: No defendant shall be released from his or her restitution liability or issued any refunds until:

Number 1. All victims to which you have -- you are liable have been paid in full;

Number 2. That you are personally -- that you have personally paid -- after you have paid -- the full amount of your -- of the judgment. Any forfeited property that may be restored or remitted shall reduce the total restitution balance owed to all of the victims, as well as any individual defendants' balance, to the extent that the individual defendants' balance exceeds the total amount as adjusted to reflect the restored or remitted funds.

Is that it, Counsel?

MR. BUTLAND: Yes, thank you.

THE COURT: Okay. Anything else, Counsel?

MR. LOWTHER: No, Your Honor, other than may I send your courtroom deputy a recommendation for designation --

THE COURT: Yes.
MR. LOWTHER: -- for the judgment?
THE COURT: Yes.
MR. LOWTHER: Thank you.
THE COURT: You don't have it yet or --
MR. LOWTHER: Well, I can do it now. I wanted to discuss it with Ms. Gehrke, but --
THE COURT: That's fine.
MR. LOWTHER: She's going to ask Federal Correctional Institution Waseca in Minnesota.
THE COURT: Okay.
COURTROOM DEPUTY: You'll need to place that on the record, Your Honor, if you're recommending that.
THE COURT: That is correct. So I will --
No objection from the government, I take it?
MR. BUTLAND: No objection.
THE COURT: All right. And counsel and the defendant have asked for placement for custody purposes, and I will allow that. And you don't quite know what it will be yet.
MR. LOWTHER: Thank you, Your Honor.
THE DEFENDANT: Waseca. We know.
MR. LOWTHER: We just -- she was making sure I made the recommendation, or notified you of the recommendation.
THE COURT: All right.
MR. LOWTHER: Thank you.

THE COURT: And it's been made and it's been ordered. And it will be part --

And how long do you think it's going to take before you'll know that?

MR. LOWTHER: I'm sorry. We know the recommendation now. I was saying I wanted to discuss it with Ms. Gehrke. She doesn't need to discuss it anymore. So we're asking for Federal Correctional Institution Waseca in Minnesota.

THE COURT: All right.

MR. LOWTHER: So if the Court will add that to the judgment, we'd appreciate it.

THE COURT: It's so done. It will be in the order.

MR. LOWTHER: Thank you.

THE COURT: Anything else?

MR. LOWTHER: Nothing else, Your Honor.

THE COURT: We're adjourned.

MR. BUTLAND: I'm sorry, Your Honor, one last thing to place on the record.

The government just formally dismissed Counts 2 through 4, 6, and 8 through 10 of the indictment with respect to this defendant now that she's been sentenced.

THE COURT: Thank you. We're adjourned.

(Proceedings concluded.)

* * *

C E R T I F I C A T E

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 8th day of October, 2025.

/s/ Christine M. Coaly________
Christine M. Coaly, RMR, CRR