**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

United States of America, Plaintiff, vs. Jeffrey Amos King, Defendant.

No. **2:24-cr-01040-ROS**

Phoenix, Arizona
October 10, 2025

**BEFORE: THE HONORABLE ROSLYN O. SILVER, SENIOR JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

## **A P P E A R A N C E S**

For the Plaintiff:

U.S. DEPARTMENT OF JUSTICE
Public Integrity Division
By: **Mr. Shane R. Butland, Esq.**
1400 New York Ave., NW, 12th Fl.
Washington, D.C. 20005

U.S. ATTORNEY'S OFFICE
By: **Mr. Matthew Williams, Esq.**
2 Renaissance Square
40 N Central Ave., Ste. 1800
Phoenix, AZ 85004

For the Defendant:

RAFFERTY LAW, LLC
By: **Mr. Brian T. Rafferty, Esq.**
1575 Johnson Rd., NE
Atlanta, GA 30306

**P R O C E E D I N G S**

COURTROOM DEPUTY: This is case number CR 2024-1040, United States of America versus Jeffrey Amos King. This is the time set for sentencing.

Would the parties please announce for the record.

MR. BUTLAND: Good afternoon, Your Honor. Shane Butland and co-counsel Matthew Williams on behalf of the government.

THE COURT: Thank you.

MR. RAFFERTY: Good afternoon, Your Honor. Brian Rafferty on behalf of Mr. King.

THE COURT: Thank you. Please be seated.

And the government has no objection to Mr. King sitting during this proceeding. I understand that --

MR. BUTLAND: No objection.

THE COURT: -- he has an ailment which does not allow him to stand properly.

All right. And, Mr. King, state your full name.

THE DEFENDANT: Yes, Your Honor. Jeffrey Amos King.

THE COURT: You've pled guilty pursuant to a plea agreement.

THE DEFENDANT: Yes, Your Honor.

THE COURT: It's now the judgment of the Court that you are guilty.

Do you know what a presentence report is?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And one was prepared. Did you review it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did you review it with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Rafferty, so there have been some objections made to the report which the presentence officer responded to.

And so objection number one that was made by your counsel is -- has been corrected, or there have been -- there is appropriate information -- or inappropriate information was removed.

And objection number two has been resolved against you by the probation officer, and I accept it.

Objection number three was responded to by the government and the probation officer, and it was resolved against you, and I accept that.

Are there any other objections to the presentence report?

THE DEFENDANT: No, Your Honor.

MR. RAFFERTY: No, Your Honor.

THE COURT: And from the government?

MR. BUTLAND: No, Your Honor.

THE COURT: All right. I have received a sentencing memorandum. And there has been a request -- or a

recommendation by the probation officer for a variance pursuant to 18 United States Code, Section 3553(a), in view of the defendant's background prior to this incident -- or this crime.

The government has objected to it.

Is there anything else you would like to say, Mr. Rafferty?

MR. RAFFERTY: Yes. Yes, Your Honor. If I might come to the podium?

THE COURT: Yes. It's up to you.

MR. RAFFERTY: Thank you.

And, Your Honor, in addition to speaking to Mr. King's personal history and characteristics, we do have some folks that would like to speak here on behalf of Mr. King, specifically, his daughter, his son, his sister, a former colleague, and a former faculty member. And then before the Court pronounces sentence, Mr. King would like to make a statement to the Court.

You know, Your Honor, I've spilled a lot of ink in drafting my sentencing memo. I know it was lengthy. And I just want to thank the Court. I know how much time the Court took to review it. And in, you know, all my years, I've never had a client who had quite the history, personally, that was reflected in our sentencing memo and in the report of Dr. Brookham.

When we were interviewed by Ms. White for the

presentence report, we actually couldn't get through all of Mr. King's personal history and had to do two sessions with her, because there was that much information that Mr. King was sharing with her.

His personal history and background is horrific. It is. He grew up in a home that was broken, a mother who was a drug addict. He was physically abused by multiple members of his own family, sexually abused by a friend. He was in and out of what you would call institutions, at times thinking of suicide.

He lived a life that we wouldn't wish on our worst enemies as a child. Yet, he was able to get through it. He was able to lift himself up, and he was able to create a life for himself. And he did it in the most honorable way. He enlisted as an infantryman in the United States Army.

He was proud to be a member of our armed services. He trained. He planned on being deployed. He married at 18. But the very mother who abused him, abandoned him, who treated him horribly, became very ill, ironically enough, ill enough that she had wounds just like the wounds at issue in this case that Mr. King insisted placing wound care products on.

He got special permission to leave the Army because he needed to take care of her, because there was nobody else there to take her. His sister will be here and describe how he was her caregiver. He took care of the mother who abandoned him.

And then he built a business, a successful business. After his wife divorced him, he focuses on this music business, Your Honor, that we spoke very lengthy about. And it was his passion. It remains his passion. It's what he loves to do. It's what he plans on doing when this is all over. He's done it his whole life.

And it was that business that allowed him to serve this community. You know, he didn't just play music and deejay. He helped kids that were sick. He let people come in and use instruments. He helped fellow veterans. He did a lot of really incredible things as a person outside of all of this.

And then he becomes a father to these two great kids that you're going to hear from, who love their dad, who spoke about their dad in their letters, and rely on him heavily. Even though they're both products of a divorce, those kids are great kids, and they rely so much on their dad. And they continue to rely on their dad even when he's where he is now. They speak to him often. He provides guidance. You'll get a chance to hear from them.

And the reason why this is all so important, Your Honor, is because, as I mentioned in my sentencing memo, personal history and characteristics under 3553 is a critical part, as this Court knows, in sentencing anyone. And although the government recognizes that Mr. King had this terrible life, unbelievably bad, the government's contention is: That's not

enough to qualify for a variance.

It's there where I vehemently disagree. There is no requirement anywhere, in the guidelines or anywhere else, that there be some causative relationship, as the government suggests, between a terrible childhood and upbringing and whatever crime you're standing before the Court to be sentenced for.

The point of all of this is personal history and characteristics under 3553 is critically important when the Court sentences an individual. And there is both a basis to depart based on somebody's background and history, but there is also a basis to vary. There is any number of cases out there that the Court could look to to see that people who have experienced things like this, they are deserving of some level of mitigation. It's not an excuse. I'm not excusing anything that Mr. King did here.

The Court said it well: This was an unbelievable fraud. It is. But Mr. King is deserving of mitigation because of what he has been before that he was able to get himself through, and what he will be when this is all over. And so I'd ask the Court to remember the words of Justice O'Connor when she said: People who have been through terrible backgrounds are deserving of some level of mitigation.

And so I would ask the Court to vary, to vary downward substantially based on what he's been through. Because a

variance, as I've suggested -- and I've suggested no more than 102 months -- a variance to that level would still require the Court to send a very clear message to Mr. King that you're going to prison, and you're going to prison for a long time. It would still send the same deterrent message to others that you don't want to do this, because even a guy like this who has been through everything he's been through is going to prison for a very long time.

And the last thing I'll say, Your Honor, you know, I tried to provide sort of how I got to 102 months. I thought it was helpful to sort of explain it to the Court. The way I get to 102 months is we have the probation officer's recommendation of 144, which is based largely on his personal history and characteristics. But you also have a, what we talked about in the sealed proceeding that the government has recommended a reduction for, and we also have the government's own motion for a variance based on his relative culpability as it relates to Ms. Gehrke.

The government points out that Mr. King was not the mastermind, Ms. Gehrke was. Ms. Gehrke was the one who planned this. Ms. Gehrke was the one who had the industry experience. Ms. Gehrke was far more culpable than Mr. King. That's the basis for their 24-month variance. If you add those numbers together, what we talked about in the sealed proceeding, the variance, you get 42 months. And that's -- those two items are

not taking into consideration with the probation department with its recommendation. Those are entirely separate.

So what I simply would submit to the Court is you take that recommendation from the government, you subtract it from what the probation office has already recommended, and you land at 102 months. I believe -- I submit that a sentence of 102 months is sufficient but not greater than necessary to meet all of the factors set forth in 3553.

Thank you.

THE COURT: Thank you. And you're going to call some witnesses?

MR. RAFFERTY: I'm sorry, Your Honor?

THE COURT: You're going to have people?

MR. RAFFERTY: Yes, I have some people that I could call at this time, if that's okay?

THE COURT: Yes. This would be the time.

MR. RAFFERTY: Could we start with Mya King.

And should they go to the podium, Your Honor?

THE WITNESS: Your Honor, thank you for the opportunity to speak. My name is Mya King.

And I'm here today as someone who deeply loves and respects the man before you, my father. He is a disabled veteran who served this country with honor. And this is the first time he's ever found himself on the wrong side of the law. One moment like this is really not who he is. It really

is an exception in an otherwise very exemplary life.

Sorry.

My father has always been my source of strength, wisdom, kindness, and guidance. Recently I have entered one of the most difficult chapters of my own life. I lost my job and I lost my home. Throughout all of it, just like when I was little, he has always been the one constant that I could rely on, and now more than ever I need his direction and his presence in my life.

He's not a threat to anybody. He's a person who has already sacrificed more than most people could imagine, and who now, I believe, needs compassion more than anything else. Please see the whole person. Please give him the fighting chance to return back to his dedicated family who will always be here to give him our utmost support, and to continue being the good man he's always been, and to please consider mercy.

Thank you for your time.

THE COURT: Thank you.

MR. RAFFERTY: Your Honor, at this time, we would call Dante King.

THE COURT: Thank you.

THE WITNESS: Hello, Your Honor. My name is Dante King. I am 15 years old.

My father Jeff King has been in jail for around a year and a half. It has affected me in ways I cannot describe. He

has always been a great dad and a role model my entire life. He has always been there for me no matter what.

He served his country in the Army for around two-and-a-half years before he had to leave early to take care of his sick mother.

He had built a music studio company from the ground up and stayed in Arizona to keep the family together.

He has always supported me no matter what, especially when I wanted to follow in his footsteps and join the Army as an officer.

He has always helped others. For example, he gave $500 to a homeless veteran to help him get off the streets.

Last year I went to a military-style college prep school in Carlsbad, California, named Army and Navy Academy. It was very hard to be there without -- to be there while he was locked away and not able to see me shine there at Army Navy Academy.

He has -- he has drilled good habits into me that I still use today. Before all of this, me and my dad used to be inseparable. We both liked many things. We used to go to music parks, go go-karting, bowling, snowboarding, go down to the shooting range, and go -- and go on motorcycle rides. And I love that we just used to hang out and watch movies together. I truly miss those times and want them back as soon as possible.

Please, Your Honor, have mercy on my dad and get him home soon. Thank you.

THE COURT: Thank you.

MR. RAFFERTY: At this time, we call Danielle Jacobs.

THE WITNESS: Good afternoon, Your Honor. My name is Danielle Jacobs.

I am Jeff's sister, and I love him very much, but I didn't meet him until I was older in life, because our mother became pregnant at age 15 and gave me up for adoption. I was whisked away out of Arizona and sent to Washington State to grow up with other people. But when DNA led me to Jeff, it was one of the greatest relationships that I have ever forged.

I'm here to provide a character reference for my brother, because I have come to know him as a steady, caring, and selfless presence to all the people around him. He's a man of strong character, integrity, and deep compassion.

One of those dedications is to his family. He has always been someone that we could rely on, but that commitment was especially evident the way he cared for our ailing mother, that same mother that abandoned both of us. He was there for her for every moment of need in her ending times. It's a difficult and demanding time to care for someone who is dying, but he never complained once. His actions during those years spoke volumes about his sense of responsibility, his capacity for empathy, and his deep love of his family.

He consistently puts the needs of others before his own. He is the kind of person who quietly steps up when it matters most, often without being asked, and brings that same level and care of reliability to all areas of his life.

He is hard working, honest, and thoughtful. He leads by example, and he takes full ownership of his actions. I too hope that you will grant him some mercy and remember some of the things that he went through in his formative years.

Thank you, Your Honor.

THE COURT: Thank you.

MR. RAFFERTY: Alejandro Gordillo. And, Your Honor, Mr. Gordillo sent me some notes for him to read from, but unfortunately I wasn't able to print them. I was here in the courthouse. So with the Court's permission, he has them on his phone.

THE COURT: Sure.

THE WITNESS: Good afternoon, Your Honor. My name is Alejandro Gordillo. And I've known Jeff for about ten years, first as a student, then as a colleague. I'm here to share a little bit about what I've seen of Jeff.

Jeff was one of the first persons that opened a real door for many -- many students at different colleges as sound engineers. When he opened up his business, he didn't just, you know, give you the space to work out of, he also was an incredible mentor, a person that showed up for you, and the

kind of mentor that shapes people and who they are today. What he did to me, he did to many other students in the colleges and the programs.

I am thankful to him because now I am an adjunct professor myself at different community colleges, and it all started with him seeing the potential in me. And I will always be grateful to him for that. And like I mentioned, he did that to many other students.

What always stood out to me about Jeff is that he genuinely cares for others. He is the type of people -- he's the type of person who loves others and likes to see the best in them. Jeff gave a lot of opportunities to many students before anyone else did, and that really means a lot.

Since everything that's happened, I've seen a man who understands the weight of everything. He's been open about wanting to make things right. And the only thing me and him talk about is him coming back to his beautiful passion that we have together.

I'm not here to excuse what happened and I know that accountability matters, but I also know the Jeff King I've known for years, someone caring, humble, and community-minded. He's made an impact on many of us, and I believe that he has more good to give to the -- to our music community here in town.

Thank you for your time.

THE COURT: Thank you.

MR. RAFFERTY: And the last witness is David Nichols.

THE WITNESS: Hello, Your Honor.

My name is David Nichols. I have known Jeffrey King for more than ten years. He's a colleague and a close friend of mine.

I'm sure you have many people that stand before you that have friends and family that they love and are distraught over the circumstances they find their loved ones in, men and women with children and loved ones who inadvertently must share the burden of the judgment. I'm not here to ask for leniency, because Jeff has people in his life that love and respect him. I'm also not here to debate what you've already adjudicated based on the true merits of this case.

I am here to share that in every dealing I've ever had with him, personally and professionally, he has never once given me pause to consider, or shown any side of himself that was anything but honorable to me and thoughtful in every interaction I have had with him over a decade.

To give you some reference of how quickly this all happened, I saw Jeff several times in a year prior to his wedding. He never mentioned to me anything about a healthcare business. We spoke only about his recording business and our children. The first and only time I met Lexie was the day they were married, and as you know, they were taken into custody

shortly after.

What I am here to plead is that I sincerely believe Jeff's crime is allowing himself to be in a situation that a reasonable person should have suspected was -- was suspect. And I -- I just hope you take that into consideration in making your decision today.

I care very deeply for Mr. King, and I thank you for allowing me to speak on his behalf.

THE COURT: Thank you.

MR. RAFFERTY: Your Honor, after, I'm sure the government has some points that they'd like to make, Mr. King would like to make a statement before the Court renders sentence.

Those are all the witnesses that I have.

THE COURT: All right. Mr. King, is there anything you'd like to say?

MR. RAFFERTY: If I could come up with him, Your Honor?

THE COURT: You can. And he can sit there if it's easier for him.

THE DEFENDANT: I'll be okay. Thank you.

Your Honor, I want to -- I want to thank the Court for allowing me to speak. I am here today to accept full responsibility for my actions. I know that my choices caused harm, and I'm deeply sorry for that. I don't stand here to

make excuses. I stand here to admit that I failed, to express my regret, and ask for the chance to rebuild my life.

I stand before you today filled with remorse, shame, and a deep sense of loss. I fully accept responsibility for my actions, and I sincerely apologize to this Court, to my family, and to my colleagues, and to all those who placed trust in me. I regret every decision that led me here --

I regret every decision that led me here and I will carry the weight of this mistake for the rest of my life. Others have already informed this Court about my difficult childhood and the pivotal role the military played in helping me turn my life around. I am ashamed that I did not live up to the oath that I swore as a soldier in the Army. I was trained to show up for others and protect what is right and to act with integrity. In this case, I did not meet those standards. I stayed silent when I should have spoke up. That is on me. That is something I will carry with me the rest of my life.

While in custody at CoreCivic, I have lived in unimaginable pain and regret. The weight of my actions has crushed me, and every day has been a battle with guilt and shame. I have failed the people I love most.

The hardest part has been facing the impact on my family. My children, Mya and Dante, have always been the center of my life. My daughter describes me as her pillar and the one who always supports her dreams. My son always told me

I was not just his dad but his best friend.

Miss you guys.

Instead of being the role model they deserve, I've become a cautionary tale. Seeing them struggle because of my mistakes has been more painful than anything I could ever describe.

I also know that I let down my community. As an audio engineer, I had people who trusted me as a mentor, and as a business owner, and as a friend. I built a music studio that provided young artists and engineers with a safe space to learn and grow. I took -- I took pride in taking interns and lifting up others. To have that work overshadowed by my wrongdoing is something I deeply regret. It's destroyed my reputation.

Your Honor, I do not seek to escape the consequences of my actions, but I beg you to consider the totality of my life, the sacrifices I've made, that I have overcome, and the remorse that consumes me every single day.

Your Honor, this moment is not about what I once did right, it is about what I did wrong and what I will do moving forward. I accept whatever sentence this Court imposes, and I will use that time to continue reflecting, growing, and proving through my actions that I can be a better person.

I promise -- my promise is simple. I will live the rest of my life with integrity, humility, and a commitment to serving others. I want my children to see that even in

failure, there can be redemption, and that the right way forward is always to take responsibility and do better.

Your Honor, I humbly submit myself before you today asking for mercy, not for myself, but for my family. I ask for your compassion in considering the impact this will have on them. I am broken but I am not beyond redemption. I only hope for a chance to rebuild, to continue providing for my family, and to prove that this does not define a lifetime of hard work and sacrifice and integrity.

Thank you.

THE COURT: Shawn, government.

MR. BUTLAND: Thank you, Your Honor.

We've had lengthy briefing in this matter, so I won't belabor every point that I've put in my papers, but in terms of 3553(a) factors, I think it bears repeating that this defendant managed and supervised one of the most financially impactful healthcare fraud schemes ever prosecuted. It involved over $1.1 billion billed to Medicare and other insurers for amniotic allografts that were placed on elderly Medicare beneficiaries, many of whom were terminally ill and dying, that were procured through kickbacks and bribes, and as I mentioned, oftentimes were not medically necessary at all.

The government has recognized that the co-defendant orchestrated the scheme, but this defendant had various roles in -- of the conspiracy, with increasing responsibility at each

stage. In the beginning, he began as one of the sales representatives who was responsible for going to these facilities with elderly Medicare beneficiaries, identifying patients for grafts to be applied, and then referring those patients to his -- first his wife's company.

He received kickbacks based on the number of grafts he ordered and applied to -- and that were applied to those patients. And then he started getting more responsibility. He started then presenting, along with his wife, at some of these training sessions for the sales representatives, training sessions in which the sales representatives were told to only order the largest, most expensive sizes of grafts, even, as his wife put it, for wounds the size of her little fingernail.

He told the sales reps that if the graft was too big, they could just fold it in half, but they needed to stick to the same size of the grafts. And we know it was because he wanted to maximize the Medicare reimbursement.

He then ultimately was the coowner of APX Mobile Medical, who was the medical practice that contracted the nurse practitioners to apply whatever grafts were ordered by the medically untrained sales representatives to these elderly Medicare beneficiaries. In that role, he controlled the bank accounts of that company. And those were the accounts through which all the Medicare reimbursements for these unnecessary claims went through.

The defendant diverted over $23 million of those Medicare reimbursements to himself and to others involved in the conspiracy, which was used to buy a $6 million house, hundreds of thousands of dollars worth of gold and silver, and watches, and a vehicle. Just to name a few of the assets purchased with the fraudulent funds.

In terms of the defendant's history and characteristics, there has been a lot of discussion, both here today and in the papers, concerning his horribly traumatic upbringing, and even through his teenage years. The government absolutely recognizes that this defendant had suffered incredible trauma, and I think he deserves a lot of credit for overcoming that, enlisting in the military, obtaining, I think it was five associate's degrees for music, starting a business, then becoming financially secure, having a family.

But I would be remiss if I didn't indicate that I believe defense counsel may have misstated the words of Justice Sandra Day O'Connor. She didn't say that anyone who suffered a disadvantaged background is deserving of a reduction, or deserving of a variance. The quote is: Defendants who commit criminal acts attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

And while I absolutely acknowledge the horrors that this defendant had to endure, I submit to the Court that there

has been no evidence that there is any relationship between what he experienced and his commission of these offenses. That's not even suggested necessarily by the defendant.

Even here today there was no causal connection that was offered. In the papers, it was that it was the defendant's love for his wife that caused him to persist in his criminal conduct. But there is no evidence that the continuation of that relationship was dependent on him in continuing his own involvement in this criminal conspiracy.

So while Your Honor is obligated to consider the defendant's history and characteristics, I will urge this Court not to put undue emphasis on that when the defendant lived a law-abiding life, overcoming that very trauma for the entire -- the entirety of his life before he became involved in this conspiracy.

The last thing I will offer is the government recommended a variance of 24 months based on the relative culpability between this defendant and his -- and the co-defendant. As we noted, Ms. Gehrke was the one who had the connections to the allograft distributor. She had prior experience in the medical field. She was fairly intimately involved with the day-to-day operations of the company. And she profited over $100 million, more than five times what this defendant had personally profited. And it is for those reasons that the government is recommending a sentence of 168 months to

reflect those disparate culpabilities.

But I will just repeat that this defendant also had a very important role in the scheme. I think without him, the magnitude of the conspiracy could not have taken place. And it is for those reasons that the government is recommending 168 months, and asks this Court to reject the variance requested by counsel, which is a 58 percent reduction from the guideline sentence.

THE COURT: So I referred to you as Shawn, but, Mr. Butland. Okay. So let me -- as you know, the sentence for Ms. Gehrke was 186 months.

MR. BUTLAND: That's correct.

THE COURT: So you're asking for a variance -- because that was a variance, as you know. That was a 30-month variance. So you're asking for a further variance?

MR. BUTLAND: Yes. The number --

THE COURT: So if we start -- we start at 240, and we have already -- we reduced that by 24, so we're 216.

And then you're asking?

MR. BUTLAND: For then a further variance to 168 months.

THE COURT: Okay. Well, once again, I will say this is, with all my experience as a judge, and with the U.S. Attorney's Office prior to that as a prosecutor, and the U.S. -- and the Department of Justice, this is -- and I'm not

one given to hyperbole, but this -- this is a shocking case to see that within, really, either 18 to 28 months, I guess, or 24 months, the loss in this case was $1,600,000,000, which is shocking, when you consider that Medicare, Medicaid, and I guess the interest in our deduction amounts to over 75 percent of our debt. And that fortunately -- and I don't -- I'm not criticizing the United States government or the Department of Justice at all, but it's unfortunate that this type of fraud can occur and that people can benefit from it in such a short period of time.

I've said before, and I say again, I've had a number of Medicare, medical care fraud cases, never amounting to anything like this. And that, of course, is what sets the guidelines. And if I thought it was accidental by the defendants, that they didn't know that they were going to gain as much, I might consider that they're maybe not as culpable as some of the others where the amount of fraud was only $300,000, or maybe half a million dollars, but that's not the case.

They were in it for greed. They were in it for what they hoped to be able to gain, and that they did gain, in a very short period of time. And then they were off -- made every effort to leave the country and escape prosecution for this. So they took advantage of this fraud. This fraud should never have occurred. There had to be some -- should be some stopgap somewhere so that we are not, as taxpayers, or as

citizens of the United States, funding frauds like this.

However, at the same time, I agree that Mr. King, there is a lot -- a lot of good things to say about him. And it's shocking to me that anyone like this would be before the Court facing as much as 20 years in prison, but it could be greater, could have been life in prison.

So, Mr. King, you did the right thing. The government gave you the opportunity to do the right thing. And you may continue to have the opportunity to even further reduce your sentence, but that's not -- that's not for me at all to say.

But, nonetheless -- and I have seen, over the 31 years that I've been a judge, many, many defendants who come before me with ADHD. If I gave them a reduction in sentence, I probably would be reducing some 90 percent of, at least the white-collar defendants that come in front of me. And if I gave every defendant a reduction in sentence because of substance abuse, that would come close to 100 percent. So it's not -- there is no basis for it.

I do understand, I do accept, as the government did, as your attorney, and your family very eloquently argued for you, that you were a different man before this only two-year period of time in your life; that you have done some very good things in your life; that you have no criminal background, and that I -- I also take into account, but -- and, yes, your background shaped your character. But I thought it was

interesting, I read everything in the report that was provided to me, very detailed, very well written report by the psychologist who evaluated you, but your character is that you're an intelligent person. You have abilities that other people don't. You have music abilities. You have family. Your family loves you. But that -- that only accounts for a certain amount.

It doesn't account for your activity here, which was that you gained, or attempted to gain -- I guess you did gain -- the government may have recovered a lot of the funds -- a staggering amount of money, because maybe it was Ms. Gehrke, it looks like it was, who discovered this potential fraud that -- because she was sophisticated enough to discover it, but you carried it out. It couldn't have been done without you. You were the operator. You were the corporate operator.

So I, frankly, don't see much difference between the two of you except I accept the government's information that you did have a lesser -- you had somewhat of a lesser involvement. And -- but I -- I was, to some extent, surprised that the -- the reduction that Mr. -- that Mr. Williams and Mr. Butland suggested, but I'm going to accept it at 168 months.

It is -- and I hope you now -- you now have the opportunity to make a difference in your life. And I know you complained about CoreCivic, everybody does. It's not the

Ritz-Carlton. It's not meant to be the Ritz-Carlton. But the Bureau of Prisons does have programs that are available. You're fortunate in this respect, that you're not being incarcerated in the state system.

The Federal Bureau of Prisons has exceptional programs that will assist you along your way, so that when you are released, you will do what you've told your family, you've told me, and you've told the government, you'll lead a law-abiding life.

It is, of course, quite a compliment to you for your service to the United States as a -- as a veteran. That means a lot to everyone, and particularly to me, but it's not enough to reduce your sentence any more.

So I'm going to sentence you, with the reduction, accepting the government's recommendation, based upon 18 United States Code, Section 3553(a), and your sentence will be 186 months.

MR. RAFFERTY: Your Honor, I think you said 186.

THE COURT: 168 months.

MR. RAFFERTY: Okay.

THE COURT: Yes. 168 months.

Has your attorney done a good job for you?

Mr. King?

THE DEFENDANT: Yeah. Yes, Your Honor.

THE COURT: And he has.

Anything else from the government?

MR. BUTLAND: No, Your Honor.

THE COURT: Please bring your client forward.

Is there anything else you'd like to say, Mr. King?

THE DEFENDANT: I'm -- I'm shocked.

THE COURT: Mr. Rafferty, can we proceed or would you like to talk to your client?

THE DEFENDANT: Am -- am I -- can I speak?

THE COURT: Why don't you sit down for a moment and collect yourself.

All right. We are in recess.

(Court stands in recess, 3:23 p.m. - 3:32 p.m.)

THE COURT: Mr. King, how are you feeling?

THE DEFENDANT: I'm --

THE COURT: Are you -- let me ask you. You're not feeling well, I can tell, but are you feeling well enough to go forward?

THE DEFENDANT: Yes, ma'am.

THE COURT: And, Mr. Rafferty, you agree?

MR. RAFFERTY: Yes.

THE COURT: No disagreement, Counsel?

MR. BUTLAND: No, Your Honor.

THE COURT: All right. I've considered everything that's been brought to my attention, the guideline range, the reductions that are appropriate in this case for a variety of

different reasons, the Sentencing Reform Act.

It is the judgment of the Court that the defendant is committed to the custody of the Bureau of Prisons for 168 months.

And I recommend that you participate in the Residential Drug Treatment -- or Abuse Treatment Program.

You are to pay a special assessment of $100. And there will be no fine. That's been agreed to by both counsel.

Correct?

MR. BUTLAND: Yes, Your Honor, correct.

THE COURT: And you are to make restitution --

And is that the correct amount? Let me ask our probation officer.

PROBATION OFFICER: Yes, Your Honor, that is the correct amount. And there was no objection --

THE COURT: Okay.

PROBATION OFFICER: -- concerning that.

THE COURT: -- restitution in the amount of $605,690,110.49 to the following victims in the following amounts:

Medicare, $586,514,060.92; TRICARE, $8,513,164.84; Anthem Elevance, $666,982.65 --

PROBATION OFFICER: Your Honor, I believe it was 466,000.

THE COURT: I'm sorry. Thank you.

-- $466,982.65; Bankers Fidelity Life Insurance, $1,151,085.32; Blue Cross and Blue Shield of Arizona, $1,811,745.66; Blue Cross and Blue Shield Minneapolis, $475,889.87; Blue Cross and Blue Shield Nebraska, $252,156.71; Blue Cross and Blue Shield North Dakota, $230,140.95; Blue Cross and Blue Shield of California, $177,541.08; Cigna, $778,053.72; Humana, $1,707,083.54; Moda Health, $1,599,584.56; Mutual Omaha Health Insurance, $205,998.11; National Association of Letters Carriers, $627,737.53; United Healthcare, $649,739.52; Western and Southern Life Insurance, $529,146.41.

The defendant's restitution -- your restitution, Mr. King -- obligation shall be paid jointly and severally with all other defendants in this case until fully paid.

You are -- you shall pay a total of $605,690,210 and -- let me say that again -- $605,690,210.49 in monetary penalties, due immediately.

Having assessed the defendant's ability to pay, payment of the total criminal penalties is due as follows:

Balance is due in equal monthly installments of $2,000 over a period of 34 months, to commence 60 days after release from imprisonment.

You are incarcerated. So while you are incarcerated, you will pay no less than $25 per quarter while incarcerated in the Inmate Financial Responsibility Program, then the criminal

penalties will be paid to the Clerk of Court in Arizona.

Payment will be credited to various monetary penalties imposed by the Court in the priority established by law as set forth in the judgment.

The Court hereby waives interest and penalties on unpaid balance.

Now, when you are released from imprisonment, you'll be placed on supervised release for 36 months.

While on supervision, you shall comply with the mandatory and standard conditions of supervision as adopted by this order in a court order -- by this Court in an order of this Court.

Of particular importance, of course, you cannot violate any law, federal, state, or local for the terms of your supervision.

Within 72 hours of release from custody, you will report to the probation office in the district in which you are released.

There are mandatory conditions. You must not commit -- as I said earlier, the mandatory conditions, you may not -- you shall not commit another federal, state, or local crime.

You must not unlawfully possess controlled substances, and this includes marijuana, even if you have the permission of a physician.

And you must refrain from any unlawful use of controlled substances, and that includes marijuana, even if there is a prescription by a doctor.

And unless suspended by the Court, you must submit to one drug test within 15 days of release of imprisonment, and at least two periodic drug tests thereafter as determined by the Court.

Mr. Rafferty, there are a number of standard conditions. Do you wish that I read them?

MR. RAFFERTY: No, Your Honor.

THE COURT: And your client waives them?

MR. RAFFERTY: Yes, Your Honor. I will provide him a copy of the written commitment and go through those with him.

THE COURT: And discuss them with him. All right.

And you agree, Mr. King?

THE DEFENDANT: Yes, Your Honor.

THE COURT: There are special conditions, and they are as follows:

You must participate as instructed by the probation officer in a program of substance abuse treatment, which may include testing for substance abuse.

If the substance abuse treatment includes inpatient treatment and you object, the probation officer must seek a court order. And you are to contribute to the cost if you can afford to pay it.

You must submit to substance abuse testing. You must not attempt to obstruct or tamper with the testing methods. You shall contribute to the cost of the testing as you can pay it.

You must not use or possess alcohol or alcoholic beverages.

And you must seek mental health treatment as prescribed, that's either outpatient, or if prescribed by a doctor, inpatient treatment. And you must follow the treatment as designed by medical -- mental health provider.

And you must take the medication as prescribed. If you wish not to take the medication, you need permission from the probation officer and the Court, if necessary.

You must submit your person, property, house, residence, vehicle, papers, or office to a search conducted by a probation officer. Failure to submit to the search could be cause for revocation. And you are to let the occupants of the house know about this particular provision.

You must provide the probation officer with access to any requested financial information, and authorize release of any financial information. Probation officer will share this information, if it deems it necessary, to the U.S. Attorney's Office and Department of Justice.

You must -- you are prohibited from making major purchases over $500, incurring new obligations of a financial

nature, and entering into financial contracts unless the probation officer approves of it.

You must cooperate with the collection of DNA as directed by the probation officer.

You must make restitution in accordance with the law. And those statutes are set forth in the judgment.

You must notify the Court of any material change in your economic circumstances that could affect your ability to make restitution and pay fines.

You must not communicate or otherwise interact with any coconspirator, and that would be, in addition to Ms. Gehrke, right, Ching, Jameson, Bennett, Kontos, Kupetz, Kinds, Denny, Palacios --

And then we added some yesterday, Counsel. Are there any others?

MR. BUTLAND: I think that's the full list, Your Honor.

THE COURT: Okay. I think there are more on this one.

-- without first obtaining permission of the probation officer.

There is a forfeiture provision. You are -- your interest in the following property is forfeited:

A sum of money equal to $130,800 -- $130,813,658 and no cents. And this represents the proceeds that you obtained, either directly or indirectly, possessed, owned, and exercised

dominion and control over, and all assets identified in Exhibit 1 of the plea agreement.

Now, yesterday is that -- we did something with Exhibit 1. Is that correct, Counsel?

MR. BUTLAND: The plea agreement --

THE COURT: We have --

MR. BUTLAND: The plea agreement that was signed today was --

THE COURT: I have the new plea agreement. Does it have it?

MR. BUTLAND: It does.

THE COURT: Okay.

MR. BUTLAND: Defendant also signed a forfeiture stipulation right before this proceeding. A copy of that was provided to the Court. And we'll be filing a motion for final order of forfeiture based on that.

THE COURT: Okay. Will it be Exhibit 1?

MR. BUTLAND: It's a separate stipulation.

THE COURT: Okay. With a separate stipulation as set forth by the government, and that will be placed in the judgment.

Do you remember when you pled guilty in front of another judge that you waived your right to appeal?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you told the judge that was a

voluntary decision, right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And was it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did anyone force you to make that decision?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. I find that you have knowingly and voluntarily waived your right to appeal. That's based upon your answers to my questions and the answers you gave to the judge when you pled guilty. I wish you the best of luck.

And anything else from the government?

MR. BUTLAND: Now that the defendant is sentenced, we move to dismiss Counts 2, 3, 4, 5, 7, and 10 of the indictment against this defendant.

THE COURT: The motion is granted.

Anything else, Mr. Rafferty?

MR. RAFFERTY: Yes, Your Honor. Three things.

One, with the Court's permission, could the Court recommend that Mr. King be sentenced to the Safford FCI --

THE COURT: You mean he be placed in custody not sentenced.

MR. RAFFERTY: I mean, placed in custody, excuse me --

THE COURT: Yes.

MR. RAFFERTY: -- at Safford FCI, which I believe is

here in Arizona.

THE COURT: And I will do so. As you know, that can only be a recommendation.

MR. RAFFERTY: Understood.

THE COURT: But I think it's a lower level facility that they may decide is appropriate.

Anything else?

MR. RAFFERTY: Yes, Your Honor. Would the Court entertain an application for bond for Mr. King at this time?

THE COURT: You talked to the -- bond?

MR. RAFFERTY: He's been --

THE COURT: Have you talked to the government?

MR. RAFFERTY: He's been detained by the Court for some time, and what we're requesting, Your Honor, is would the Court consider granting a bond so that Mr. King can get his affairs in order before he surrenders to Safford?

MR. BUTLAND: Judge, at this point, I don't know if there has been a change of circumstances to warrant a bond. If counsel wants to --

THE COURT: If you want to file a motion, that's different. We've been through this before, so -- and the government has not agreed to it, so you're going to have to file a motion.

Anything else?

MR. RAFFERTY: Last thing, Your Honor, it's an unusual

request. Mr. King has not had a chance to hug his children in 480 days. When he visits with them at the facility, it's between glass. And so they are here. And what I would ask is would the Court permit Mr. King to just give his children a hug before he's taken away?

THE COURT: And I appreciate that, Mr. Rafferty, but that's not my decision. We have court security officers. We have our marshals here. And oftentimes they don't agree to it. They can discuss it with the government. I have no problem, but the marshals and the United States government must agree.

MR. RAFFERTY: Thank you, Your Honor.

THE COURT: Anything else from the government?

MR. BUTLAND: Just the last thing. With respect to the restitution order, there is some additional language proposed. We also added it to Ms. Gehrke's yesterday. The parties have agreed to it. It's identical language. We just ask that that be a part of the restitution order.

THE COURT: And you agree to this language?

MR. RAFFERTY: Yes, Your Honor.

THE COURT: All right. The language is:

No defendant shall be released from his or her restitution liability or issued any refunds until all victims to which the defendant is liable have been paid in full; and

Number 2. That the defendant has personally paid the full amount of his judgment. Any forfeited property that may

be restored or remitted shall reduce the total restitution balance owed to the victims, as well as any individual defendant's balance, to the extent that the individual defendant's balance exceeds the total balance as adjusted to reflect the restored or remitted funds.

Is that correct, Mr. Butland?

MR. BUTLAND: Yes, Your Honor. Thank you.

THE COURT: Anything else now from the government?

MR. BUTLAND: No, Your Honor.

THE COURT: And, Mr. Rafferty?

MR. RAFFERTY: No, Your Honor.

THE COURT: We're adjourned.

(Proceedings concluded.)

* * *

C E R T I F I C A T E

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 14th day of October, 2025.

/s/ Christine M. Coaly
Christine M. Coaly, RMR, CRR